# EXHIBIT 3

## DEFENDANTS' PROPOSED CONSTRUCTIONS FOR DISPUTED CLAIM TERMS AND EVIDENTIARY SUPPORT

| Claims | Disputed Claim Term | Defendants' Proposed Construction | Evidentiary Support |
|---|---|---|---|
| 1, 40 | "a computer implemented sales system used to facilitate a sales process" | "a computer providing salesperson support during a sales process" | **Intrinsic Evidence:**<br><br>*Specification*<br>Figs. 1-2; Abstract, 1:5-9, 3:60-64, 4:16-18, 4:57-63, 5:31-34, 5:65 to 6:5, 6:18-23, 6:26-30, 6:49-52, 6:64-65, 7:43-44, 7:58-61, 7:65-8:2, 9:26-28, 9:46-48, 9:60-66, 11:3-8, 12:13-21, 12:24-31, 12:51-55, 13:7-10, 14:21-24, 14:64 to 15:1, 16:36-37, 17:19-22, 17:59-64, 19:12-14, 21:25-29, 21:60-62, 24:31-41, 27:63 to 28:1, 30:19-23, 30:35-43, 33:8-11, 33:14-17, 33:26-29, 34:36-50, 35:40-44, 35:63, 35:65, 36:9, 36:29-30, 36:35-36, 36:42-44, 36:49-52, 36:53-54, 36: 58-59, 36:60-61, 36:64-65, 36:66-67, 37:6-7, 37:13-14, 37:35, 37:44, 37:55-58, 37:61-64, 38:35-36, 38:48-49, 38:55-56, 38:61-62, 39:1, 39:8.<br><br>*Prosecution History*<br>12-10-97 Amendment, pp. 15-16<br>07-14-98 Amendment, p. 3, pp. 5-7<br>10-25-99 Amendment, pp. 3-4<br><br>**Extrinsic Evidence:**<br><br>Webster's, p. 690 – facilitate: 1. to make easier or less difficult; help forward (an action, a process, etc.); 2. to assist the progress of (a person).  See Exh. 3-A. |

| Claims | Disputed Claim Term | Defendants' Proposed Construction | Evidentiary Support |
|---|---|---|---|
| 20 | "facilitating a sales process using a computer arrangement" | "using a computer providing salesperson support during a sales process" | **Intrinsic Evidence:**<br><br>*Specification*<br>Figs. 1-2; Abstract, 1:5-9, 3:60-64, 4:16-18, 4:57-63, 5:31-34, 5:65 to 6:5, 6:18-23, 6:26-30, 6:49-52, 6:64-65, 7:43-44, 7:58-8:19, 9:26-28, 9:46-48, 9:54-10:5, 9:60-66, 11:3-8, 12:13-21, 12:24-31, 12:51-55, 13:7-10, 14:21-24, 14:64 to 15:1, 16:36-37, 17:19-22, 17:59-64, 19:12-14, 21:25-29, 21:52-65, 24:31-41, 27:63 to 28:1, 30:19-23, 30:35-43, 33:8-11, 33:14-17, 33:26-29, 34:36-50, 35:40-44, 35:63, 35:65, 36:9, 36:29-30, 36:35-36, 36:42-44, 36:49-52, 36:53-54, 36: 58-59, 36:60-61, 36:64-65, 36:66-67, 37:6-7, 37:13-14, 37:35, 37:44, 37:55-58, 37:61-64, 38:35-36, 38:48-49, 38:55-56, 38:61-62, 39:1, 39:8.<br><br>*Prosecution History*<br>12-10-97 Amendment, pp. 15-16<br>07-14-98 Amendment, p. 3, pp. 5-7<br>10-25-99 Amendment, pp. 3-4<br><br>**Extrinsic Evidence:**<br><br>Webster's, p. 690 – facilitate: 1. to make easier or less difficult; help forward (an action, a process, etc.); 2. to assist the progress of (a person).  See Exh. 3-A. |
| 1-3, 20, 21, 24-25, 40 | "sales process" | the lead generation, time with customer, order management, and customer retention phases of selling | **Intrinsic Evidence:**<br><br>*Specification*<br>Figs. 1-2, Fig. 21A-21E, 1:10-61, 1:62- |

| Claims | Disputed Claim Term | Defendants' Proposed Construction | Evidentiary Support |
|---|---|---|---|
| | | | 2:5, 2:6-19, 2:25-34, 3:60-61, 4:12-16, 4:21 to 6:25, 4:16-18, 7:43-44, 7:65 to 8:2, 10:28-30, 13:52-59, 17:56-58, 19:49-52, 27:29-32, 27:63-65, 30:13-17, 35:25-34, 35:44-49.<br><br>*Prosecution History*<br>12-15-97 Amendment, pp. 15-16<br>07-14-98 Amendment, pp. 5-6<br>09-09-98 Interview Summary |
| 1, 3, 4, 40 | "event occurring within the system"; "event occurring in the system" | a hardware or software operation that has occurred internal to the sales system | **Intrinsic Evidence:**<br><br>*Specification*<br>6:34-48; 30:12-23; 30:29-58; 31:26-43; 36:3-4; 39:18-19<br><br>Prosecution History:<br>12-10-97 Amendment, pp. 2, 8<br>07-14-98 Amendment p. 2<br><br>12/412,455 App., pp. 258-67 (original claims) |
| 20, 25 | "event occurring in the sales process" | a salesperson's action that has occurred external to the sales system | **Intrinsic Evidence:**<br><br>*Specification*<br>2:14-18; 2:35-38; 2:44-47; 11:29-38; 37:38-39; 37:49-50<br><br>*Prosecution History*<br>12-17-97 Amendment, p. 7<br><br>09/566,872 App., p. 192-94 (original claims) |

| Claims | Disputed Claim Term | Defendants' Proposed Construction | Evidentiary Support |
|---|---|---|---|
| | | | 12/412,455 App., p. 258-67 (original claims) ("the event comprises a purchased item or service purchased by a customer actually being, at least one of, ordered, processed, built, manufactured or delivered.") |
| 1, 20, 40 | "changes in state characteristic of an event" | "a change in a unique configuration of information within the event manager database that is indicative of the occurrence of an event within the system" | **Intrinsic Evidence:**<br><br>*Specification*<br>Fig. 19, 32:13-28, 32:46-56; 32:57-33:17<br><br>*Prosecution History*<br>12-10-97 Amendment, pp. 15-16<br>07-14-98 Amendment, p. 3-7<br>10-25-99 Amendment, pp. 2-5 |
| 1-4, 20, 24, 25, 40 | "context" | "customer-related information already existing within the system that becomes relevant upon the occurrence of an event" | **Intrinsic Evidence:**<br><br>*Specification*<br>15:4-16, 17:26-37, 19:29-35, 27:41-62, 27:63 to 28:5, 32:46 to 33:4, 32:58-59<br><br>*Prosecution History*<br>12-10-97 Amendment, pp. 15-16<br>07-14-98 Amendment, pp. 3-6<br>10-25-99 Amendment, pp. 3-4 |
| 1, 20, 40 | "inferring . . . a context" | "logical process by which the significance of customer-related information already existing within the system is evaluated with respect to the event by application of logical rules to the detected changes in state" | **Intrinsic Evidence:**<br><br>*Specification*<br>Fig. 19, 2:30-44, 8:36-39, 15:4-16, 17:26-37, 18:41-49, 19:20-35, 27:41-62, 30:66-31:10, 32:14-33:30, 33:63-34:62, 36:5-7, 37:40-42, 39:20-22<br><br>*Prosecution History* |

| Claims | Disputed Claim Term | Defendants' Proposed Construction | Evidentiary Support |
|--------|---------------------|-----------------------------------|---------------------|
|        |                     |                                   | 12-10-97 Amendment, pp. 15-16 <br> 07-14-98 Amendment, p. 3-7 <br> 10-25-99 Amendment, pp. 2-5 <br><br> 09/566,872 App., 09-15-06 Amendment, pp. 7-8 <br><br> **Extrinsic Evidence:** <br><br> Microsoft Press Computer Dictionary, p. 210 - Inference:  "The process of formulating a conclusion based on specific information…This process typically takes place either through application of the formal rules of logic or through statistical generalization from a set of observations.  Inference is a feature of expert systems built around a program called an inference engine, which matches propositions with facts compiled in a knowledge base (database) and then derives a conclusion based on the facts that agree with (confirm) the propositions."  See Exh. 3-B. <br><br> Wordnet (http://wordnet.princeton.edu) – Inference:  "the reasoning involved in drawing a conclusion or making a logical judgment on the basis of circumstantial evidence and prior conclusions rather than on the basis of direct observation." <br><br> 6/10/08 Johnson Dep. Tr., 178:1-182:7, 196:4-197:12, 233:15-235:22, 245:20-246:10.  See Exh. 3-C. |

| Claims | Disputed Claim Term | Defendants' Proposed Construction | Evidentiary Support |
|--------|---------------------|-----------------------------------|---------------------|
| | | | |
| 1, 20, 40 | "automatically initiating" / "automatically initiate" | "automatically" is *Indefinite* | **Intrinsic Evidence:**<br><br>*Specification*<br>4: 46-51, 6:34-41, 8:37-40, 12:58-65, 13:49-51, 15:6-11, 16:40 to 17:14, 17:29-32, 18:37-49, 27:446-49, 29:22-35, 31:26-38, 32:46-56, 33:24-26<br><br>*Prosecution History*<br>12-10-97 Amendment, pp. 15-16<br>07-14-98 Amendment, p. 3-7<br>10-25-99 Amendment, pp. 2-5 |
| 1, 20, 40 | "automatically initiating an operation . . . based on the inferred context"<br><br>"automatically initiate an operation . . . based on the inferred context" | "automatically" is *Indefinite* (see above)<br><br>"based on the inferred context" is "using customer-related information already existing within the system to  inform the system as to whether to proceed and what the next step should be" | **Intrinsic Evidence:**<br><br>*Specification*<br>8:36-39, 18:41-54, 32:14-33:30, 33:63-34:62, 36:8-10, 37:43-45, 40:26-28<br><br>*Prosecution History*<br>12-10-97 Amendment, pp. 15-16<br>07-14-98 Amendment, pp. 4-7<br>10-25-99 Amendment, pp. 2-5<br><br>**Extrinsic Evidence:**<br>6/10/08 Johnson Dep. Tr., 221:4-222:24. See Exh. 3-C. |
| **Claims** | **Disputed Claim Term governed by §112, ¶6** | **Defendants' Proposed Construction** | **Evidentiary Support** |
| 1, 20, 40 | "a plurality of subsystems configured to facilitate one or more actions performed during at least one phase of the sales process" | *Means plus function term*<br><br>**35 USC 112 ¶ 6 function**:<br><br>• facilitat[ing] one or more actions | **Intrinsic Evidence:**<br><br>*Specification*<br>Abstract; Figs. 1-6, 19, 20, 22, 21A-21D; 1:5-9; 1:40-2:18; 2:22-34; 2:62-3:6, 3:51- |

| Claims | Disputed Claim Term | Defendants' Proposed Construction | Evidentiary Support |
|---|---|---|---|
| | "a plurality of subsystems configured to electronically facilitate actions performed during the sales process" | performed during at least one phase of the sales process<br><br>**35 USC 112 ¶ 6 structure**:<br><br>• Lead Generation component with API 102 & 202A<br><br>• Time With Customer component with API 104 & 204A<br><br>• Order Management component with API 106 & 206A<br><br>• Customer Retention component with API 108 & 208A | -4:3, 4:11-18, 4:21-6:25, 8:22-28, 10:6-11; 10:55-11:63; 11:64-17:37; 17:38-18:54; 18:55-19:47; 27:16-20; 28:15-43; 30:12-65; 30:66-31:50; 32:13-33:30.<br><br>*Prosecution History*<br>12-10-97 Amendment, pp. 15-16<br>07-14-98 Amendment, pp. 2-7<br><br>**Extrinsic Evidence:**<br><br>6/10/08 Johnson Dep. Tr., 226:17-227:25, 229:4-230:22, 230:23-232:8<br><br>"subsystem": "a secondary or subordinate system." Webster's New Universal Unabridged Dictionary (1996). See Exh. 3-D.<br><br>"subsystem": "(4) (software) a secondary or subordinate system with a larger system." The New IEEE Standard Dictionary of Electrical and Electronics Terms (5 ed.). See Exh. 3-E.<br><br>"subsystem": "a major part of a system which itself has the characteristics of a system, usually consisting of several components." McGraw-Hill Dictionary of Scientific and Technical Terms (5 ed.). See Exh. 3-F.<br><br>Defendants will submit an expert |

| Claims | Disputed Claim Term | Defendants' Proposed Construction | Evidentiary Support |
|---|---|---|---|
| | | | Declaration of Dr. Philip Greenspun in support of their P.R. 4-5(b) responsive claim construction brief regarding the meaning of "a plurality of subsystem configured to electronically facilitate actions performed during the sales process" to one skilled in the art and whether "a plurality of subsystem configured to electronically facilitate actions performed during the sales process" denotes sufficiently definite structure to one skilled in the art. |
| 1 | "an event manager, coupled to the subsystems, the event manager detecting one or more changes in state characteristic of an event occurring within the system, inferring occurrence of the event and a context in which the event occurred based at least in part on the detected changes in state, and automatically initiating an operation in one or more particular subsystems of the computer to facilitate a new action based on the inferred context" | *Means plus function term* <br><br> **35 USC 112 ¶ 6 functions**: <br><br> • detecting one or more changes in state characteristic of an event occurring within the system, <br><br> • inferring occurrence of the event and a context in which the event occurred based at least in part on the detected changes in state <br><br> • automatically initiating an operation in one or more particular subsystems of the computer to facilitate a new action based on the inferred context. | **<u>Intrinsic Evidence:</u>** <br><br> *Specification* <br> Figs. 2-6, 16, 19, 20, 21A-E, 22; 1:5-47; 1:62-2:18; 2:21-54; 3:36-37; 3:43-44; 3:51-59; 4:44-51; 5:4-12; 5:40-43; 5:60-64; 6:23-25; 7:15-18; 7:58-8:21; 8:22-58; 9:16-24; 10:35-38; 11:20-37; 12:58-65; 15:4-16; 16:18-20; 17:26-37; 18:37-54; 19:15-25; 19:26-34; 19:35-47; 19:61-20:7; 21:25-29; 22:15-18; 26:36-38; 27:9-24; 27:41-62; 28:37-29: 35; 30:13-31:50; 32:13-33:30; 33:31-34:67; 35:44-49. <br><br> *Prosecution History* <br> 12-10-97 Amendment, pp. 15-16 <br> 07-14-98 Amendment, pp. 1-7 <br> 10-25-99 Amendment pp. 2-5 <br><br> 09/566,872 App., 09-15-06 Amendment, |

| Claims | Disputed Claim Term | Defendants' Proposed Construction | Evidentiary Support |
|---|---|---|---|
| | | **35 USC 112 ¶ 6 structure:**<br><br>• event managing unit 1902<br><br>• event manager database 1904<br><br>• editor 1906<br><br>• monitoring unit 1908 | pp. 7-8; 10-05 Amendment, p. 7.<br><br>**Extrinsic Evidence:**<br><br>9/22/08 Krebsbach Dep. Tr. , 82-91.  See Exh. G.<br><br>9/25/08 Lundberg Dep. Tr., 62-79.  See Exh. H.<br><br>Defendants will submit an expert Declaration of Dr. Philip Greenspun in support of their P.R. 4-5(b) responsive claim construction brief regarding the meaning of "event manager" to one skilled in the art and whether "event manager" denotes sufficiently definite structure to one skilled in the art. |
| 40 | "an event manager coupled to the subsystems and configured to detect one or more changes in state characteristic of an event occurring in the system, infer occurrence of the event and a context in which the event occurred based at least in part on the detected changes in state, link the inferred event with an action to be performed during the sales process based on prior sales experience using the sales system, and automatically initiate an operation using one or more of the plurality of subsystems to facilitate the action to be performed based on the inferred context" | *Means plus function term*<br><br>**35 USC 112 ¶ 6 functions:**<br><br>• detecting one or more changes in state characteristic of an event occurring within the system,<br><br>• inferring occurrence of the event and a context in which the event occurred based at least in part on the detected changes in state<br><br>• link the inferred event with an action | **Intrinsic Evidence:**<br><br>Specification<br>Figs. 2-6, 16, 19, 20, 21A-E, 22; 1:5-47; 1:62-2:18; 2:21-54; 3:36-37; 3:43-44; 3:51-59; 4:44-51; 5:4-12; 5:40-43; 5:60-64; 6:23-25; 7:15-18; 7:58-8:21; 8:22-58; 9:16-24; 10:35-38; 11:20-37; 12:58-65; 15:4-16; 16:18-20; 17:26-37; 18:37-54; 19:15-25; 19:26-34; 19:35-47; 19:61-20:7; 21:25-29; 22:15-18; 26:36-38; 27:9-24; 27:41-62; 28:37-29: 35; 30:13-31:50; 32:13-33:30; 33:31-34:67; 35:44-49.<br><br>'625 Prosecution History: |

| Claims | Disputed Claim Term | Defendants' Proposed Construction | Evidentiary Support |
|--------|---------------------|-----------------------------------|---------------------|
| | | to be performed during the sales process based on prior sales experience using the sales system<br><br>• automatically initiating an operation in one or more particular subsystems of the computer to facilitate a new action based on the inferred context.<br><br>**35 USC 112 ¶ 6 structure**:<br><br>• event managing unit 1902<br><br>• event manager database 1904<br><br>• editor 1906<br><br>• monitoring unit 1908 | 12-10-97 Amendment, pp. 15-16<br>07-14-98 Amendment, pp. 1-7<br>10-25-99 Amendment pp. 2-5<br><br>09/566,872 App., 09-15-06 Amendment, pp. 7-8; 10-05 Amendment, p. 7.<br><br>**Extrinsic Evidence:**<br><br>9/22/08 Krebsbach Dep. Tr. , 82-91.  See Exh. G.<br><br>9/25/08 Lundberg Dep. Tr., 62-79.  See Exh. H.<br><br>Defendants will submit an expert Declaration of Dr. Philip Greenspun in support of their P.R. 4-5(b) responsive claim construction brief regarding the meaning of "event manager" to one skilled in the art and whether "event manager" denotes sufficiently definite structure to one skilled in the art. |

# EXHIBIT 3-A

# WEBSTER'S
## NEW UNIVERSAL
# UNABRIDGED
# DICTIONARY

The dictionary entries are based on the
Second Edition of *The Random House
Dictionary of the English Language*



BARNES
&NOBLE
BOOKS
NEW YORK

Acknowledgments and Permissions

The "A Dictionary of the English Language" section of this book
(*Webster's New Universal Unabridged Dictionary*) is based on the second edition of
*The Random House Dictionary of the English Language,*
*the Unabridged Edition,* copyright 1993, 1987.

Copyright 1996 by Random House Value Publishing, Inc.
All rights reserved under International and Pan-American Copyright Conventions.

No part of this book may be reproduced or transmitted in any form
or by any means electronic or mechanical including photocopying, recording,
or by any information storage and retrieval system, without permission
in writing from the publisher.

This edition published by Barnes & Noble, Inc.
by arrangement with Random House Value Publishing, Inc.

1996 Barnes & Noble Books

ISBN 0-7607-0288-8

Printed and bound in the United States of America

M  9  8  7  6  5

outer or upper side of a fixture; right side. **16.** the acting, striking, or working surface of an implement, tool, etc. **17.** *Geom.* any of the bounding surfaces of a solid figure: *a cube has six faces.* **18.** Also called working **face.** *Mining.* the front or end of a drift or excavation, where the material is being or was last mined. **19.** *Print.* **a.** the working surface of a type, of a plate, etc. See diag. under **type. b.** Also called **typeface.** any design of type, including a full range of characters, as letters, numbers, and marks of punctuation, in all sizes: *Caslon is one of the most popular faces.* See table under **typeface. c.** Also called **typeface.** the general style or appearance of type: *broad or narrow face.* **20.** *Naut., Aeron.* the rear or after side of a propeller blade (opposed to *back*). **21.** *Fort.* either of the two outer sides that form the salient angle of a bastion or the like. See diag. under bastion. **22.** *Crystall.* any of the plane surfaces of a crystal. **23.** *Electronics.* faceplate (def. 3). **24.** *Archaic.* sight; presence: *to flee from the face of the enemy.* **25. face to face,** a. facing or opposite one another: *We sat face to face at the table.* b. in an open, personal meeting or confrontation: *The leaders spoke face to face about a reduction in nuclear arms.* **26. face to face with,** in close proximity to; narrowly escaping; confronting: *face to face with death.* **27.** fly in the face of. See fly[1] (def. 21). **28. get out of someone's face** (usually used imperatively): *a. Southern U.S.* go away!; leave. **b.** *Slang.* to stop bothering or annoying someone. **29.** in the face of, a. in spite of; notwithstanding: *She persevered in the face of many obstacles.* **b.** when confronted with: *They were steadfast in the face of disaster.* **30.** lose face, to suffer disgrace, humiliation, or embarrassment: *It was impossible to apologize publicly without losing face.* **31.** make a face, to grimace, as in distaste or contempt; contort one's face in order to convey a feeling or to amuse another: *She made a face when she was told the work wasn't finished. The children made me laugh by making faces.* **32.** on the face of it, to outward appearances; superficially; seemingly: *On the face of it, there was no hope for a comeback.* **33.** put on a bold face, to give the appearance of confidence or assurance: *Everyone knew that he had been fired, even though he put on a bold face. Also,* **put a bold face on. 34. save face,** to avoid disgrace, humiliation, or embarrassment: *She tried to save face by saying that he still had never arrived.* **35. set one's face against,** to disapprove strongly of; oppose: *My parents have set their face against my becoming an actress.* **36.** show one's face, to make an appearance; be seen: *I would be ashamed to show my face in such an outlandish outfit. Just show your face at the party and then you can leave.* **37.** to one's face, in one's presence; brazenly; directly: *Tell him to his face that he's a liar!*

—**n. 38.** to look toward or in the direction of: *to face the light.* **39.** to have the front toward or permit a view of: *The building faces Fifth Avenue. The bedroom faces the park.* **40.** to confront directly: *to be faced with a problem; to face the future confidently.* **41.** to confront courageously, boldly, or impudently (usually fol. by *down* or *out*): *He could always face down his detractors.* **42.** to oppose or to meet defiantly: *to face fearful odds; Army faces Navy in today's football game.* **43.** to cover or partly cover with a different material in front: *They faced the old wooden house with brick.* **44.** to finish the edge of a garment with facing. **45.** to turn the face of (a playing card) upwards. **46.** to dress or smooth the surface of (a stone or the like). **47.** to cause (soldiers) to turn to the right, left, or in the opposite direction. **48.** *Ice Hockey.* (of a referee) to put (the puck) in play by dropping it between two opposing players each having his or her stick on the ice and facing the goal of the opponent.

—**v.i. 49.** to turn or be turned (often fol. by *to* or *toward*): *She faced toward the sea.* **50.** to be placed with the front in a certain direction (often fol. by *on, to,* or *toward*): *The house faces on the street. The barn faces south.* **51.** to turn to the right, left, or in the opposite direction: *Left face!* **52.** *Ice Hockey.* to face the puck (often fol. by *off*). **53.** face down, to confront boldly or intimidate (an opponent, critic, etc.). **54.** face off, *Ice Hockey.* to start a game or period with a face-off. **55.** face the music. See music (def. 9). **56.** face up to, a. to acknowledge; admit: *to face up to the facts.* b. to meet courageously; confront: *He refused to face up to his problems.* [1200–1300; (n.) ME < AF, OF < VL *facia,* for L *faciēs* faces; (v.) late ME *facen,* deriv. of the n.] —**Syn. 1.** FACE, COUNTENANCE, VISAGE refer to the front of the (usually human) head. The FACE is the combination of the features: *a face with broad cheekbones.* COUNTENANCE, a more formal word, denotes the face as it is affected by or reveals the state of mind, and hence often signifies the look or expression on the face: *a thoughtful countenance.* VISAGE, still more formal, refers to the face as seen in a certain aspect, esp. as revealing seriousness or severity: *a stern visage.* **2.** appearance, aspect, mien. **7.** exterior. **14.** façade. **43.** veneer.

**face/ an'gle,** *Geom.* the angle formed by two successive edges of a polyhedron. [1910–15]

**face/ bow'** (bō), *Dentistry.* a device for determining the relationship of the maxillae to the mandibular joint. Also, **face'bow'.** [1930–40]

**face/ card',** the king, queen, or jack of playing cards. [1665–75]

**face-cen•tered** (fās'sen'tərd), *adj. Crystall.* (of a crystal structure) having lattice points on the faces of the unit cells. Cf. body-centered. [1910–15]

**face-cloth** (fās'klôth', -kloth'), *n., pl.* -cloths (-klôthz', -kloths', -klôths', -kloths'). washcloth. Also called, *Brit.,* **face/ flan'nel.** [1595–1605; FACE + CLOTH]

**faced** (fāst), *adj.* having a specified kind of face or

**face'down',** *adv., n. (fās'doun'), n. (fās'doun'), adv.* **1.** with the face or the front or upper surface downward: *He was lying facedown on the floor. Deal the cards face-down on the table.* —**n. 2.** Also, **face'-down'.** *Informal.* a direct confrontation; showdown. [1930–35; (def. ) 1: FACE + DOWN¹; (def. 2) n. use of v. phrase *face down*]

**face/ gear',** *Mach.* a disklike gear having teeth cut on the face more or less radially and engaging with a spur or helical pinion, the axis of which is at right angles to it.

**face-hard•en** (fās'här'dn), *v.t.* to harden the surface of (metal), as by chilling or casehardening. [1895–1900]

**face-less** (fās'lis), *adj.* **1.** without a face: *a faceless apparition.* **2.** lacking personal distinction or identity: *a faceless mob.* **3.** concealed or unidentifiable; concealing one's identity: *a faceless kidnapper.* [1560–70; FACE + -LESS] —**face/less•ness,** *n.*

**face-lift** (fās'lift'), *n.* **1.** Also, **face/ lift'ing, face/-lift'ing.** plastic surgery on the face for elevating sagging tissues and eliminating wrinkles and other signs of age; rhytidectomy. **2.** a renovation or restyling, as of a room or building, intended to give an attractive, more up-to-date appearance. —*v.t.* **3.** to perform a face-lift upon. **4.** to renovate or restyle in order to give a fresher, more modern appearance: *Our old offices have been face-lifted with new furniture.* Also, **face/lift'.** [1920–25; Amer.]

**face/ mask',** **1.** *Sports.* the protective equipment, usually made of steel or plastic, that guards the face, as the steel cage worn by a baseball catcher or the molded plastic covering worn by a hockey goalkeeper. **2.** any of various similar devices to shield the face, sometimes attached to or forming part of a helmet, as that worn by workers engaged in a hazardous activity. Also, **face/-mask'.** [1905–10; FACE + MASK]

**face-off** (fās'ôf'), *n.* **1.** (in ice hockey) the method of starting play, in which the referee drops the puck between two opposing players, who attempt to gain control of it. **2.** a direct confrontation. [1895–1900; n. use of v. phrase *face off*]

**face-plate** (fās'plāt'), *n.* **1.** (on a lathe) a perforated plate, mounted on the live spindle, to which the work is attached. **2.** the part of a protective headpiece, as a diver's or astronaut's helmet, that covers the upper portion of the face, often of transparent material and sometimes movable. **3.** Also called **face.** Electronics. the glass front of a cathode ray tube upon which the image is displayed. **4.** a protective plate, as one surrounding an electric outlet or light switch. Cf. switch plate. [1835–45; FACE + PLATE¹]

**face/ pow'der,** a cosmetic powder used to give a mat finish to the face. [1855–60]

**fac•er** (fā'sər), *n.* **1.** a person or thing that faces. **2.** *Informal.* a blow in the face. **3.** *Brit. Informal.* an unexpected major difficulty, dilemma, or defeat. [1605–15; FACE + -ER¹]

**face-sav•er** (fās'sā'vər), *n.* something that saves one's prestige or dignity: *Allow him the face-saver of resigning instead of being fired.* [1940–45] —**face'-sav'ing,** *n., adj.*

**fac•et** (fas'it), *n., v.,* -et•ed, -et•ing *or* (esp. Brit.) -et•ted, -et•ting. —*n.* **1.** one of the small, polished plane surfaces of a cut gem. **2.** a similar surface cut on a frogment of rock by the action of water, windblown sand, etc. **3.** aspect; phase: *They carefully examined every facet of the argument.* **4.** *Archit.* any of the faces of a column cut in a polygonal form. **5.** Zool. one of the corneal lenses of a compound arthropod eye. **6.** Anat. a small, smooth, flat area on a hard surface, esp. on a bone. **7.** *Dentistry.* a small, highly burnished area, usually on the enamel surface of a tooth, produced by abrasion between opposing teeth in chewing. —*v.t.* **8.** to cut facets on. [1615–25; < F *facette* little face. See FACE, -ET]

**fac•ete** (fə sēt'), *adj. Archaic.* facetious. [1595–1605; < L *facētus*] —**fa•cete'ly,** *adv.* —**fa•cete'ness,** *n.*

**fac•e•ti•ae** (fə sē'shē ē'), *n.pl.* amusing or witty remarks or writings. [1520–30; < L, pl. of *facētia* something witty. See FACETE, -IA]

**facet/ time',** **1.** a brief appearance on television. **2.** a brief face-to-face meeting, esp. with someone important. [1975–80]

**fa•ce•tious** (fə sē'shəs), *adj.* **1.** not meant to be taken seriously or literally: *a facetious remark.* **2.** amusing; humorous. **3.** lacking serious intent; concerned with something nonessential, amusing, or frivolous: *a facetious person.* [1585–95; FACETE + -IOUS; see FACETIAE] —**fa•ce'tious•ly,** *adv.* —**fa•ce'tious•ness,** *n.* —**Syn. 2.** See humorous.

**fac'et joint',** *Anat.* any of the four projections that link one vertebra of the spine to an adjacent vertebra.

**face-to-face** (fās'tə fās'), *adj.* **1.** with the fronts or faces toward each other. **2.** involving close contact or direct opposition: *a face-to-face confrontation.* [1300–50; ME]

**face/ tow'el,** a small towel for the face. [1920–25]

**face•up** (fās'up'), *adv.* with the face or the front or upper surface upward: *Place the cards faceup on the table.* [1900–05; FACE + UP]

**face val•ue** (fās' val'yōō for 1; fās' val'yōō for 2), **1.** the value printed on the face of a stock, bond, or other financial instrument or document. **2.** apparent value: *Do not accept promises at face value.* [1875–80]

**fa•cia** (fā'shə), *n. Chiefly Brit.* dashboard (def. 1). Also, **fascia.** Also called **fa'cia board'.** [1880–85; spar. of FASCIA, perh. through confusion with L *faciēs,* E FACE, FACIAL, etc.]

**fa•cial** (fā'shəl), *adj.* **1.** of the face: *facial expression.* **2.** for the face or facial cream. —*n.* **3.** a treatment for beautify the face. [1600–10; 1910–15 for def. 3; < ML *faciālis.* See FACE, -AL¹] —**fa'cial•ly,** *adv.*

**fa'cial an'gle,** Craniom. the angle formed by a line from nasion to prosthion at its intersection with the plane of the Frankfort horizontal. [1815–25]

**fa'cial in'dex,** Craniom. the ratio of the breadth of the face to its height. [1885–90]

**fa'cial nerve',** Anat. either one of the seventh pair of cranial nerves composed of motor fibers that control muscles of the face except those used in chewing. [1830–40]

**fa'cial neu•ral'gia,** Pathol. See tic douloureux.

**fa'cial tis'sue,** a soft, disposable paper tissue, esp. for cleansing the face or for use as a handkerchief. [1920–30]

**fa•ci•es** (fā'shē ēz', -shēz), *n., pl.* **fa•ci•es. 1.** general appearance, as of an animal or vegetable group. **2.** *Geol.* the appearance and characteristics of a sedimentary deposit, esp. as they reflect the conditions and environment of deposition and serve to distinguish the deposit from contiguous deposits. Cf. metamorphic facies. **3.** *Med.* a facial expression characteristic of a disease or pathological condition. **4.** *Archaeol.* a distinctive phase of a prehistoric cultural tradition. [1350–1400; for an earlier sense: ME < L *faciēs,* figure, appearance, face, akin to *facere* to make]

**fac•ile** (fas'il *or, esp. Brit.,* -īl), *adj.* **1.** moving, acting, working, proceeding, etc., with ease, sometimes with superficiality: *facile fingers; a facile mind.* **2.** easily done, performed, used, etc.: *a facile victory; a facile method.* **3.** easy or unconstrained, as manners or persons. **4.** affable, agreeable, or complaisant; easily influenced: *a facile temperament; facile people.* [1475–85; < L *facilis* that can be done, easy, equiv. to *facere* to do, make + *-ilis* -ILE] —**fac'ile•ly,** *adv.* —**fac'ile•ness,** *n.* —**Syn. 1.** smooth, flowing, fluent; glib. **2.** superficial. **3.** bland, suave; urbane.

**fa•ci•le prin•ceps** (fā'sī lē' pring'keps; Eng. fas'ə lē prin'seps), *Latin.* easily the first or best.

**fac•il•is de scen•sus A•ver•no** (fā'ki lis des kav'sōōs ä wen'nō; Eng. fas'ə lis di sen'səs ə vûr'nō), *Latin.* (the) descent to hell is easy; it is easy to take the downward path. Vergil, Aeneid, 6:126.

**fa•cil•i•tate** (fə sil'i tāt'), *v.t.,* -tat•ed, -tat•ing. **1.** to make easier or less difficult; help forward (an action, a process, etc.): *Careful planning facilitates any kind of work.* **2.** to assist the progress of (a person). [1605–15; FACILIT(Y) + -ATE¹] —**fa•cil'i•ta'tive,** *adj.*

**fa•cil•i•ta•tion** (fə sil'i tā'shən), *n.* **1.** the act or process of facilitating. **2.** *Physiol.* the lowering of resistance in a neural pathway to an impulse, resulting from previous or simultaneous stimulation. [1610–20; FACILITATE + -ION]

**fa•cil•i•ta•tor** (fə sil'i tā'tər), *n.* **1.** a person or thing that facilitates. **2.** a person responsible for leading or coordinating the work of a group, as one who leads a group discussion: *Each committee will meet with its facilitator.* [1815–25; FACILITATE + -OR¹]

**fa•cil•i•ty** (fə sil'i tē), *n., pl.* -ties. **1.** Often, **facilities. a.** something designed, built, installed, etc., to serve a specific function affording a convenience or service: *transportation facilities; educational facilities; a new research facility.* **b.** something that permits the easier performance of an action, course of conduct, etc.: *to provide someone with every facility for accomplishing a task; to lack facilities for handling bulk mail.* **2.** readiness or ease due to skill, aptitude, or practice; dexterity: *to compose with great facility.* **3.** ready compliance: *Her facility with every detail.* **4.** amiability or ready acquiescence to the will of another: *facility of disposition.* **5.** An easy-flowing manner: *facility of style.* **6.** the quality of being easily or conveniently done or performed. **6.** Often, **facilities.** Informal. a rest room, esp. one for use by the public, as in a theater or restaurant. **7.** freedom from difficulty, controversy, misunderstanding, etc.: *facility of understanding.* [1375–1425; into ME ing, etc.; *facility* of understanding; < L *facilitās.* See FACILE, -ITY]

**fac•ing** (fā'sing), *n.* **1.** a covering in front, for ornament, protection, etc., as on outer layer of stone on a brick wall. **2.** a lining applied to the edge of a garment for ornament or strengthening. **3.** a material turned outward or inward, as a cuff or hem. **4.** facings, coverings of a different color applied on the collar, cuffs, or other parts of a military coat. [1350–1400; ME; see FACE, -ING¹]

**fac'ing tool',** Metalworking. a tool for smoothing a plane surface at right angles to the axis of rotation. [1880–85]

**fa•çon de parler** (fà sôn' də pàr lā'), French. **1.** a fashion; manner; style. **2.** workmanship; make. [1795–1805]

**fac•si•mi•le** (fak sim'ə lē), *n., v.,* -led, -le•ing, *adj.* —*n.* **1.** an exact copy, as of a book, painting, or manuscript. **2.** Also called **fax.** Telecommunications. **a.** a method or device for transmitting documents, drawings, photographs, or the like, by means of radio or telephone for exact reproduction elsewhere. **b.** an image transmitted or received by such a method. —*v.t.* **3.** to make a facsimile of; reproduce. **4.** to reproduce in facsimile; make a facsimile of. —*adj.* **5.** of or pertaining to exact reproduction. Also, **fax.** Telecommunications. **a.** (of an image) copied or reproduced exactly. Also, **facsim.** [1685–95; L *fac simile* make (thou) similar, equiv. to *fac,* imperative of *facere* to make + *simile,* neut. of *similis* like; compare SIMILE] —**fac•sim'i•list,** *n.*

**facsim.** facsimile.

# EXHIBIT 3-B

# MICROSOFT PRESS®

# COMPUTER DICTIONARY

## SECOND EDITION



COMPLETELY
REVISED AND
UPDATED, WITH NEW
DEFINITIONS AND
ILLUSTRATIONS

# THE COMPREHENSIVE STANDARD FOR BUSINESS, SCHOOL, LIBRARY, AND HOME



PUBLISHED BY
Microsoft Press
A Division of Microsoft Corporation
One Microsoft Way
Redmond, Washington 98052-6399

Copyright © 1994 by Microsoft Press

All rights reserved. No part of the contents of this book may be reproduced or
transmitted in any form or by any means without the written permission of the publisher.

Library of Congress Cataloging-in-Publication Data

Microsoft Press computer dictionary : the comprehensive standard for
     business, school, library, and home / Microsoft Press. -- 2nd ed.
          p.   cm.
     ISBN 1-55615-597-2
     1. Computers--Dictionaries.   2. Microcomputers--Dictionaries.
  I. Microsoft Press.   II. Title: Computer dictionary.
  QA76.15.M54   1993
  004'.03--dc20                                          93-29868
                                                           CIP

Printed and bound in the United States of America.

1 2 3 4 5 6 7 8 9   MLML   9 8 7 6 5 4

Distributed to the book trade in Canada by Macmillan of Canada, a division of Canada
Publishing Corporation.

Distributed to the book trade outside the United States and Canada by
Penguin Books Ltd.

Penguin Books Ltd., Harmondsworth, Middlesex, England
Penguin Books Australia Ltd., Ringwood, Victoria, Australia
Penguin Books N.Z. Ltd., 182-190 Wairau Road, Auckland 10, New Zealand

British Cataloging-in-Publication Data available.

**Project Editor:** Casey D. Doyle
**Manuscript Editor:** Alice Copp Smith
**Technical Editors:** Mary DeJong, Jeff Carey, Dail Magee, Jr., Jim Fuchs, Seth McEvoy

close proximity but are electrically insulated from each other. An alternating current in the primary winding sets up an oscillating magnetic field that cuts across the secondary winding and induces a current there.

**inductor** A component, commonly referred to as a choke, designed to have a specific amount of inductance (ability to store energy in the form of a magnetic field). An inductor usually consists of a length of wire coiled in a cylindrical or a toroidal (doughnut-shaped) form, sometimes with a ferromagnetic core. See the illustration. An inductor passes direct current but impedes alternating current to a degree dependent on its frequency.



*Inductor.*
*One of several kinds of inductors.*

**Industry Standard Architecture** *See* ISA.

**inference** The process of formulating a conclusion based on specific information—for example, inferring that canaries have feathers because canaries are birds and birds have feathers. This process typically takes place either through the application of the formal rules of logic or through statistical generalization from a set of observations. Inference is a feature of expert systems built around a program called an inference engine, which matches propositions with facts compiled in a knowledge base (database) and then derives a conclusion based on the facts that agree with (confirm) the propositions. *See also* expert system, knowledge base.

**inference engine** In artificial intelligence, the processing portion of an expert system. An inference engine contains known facts and rules about an area of expertise; it weighs input against these facts and rules to derive inferences (conclusions) on which the expert system then acts.

**inference programming** A method of programming in which programs yield results based on logical inference from a set of facts and rules. One language that directly supports inference programming is Prolog. *See also* Prolog.

**infinite loop** A loop that, due to semantic or logic errors, can never terminate through normal means; also, a loop that is intentionally written with no explicit termination condition but that will terminate as a result of side effects. *See also* loop, side effect.

**infix notation** A notation, used for writing expressions, in which binary operators appear between their arguments (for example, $2 + 4$) and unary operators usually appear immediately before their arguments (for example, $-1$). *See also* operator precedence, postfix notation, prefix notation.

**information** The meaning of data, as it is intended to be interpreted by people. Data consists of facts, which become information when they are seen in context and convey meaning to people. Computers process data without any understanding of what that data represents.

**information center** Typically, a large computer installation and its associated offices, the hub of an information management and dispersal facility in an organization. The term can also refer to a specialized type of computing system dedicated to information retrieval and decision-support functions; the information in such a system is usually read-only and consists of data extracted or downloaded from other production systems.

**information explosion** Also called information revolution. A popular term used in reference to the current period in human history, in which the possession and dissemination of information has supplanted mechanization or industrialization as a driving force in society; also used to refer to the rapid growth in the amount of information available today.

**information hiding** In programming, a design practice in which implementation details for both data structures and algorithms within a module or subroutine are "hidden" from routines using that module or subroutine. The goal is to ensure that

# EXHIBIT 3-C

Jerome Johnson
CONFIDENTIAL - ATTORNEYS' EYES ONLY

1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Case No. 6:07-cv-607 (E.D. Tex.)

----------------------------------------------
Triton IP, LLC,
Plaintiff,
vs.
Sage Group, PLC, et al.,
Defendants.
----------------------------

----------------------------------------------
CONFIDENTIAL - ATTORNEYS' EYES ONLY
DEPOSITION OF JEROME JOHNSON
VOLUME 1
----------------------------------------------

TAKEN ON: 6/9/2008       BY: DANA ANDERSON

2

1   APPEARANCES:
2
3   BLANK AND ROME
    One Logan Square
4   18th and Cherry Streets
    Philadelphia, PA 19103-6998
5   Phone: 215.569.5364
    Fax: 215.832.5364
6   E-mail: Zaher@BlankRome.com
7   By: Mr. Alfred W. Zaher, Esquire
        Mr. Joel L. Dion, Esquire
8
    For the Defendants
9
10
11
    THE LAW OFFICES OF MICHAEL J. NEWTON
12  2714 Beverly Drive
    Flower Mound, TX 75022
13  Phone: 214.438.0806
    Fax: 214.438.0825
14  E-mail: mike@mjnfirm.com
15  By: Mr. Michael J. Newton, Esquire
16  For the Plaintiffs
17
18
    KAKELDEY & ASSOCIATES
19  Madison East Center
    P.O. Box 4129
20  1400 Madison Ave. #628
    Mankato, MN 56002-4129
21  Phone: 507.625.1030
    Fax: 507.625.1550
22  E-mail: dhoehn@hickorytech.net
23  By: Mr. Dan J. Hoehn, Esquire
24  For the Witness
25

3

1   APPEARANCES (continued):
2
3   LAW OFFICE OF DAVID PRIDHAM
    25 Linden Road
4   Barrington, RI 02806
    Phone: 401.368.4607
5   E-mail: david@pridhamiplaw.com
6   By: Mr. David Pridham, Esquire
7   For the Plaintiffs
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

4

1   INDEX
2   Examination by Mr. Zaher, page 5
3
4
5   INDEX OF EXHIBITS
6   1 - Subpoena, page 6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

176

1      THE WITNESS:  Normal course of
2  business we would create a demo or a
3  prototype.  I don't recall doing it here
4  or not.
5  BY MR. DION:
6  Q. You don't recall if you ever created a demo
7     or a prototype for this idea?
8  A. Correct.
9  Q. It's possible that one may have been created?
10 A. Yes.  That was our normal way of doing
11    things.
12 Q. If one were created would you personally have
13    any documentation that would show that?
14 A. No.  I've turned in everything I've got.
15 Q. Would the company have at the time had any
16    documentation relating to the creation of
17    such a prototype or demo?
18 A. I would think so.
19         (Phone ringing.)
20         MR. NEWTON:  Hey David.  David?  Are
21    you there?
22         MR. PRIDHAM:  Yeah.  Sorry about
23    that.
24         MR. NEWTON:  No problem.
25 BY MR. DION:

177

1  Q. Do you recall what that documentation would
2     have been?  Was there a standard form or a
3     file created, any type of standard practice
4     that would have occurred?
5  A. No.  I don't know.
6  Q. If there were a prototype or a demo created,
7     would that have been a software prototype?
8  A. That was a common practice that we had done.
9  Q. If a software prototype was created, would
10    you have any copy of that prototype, a disk,
11    a CD, a tape, whatever it might have been?
12 A. I don't have anything.
13 Q. If anything like that existed, the company
14    would have it?
15 A. I would assume so.
16 Q. If we could go back to the example that you
17    described earlier about a training situation
18    that would be one example of how this system
19    might function, do you recall that?
20 A. Yes.
21 Q. Are you able to elaborate at all about --
22    from beginning to end how that -- that
23    example would occur?
24 A. I can speculate.
25        MR. NEWTON:  Object to form.

178

1  BY MR. DION:
2  Q. I'm not necessarily looking for you to
3     speculate.  But I'm looking to understand an
4     example of the system working based on your
5     conception of, you know, the system.  And if
6     it's easier for you to choose a different
7     example -- but I guess something that would
8     go through each of the steps that you
9     described here so that I could have just one
10    example of how the system might function in
11    the real world were it ever created?
12 A. I'll give you some examples of how I would
13    have done it.  But the rules could be written
14    in a variety of ways.  If a training course,
15    the person scored too low, implement another
16    training or implement different types of
17    training or if a proposal did not include
18    certain information, trigger a training.
19 Q. So in the second example, if I could take
20    that one, a salesperson would create a
21    proposal for a customer, is that correct?
22 A. Correct.
23 Q. And then the system would review the
24    information that was included in that
25    proposal, is that correct?  I don't mean to

179

1     put words in your mouth here.
2  A. I think the rules could be written to look at
3     the proposals as to what the content was.
4  Q. Would that have been the way it would have
5     happened in the example that you provided?
6        MR. NEWTON:  Object to form.
7        THE WITNESS:  That would be one
8     example.
9  BY MR. DION:
10 Q. And then if a certain piece of information or
11    pieces of information were not included in
12    the proposal, the system would then trigger a
13    training event, is that correct?
14 A. That's one way that I would think it would
15    work, yes.
16 Q. So with that example in mind, what would
17    be -- what would your understanding be in
18    that example of the occurrence of the event
19    which is -- we looked at line 5, column 36 it
20    says "inferring occurrence of the event,"
21    what would be the event that occurred in that
22    example?
23        MR. NEWTON:  Object to form.
24        THE WITNESS:  My example a proposal
25    was made.

180

1    BY MR. DION:
2    Q. How would the system know that a proposal was
3       made?
4    A. The system would assist the salesperson in
5       the creation of that proposal.
6    Q. So the salesperson would sit down at their
7       computer terminal or what have you and create
8       the proposal in one of the modules of the
9       system, is that correct?
10   A. Yes.
11          MR. NEWTON: Object to form.
12   BY MR. DION:
13   Q. And the creation of that proposal would be
14      the occurrence of the event, is that correct?
15   A. In this example, yes.
16   Q. So what would be the inferring the occurrence
17      of the event?
18          MR. NEWTON: Object to form.
19          THE WITNESS: I don't know.
20          (Phone ringing.)
21   BY MR. DION:
22   Q. What would your understanding be of the
23      context in which the event occurred in that
24      example?
25          MR. NEWTON: Object to form.

181

1           THE WITNESS: Could be several
2       things, I suppose. One would be that it's
3       a first proposal to a customer.
4    BY MR. DION:
5    Q. That would be an example of possible context
6       for that event?
7    A. Correct.
8    Q. Then what would be the automatically
9       initiating an operation one or more
10      particular subsystems of the computer to
11      facilitate a new action based on the inferred
12      context? How would that happen in the
13      example that you provided?
14          MR. NEWTON: Object to form.
15          THE WITNESS: Again, depending upon
16      the rules, but the one example would be
17      suggestions to a salesperson as to what
18      they could have included in the proposal.
19   BY MR. DION:
20   Q. When you say "depending upon the rules," the
21      rules that you are referring to, how would
22      they come to exist within the system?
23   A. Do you remember which claim rules were
24      mentioned in here?
25   Q. I'm asking, I guess, more generally in

182

1    the -- in your conception of this invention.
2    Did you conceive of it as having rules that
3    would dictate which actions were taken?
4    A. Generally the rules could come from a variety
5       of places but generally from the person who
6       is the administrator of the system or who has
7       administrative rights.
8    Q. So a person would input the rules into the
9       system?
10   A. I'm not sure that's the only way that rules
11      could be created.
12   Q. What are the other ways that you think rules
13      could be created?
14   A. By artificial intelligence by past usage of
15      the system, by modeling. There could be a
16      variety of ways that these rules could be
17      created.
18   Q. In 1995 when you conceived of the invention
19      that's described here, at that time did you
20      believe that artificial intelligence had a
21      role in the system that you conceived of?
22   A. It was something that was talked about.
23   Q. How was it talked about?
24   A. Talked about in the industry and amongst
25      clients.

183

1    Q. What role did you believe it could
2       potentially or would have in the system that
3       you conceived of at that time?
4           MR. NEWTON: Object to form.
5           THE WITNESS: I'm sorry, could you
6       repeat that.
7    BY MR. DION:
8    Q. In 1995 when you invented this system, what
9       role did you believe artificial intelligence
10      would play in this system?
11          MR. NEWTON: Same objection.
12          THE WITNESS: AI, artificial
13      intelligence, was a developing art. My --
14      Jerry Smith, we talked about yesterday, he
15      always had a saying: We aren't going to
16      build artificial intelligence in the
17      software, we're going to build real
18      intelligence, so artificial intelligence
19      or some variation of that. I don't know
20      how to elaborate.
21   BY MR. DION:
22   Q. We were talking about how the rules came to
23      be in the system. And you said that other
24      than human input of rules, one possible other
25      way the rules would come to be was artificial

196

1      MR. NEWTON: Object to form.
2      THE WITNESS: I think so.
3  BY MR. DION:
4  Q. If I could direct your attention back to
5     column 2, two sentences further down than
6     what we were discussing there is a sentence
7     that begins "The computer automatically
8     detects the occurrence of the event."
9        Do you see that?
10 A. Second paragraph?
11 Q. Yes, second sentence of the second paragraph
12    under summary of invention if I could have
13    you review that?
14 A. Yes.
15 Q. That describes that the computer detects the
16    occurrence of the event and determines the
17    context in which the event occurs. Was
18    determining the context in which the event
19    occurs a feature or functionality of the
20    system that you invented?
21 A. Yes.
22 Q. What was your understanding of, in your
23    conception, what that would mean?
24 A. Automatically detects means that somebody
25    doesn't have to say to the computer: I did

197

1     this. It was detected based upon actions or
2     events.
3  Q. And then what about the second portion of
4     that sentence, "Determines the context in
5     which the event occurs"?
6  A. Don't know.
7  Q. Do you know what context is as it relates to
8     your invention?
9  A. No.
10 Q. You don't know what context is?
11 A. My definition would be something around
12    situation in which it occurred.
13 Q. You said earlier that you would have reviewed
14    the application before it was filed, is that
15    correct?
16 A. Correct.
17 Q. At the time that you reviewed the
18    application, did you feel that it fairly and
19    accurately described your invention?
20 A. Yes.
21 Q. Did you at that time understand what
22    "determine the context" meant in relation to
23    your invention?
24 A. Yes.
25 Q. Did you direct that that language be a part

198

1     of the application?
2  A. Probably not.
3  Q. Do you know who did?
4      MR. NEWTON: Object to form.
5      THE WITNESS: My feeling is
6     John Sumner, the legal firm would have
7     crafted that.
8  BY MR. DION:
9  Q. So your testimony is that you don't
10    understand in relation to your invention what
11    context means and that you think your
12    attorney added that description into the
13    application, is that correct?
14     MR. NEWTON: Object to form.
15     THE WITNESS: I don't think that's
16    what I said.
17 BY MR. DION:
18 Q. What did you say?
19 A. I said that when we submitted it, I
20    understood it. I'm not sure today as to what
21    that means.
22 Q. If you look at the language in the
23    specification that talks about the event
24    manager determines the context in which the
25    recognized event occurs, then if I could have

199

1     you look back at the language in the claim
2     where it describes, looking at line 5 at
3     column 36, "Inferring occurrence of the event
4     and the context in which the event occurred,"
5     do you believe that inferring a context in
6     which the event occurred is the same or
7     different than determining the context in
8     which the event occurred?
9  A. I would think so.
10 Q. You would think that they are the same, or
11    you would think that they are different?
12 A. Determining, they are both used in -- well,
13    let me -- so inferring column 36, row 5,
14    inferring with what over here now?
15 Q. Column 36, line 5 says, "Inferring occurrence
16    of the event and a context in which the event
17    occurred." I read that to mean that the
18    system infers both the occurrence of the
19    event and also infers a context in which the
20    event occurred.
21       Is your reading of that the same as
22    mine?
23 A. I don't know.
24 Q. How do you read that?
25 A. To me it would be, I believe so.

220

1        salesperson thereafter --
2    BY MR. DION:
3    Q. So now that -- I'm sorry, were you finished?
4    A. Yes, I was finished.
5    Q. So on the document that we were looking at
6        here in Exhibit Number 3, which is page 15 of
7        this December 10 response to -- the
8        December 10 amendment, it states here that
9        it's this context sensitive event recognition
10       and a -- that results in a nonlinear sales
11       process, is that a fair statement?
12              MR. NEWTON: Could I have that
13       question back.
14              (Whereupon, the court reporter read
15       back the previous question.)
16              MR. NEWTON: Object to form.
17              THE WITNESS: The nonlinear sales
18       process is just the way things are.
19   BY MR. DION:
20   Q. What do you mean by "just the way things
21       are"?
22   A. That's the way -- sales processes are
23       nonlinear as we discussed earlier.
24   Q. So in the real world, detached from any
25       particular software product, sales processes

221

1        are nonlinear, is that what you are trying to
2        say?
3    A. That's my experience.
4    Q. And the software that you invented then was
5        an attempt to facilitate these nonlinear
6        sales processes with software, is that
7        correct?
8    A. Yes.
9    Q. And what existed in the marketplace before
10       your software it's your belief it did not
11       have the ability to facilitate nonlinear
12       sales processes, is that correct?
13              MR. NEWTON: Object to form.
14              THE WITNESS: And there was a whole
15       variety of small systems out there.
16   BY MR. DION:
17   Q. So a system that had a linear progression,
18       the sales process would just go from step A
19       to step B to step C and so on each time
20       regardless of context, is that correct?
21              MR. NEWTON: Object to form.
22              THE WITNESS: That would be my
23       definition.
24   BY MR. DION:
25   Q. And the system that you conceived of would

222

1        then have the -- the sales process would
2        begin, an event would occur, the context of
3        the event would be considered by the system
4        and then rather than A to B just as a matter
5        of course, the process might continue in any
6        one of a number of directions based on the
7        event and the context, is that accurate?
8    A. The event the context and the rules, yes.
9    Q. So the linear system would have rules as
10       well, right?
11   A. Could have, I suppose.
12   Q. And the rules would just be performed step A
13       then go to B then go to C then go to D and on
14       and on, is that correct?
15   A. Correct.
16   Q. Now, you said your system would consider the
17       inputs, the event, the context and then based
18       on the rules, direct a direction for the
19       sales process to proceed, is that correct?
20   A. Correct.
21   Q. Does that result from anything other than
22       just a more complex set of rules?
23              MR. NEWTON: Object to form.
24              THE WITNESS: We believe so, yes.
25   BY MR. DION:

223

1    Q. What else do you believe results in that
2        outcome other than just a more complex set of
3        rules?
4    A. I think it's as stated in here (indicating),
5        this -- page 15.
6    Q. What exactly on page 15 are you referring to?
7    A. That this Negrino fails to adequately teach
8        or suggest context sensitive event
9        recognition, it doesn't have flexibility,
10       it's a plurality of systems -- subsystems,
11       which is unique and it's in great advancement
12       in the state of the art.
13   Q. Do you believe that the system you invented
14       was the first system to integrate a plurality
15       of subsystems?
16              MR. NEWTON: Object to form.
17              THE WITNESS: Especially in
18       combination with an event manager here.
19   BY MR. DION:
20   Q. Well, you told me earlier event manager was a
21       term that you never applied to anything that
22       you developed?
23   A. Right. No, that's in here (indicating).
24   Q. Well, what do you understand the event
25       manager to be?

224

1    A.   The functionality that facilitated this
2         capability.
3    Q.   Facilitated what capability?
4    A.   Nonlinear sales plurality of systems.
5    Q.   Yesterday we talked a lot about the software
6         that you developed in 1983?
7    A.   Right.
8    Q.   And you said that that had multiple
9         functionalities, it had pricing, quoting,
10        finance, proposals, product and lifecycle at
11        the beginning and then others were added
12        later, is that accurate?
13   A.   Right.
14   Q.   Were those subsystems?
15            MR. NEWTON:  Object to form.
16            THE WITNESS:  I called them modules.
17        I would have to think about that.
18   BY MR. DION:
19   Q.   I'd appreciate if you would and let me know
20        if you can answer the question.
21            THE WITNESS:  Is subsystem defined
22        in that?
23   BY MR. DION:
24   Q.   I don't know the answer to that question off
25        the top of my head, but you can go ahead and

225

1         take a look.
2             Do you have an understanding of what
3         the term "subsystem" means as it's used in
4         this patent?
5             MR. NEWTON:  Object to form.
6             THE WITNESS:  I'm not sure.
7    BY MR. DION:
8    Q.   If I could direct your attention to column 3.
9         I don't know if this is quite a definition,
10        per se.  But if you look under the heading
11        Detailed Description of the Preferred
12        Embodiments at the second paragraph, it
13        describes there starting in the second
14        sentence that a salesperson's support system,
15        100, is made up of a number of different
16        subsystems which generally relate to various
17        phases of the sales process.  The system as
18        disclosed is divided into four core process
19        components, 103, namely, a lead generation
20        component, 102, a time with customer
21        component, 104, an order management
22        component, 106, and a customer retention
23        component, 108.
24            I don't know if that's a definition,
25        but that's a description in the patent of the

226

1         subsystems.  I don't know if that's helpful
2         to you or not.
3    A.   Well, then figure 2 is an illustration that
4         describes that.
5    Q.   Does that provide you with a sufficient
6         understanding of subsystems then to answer
7         the question as to whether the modules as
8         you've described them in your 1983 software
9         are the same or different than the term
10        "subsystems" as it's used in the patent?
11   A.   The way that this is illustrated is that
12        these are all subsystems on the top layer.
13        And all of those modules you talked about
14        were within this time with customer
15        subsystem, they were modules within that
16        subsystem.
17   Q.   With that understanding of subsystem, were
18        the modules of your 1983 software subsystems?
19   A.   No.
20   Q.   And why is that?
21   A.   They were a part of this subsystem of time
22        with customer.
23   Q.   I don't know if I follow that answer.
24            The modules in your 1983 software,
25        those functionalities, are part of the time

227

1         with customer subsystem?
2    A.   Correct.
3    Q.   Was your 1983 software a single system?
4             MR. NEWTON:  Object to form.
5             THE WITNESS:  It was a single
6         solution with a variety of modules is the
7         way we described it.
8    BY MR. DION:
9    Q.   And each module provided different
10        functionality, is that correct?
11   A.   Correct.
12   Q.   Were those modules integrated?
13   A.   They passed data from one to another.
14   Q.   Was that yes, they were integrated?
15            MR. NEWTON:  Object to form.
16            THE WITNESS:  Yes, they were.
17   BY MR. DION:
18   Q.   So would it be fair to say that your 1983
19        software then had the integration of a
20        plurality of modules into a single system for
21        facilitating a sales process?
22   A.   Yes.
23   Q.   And you said also that information was shared
24        between the different modules?
25   A.   Yes.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

228

1   Q. Was there some components of the system that
2     facilitated that transfer of information?
3         MR. NEWTON: Object to form.
4         THE WITNESS: That's the question we
5     got tangled up on yesterday. Is it in a
6     disk? Is it in memory? How was it
7     stored? And so we are back to that same
8     question.
9   BY MR. DION:
10   Q. Well, I don't mean to necessarily ask about
11     the particular architecture of the hardware
12     then. But -- so if I put -- if I'm sitting
13     down at the computer and a customer walks in
14     and I type in their, you know, name and
15     address and the piece of equipment they want
16     to buy and I put all of that information into
17     the pricing module and that gives me a price,
18     correct?
19   A. There is a menu approach. But yes,
20     essentially.
21   Q. And then if I switch to the quoting system,
22     the information that I -- that was input in
23     the pricing module shows up in the quoting
24     module?
25   A. Yes.

229

1   Q. Does the system facilitate that transfer of
2     information?
3   A. Yes.
4   Q. Okay. We were talking about what was unique
5     or inventive or innovative about the system
6     you invented and one of the things you said
7     was the integration of a plurality of
8     subsystems, and then you said, in addition,
9     that the integration of those subsystems with
10     an event manager was unique, is that correct?
11   A. Yes.
12   Q. What was it about the event manager that was
13     unique?
14         MR. NEWTON: Object to form.
15         THE WITNESS: My recollection is
16     that we wanted to help the salespeople be
17     as effective as possible. And when you
18     have multiple systems, multiple sales
19     processes helping them with the proper
20     content, the proper tools at the right
21     point in time --
22   BY MR. DION:
23   Q. How does --
24   A. -- in turn making it more effective.
25   Q. How does that relate to the event manager?

230

1   A. That would be the software that would do
2     that.
3   Q. The event manager was the software that would
4     do that?
5   A. Again, I'm not sure if I understand the exact
6     architecture, but there was a piece of
7     functionality or capabilities that would do
8     that.
9   Q. So there was a functionality of the system
10     that would work with the different subsystems
11     to try and provide that efficiency to the
12     salesperson?
13   A. And that's reflected I think on figure 2.
14   Q. And that's what you would refer to as the
15     event manager?
16   A. Yes.
17   Q. So the event manager would interface with
18     each of the subsystems?
19   A. Yes.
20   Q. Would it share information between the
21     subsystems?
22   A. Yes.
23   Q. Is that somehow different than the component
24     of your 1983 software that transferred and
25     shared information among the different

231

1     modules?
2         MR. NEWTON: Object to form.
3         THE WITNESS: The tool in 1983 would
4     be captured in that box right there
5     (indicating), time with customer.
6   BY MR. DION:
7   Q. I understand that. But within that tool in
8     1983 there were different modules that
9     performed different functions?
10   A. Correct.
11   Q. And those modules we talked about earlier
12     were integrated?
13   A. Yes.
14   Q. And information was transferred from one
15     module to another?
16         MR. NEWTON: Object to form.
17         THE WITNESS: Yes.
18   BY MR. DION:
19   Q. So the component of that 1983 system that
20     transferred information from one module to
21     another, is that different than the event
22     manager described in the '525 Patent?
23         MR. NEWTON: Object to form.
24         THE WITNESS: Yes.
25   BY MR. DION:

SFA008491

232

1  Q. How are they different?
2  A. The 1983 would pass information from one
3     module to another, it had no relationship to
4     other systems, other subsystems, there was
5     nothing to do with any events. This was
6     simply transferring this data to where it was
7     needed in another module, kind of filling out
8     the blanks so you didn't have to reenter it.
9  Q. Did that create efficiency for the
10    salesperson?
11 A. Yes.
12 Q. Did it facilitate the sales process?
13        MR. NEWTON: Object to form.
14        THE WITNESS: Yes.
15 BY MR. DION:
16 Q. If a salesperson was sitting at their
17    computer using your 1983 system and they put
18    in information in one module and then they
19    went into a separate module, did they have to
20    do anything in order to fill the information
21    entered into the first module into the fields
22    in the second module?
23 A. No.
24 Q. So it was automatic?
25 A. Yes.

233

1        THE WITNESS: Lunchtime?
2        MR. DION: Can we go off the record?
3     (Recess.)
4        MR. DION: Are we all set?
5        MR. NEWTON: (Laughing.)
6  BY MR. DION:
7  Q. Mr. Johnson, are you familiar with the term
8     "expert system"?
9  A. Somewhat.
10 Q. What is your understanding of that term?
11 A. In my definition artificial intelligence
12    could be a part of that, an expert system is
13    a system that helps you, it facilitates
14    functionality.
15 Q. What differentiates an expert system from a
16    nonexpert system? Or I don't know if there
17    is another more appropriate term.
18        MR. NEWTON: Object to form.
19        THE WITNESS: It doesn't necessarily
20     relate to this, but a Google search where
21     you type in a word and it comes back with
22     words is a nonexpert system to me. An
23     expert system would be something that
24     would help organize it and help anticipate
25     what you're looking for.

234

1  BY MR. DION:
2  Q. Is that accomplished, in your understanding,
3     by a series of rules?
4        MR. NEWTON: Object to form.
5        THE WITNESS: It would depend upon
6     how broadly you can define rules, but yes.
7  BY MR. DION:
8  Q. Well, for instance, the Google search, I
9     would assume, returns search results based on
10    some set of rules that dictate how the search
11    functionality works, would you think that's
12    true?
13 A. Yes, if I understand -- maybe it's a bad
14    example, but if I understand their
15    capability, yes.
16 Q. And you described that an expert system might
17    be perhaps a system that returned results
18    with some maybe additional layer of
19    information or that anticipates what the user
20    might be looking for, is that --
21 A. Yes, more helpful.
22 Q. Would that additional helpfulness come from
23    more rules?
24        MR. NEWTON: Object to form.
25        THE WITNESS: Yes, but depending

235

1     upon definition of rules. Rules can be a
2     variety of not just if-then statements.
3  BY MR. DION:
4  Q. Does an expert system use a different type of
5     rules than a nonexpert system?
6  A. I really don't know.
7  Q. Would you characterize your invention that's
8     disclosed and claimed in the '525 Patent as
9     an expert system?
10 A. I would.
11 Q. Why would you say that this system is an
12    expert system?
13 A. Because it's a -- helping a salesperson based
14    upon situations, type of customer, guiding
15    them to the right place, presenting them with
16    the right kind of information.
17 Q. Are all of those things you just described
18    accomplished by rules?
19        MR. NEWTON: Object to form.
20        THE WITNESS: You know, it would
21     have to depend upon how rules are defined,
22     but yes.
23 BY MR. DION:
24 Q. How would you define the rules?
25 A. Some people define rules as if-then

CONFIDENTIAL ATTORNEYS' EYES ONLY

244

1   A. As I read it here today, it looks detects to
2     me would be a good term.
3   Q. If I could have you turn to the last tab.
4   A. (Complies.)
5   Q. Again, that's another amendment filed with
6     the patent office. It's stamped in the top
7     left October 27, 1999.
8   A. (Reviews document.) Yes.
9   Q. Both looking at the same document?
10       Do you recall if you saw that
11     document before it was submitted to the
12     patent office?
13   A. No.
14   Q. On October 27, 1999 were you still employed
15     with CWC?
16   A. This could have been my last day, it was the
17     27th, 28th, 29th of October. Right -- the
18     very end of October.
19   Q. Do you have any recollection leading up to or
20     around your last day, you know, having any
21     involvement with the prosecution of this
22     patent, somebody calling you saying: Hey, we
23     know you are leaving. We have to get this
24     done before you go or anything like that?
25   A. No.

245

1   Q. Did you have any further contact with the
2     attorneys prosecuting this patent after you
3     left CWC?
4   A. I don't remember.
5   Q. If I could have you look at page 2 of that
6     document. The last full paragraph toward the
7     bottom starting "It is important..." would
8     you please review that paragraph. And as
9     before, feel free to review any other
10     information that might be necessary to give
11     you context for that paragraph.
12   A. (Reviews document.) Okay.
13   Q. One of the things it says in that paragraph
14     is that these certain qualities of the event
15     manager allow the system to make more
16     educated decisions.
17       Do you have an understanding of what
18     that means?
19   A. No, I don't.
20   Q. Did the system that you invented, your
21     understanding of that system, did it make
22     more educated decisions?
23   A. Yes.
24   Q. More educated than what?
25   A. Than a salesperson deciding on their own.

246

1   Q. And how is it that those decisions that the
2     system made were more educated?
3   A. We are back to rules, how the rules were
4     created, so rules or expert systems are
5     helping a salesperson.
6   Q. So the rules that were implemented by the
7     system analyzed whatever information there
8     was to help the salesperson make a more
9     educated decision, is that fair?
10   A. Yes.
11   Q. And the last sentence says that the system
12     becomes more automated and efficient in this
13     way.
14       Was it your understanding that the
15     system you invented would become more
16     automated?
17   A. Yes.
18   Q. How would it become more automated?
19   A. Rather than a salesperson requesting
20     additional information or going in and
21     searching for it, it would be presented to
22     them. So it's more automated in the way that
23     information is given to them.
24   Q. Now, that's more automated as compared to...
25   A. Manually selecting it.

247

1   Q. Okay. So as compared to, say, the prior
2     systems that were in the market before this?
3   A. Correct.
4   Q. Do you understand that to mean that the
5     system that you invented would itself become
6     more automated over time?
7   A. That is not -- no, I wouldn't take that
8     statement to mean that.
9   Q. So it's just simply more automated than, say,
10     the salesperson working without a computer or
11     even perhaps more automated than the
12     salesperson working with software that
13     existed before this invention?
14   A. Correct.
15   Q. Same thing with regard to efficient, was the
16     efficiency over the prior art systems rather
17     than the new system itself becoming more
18     efficient over time?
19   A. Correct.
20   Q. Are you getting paid for your time here
21     today?
22   A. Yes.
23       MR. NEWTON: Object to form.
24   BY MR. DION:
25   Q. Who are you being paid by?

SFA008495

# EXHIBIT 3-D

**sub·son·ic** (sub´son´ik), *adj.* 1. noting or pertaining to a speed less than that of sound in air at the same height above sea level. 2. infrasonic. [1940–45; SUB- + SONIC] —**sub·son´i·cal·ly,** *adv.*

**sub·space** (sub´spās´), *n.* 1. a smaller space within a main area that has been divided or subdivided: *The jewelry shop occupies a subspace in the hotel's lobby.* 2. *Math.* a subset of a given space. b. Also called *linear manifold.* a subset of a vector space which is itself a vector space, or a subset of a topological space, having the relative topology. [1925–30; SUB- + SPACE]

**sub´space topol´ogy,** *Math.* See relative topology.

**sub·spe·cial·ty** (sub spesh´əl tē, sub´spesh´-), *n., pl. -ties.* a lesser or minor specialty: *a cinematographer with a subspeciality of portrait photography.* [1925–30; SUB- + SPECIALTY]

**sub·spe·cies** (sub´spē´shēz, sub spē´-), *n., pl. -cies,* a subdivision of a species, esp. a geographical or ecological subdivision. [1690–1700; SUB- + SPECIES]

**sub·spe·cif·ic** (sub´spə siFik), *adj.* 1. of, pertaining to, or of the nature of a subspecies. 2. less than specific. [1835–70; SUB- + SPECIFIC] —**sub´spe·cif´i·cal·ly,** *adv.*

**subst.,** 1. substantive. 2. substantively. 3. substitute.

**sub·stage** (sub´stāj´), *n.* the component part of a microscope below the stage, for supporting a condenser, mirror, or other accessories. [1885–90; SUB- + STAGE]

**sub·stance** (sub´stəns), *n.* 1. that of which a thing consists; physical matter or material: *form and substance.* 2. a species of matter of definite chemical composition: *a milky substance.* 3. See controlled substance. 4. the subject matter of thought, discourse, study, etc. 5. the actual matter of a thing, as opposed to the appearance or shadow; reality. 6. substantial or solid character or quality: *claims lacking in substance.* 7. consistency; body: *soup without much substance.* 8. the meaning or gist, as of speech or writing. 9. something that has separate or independent existence. 10. *Philos.* a. something that exists by itself and in which accidents or attributes inhere; that which receives modifications and is not itself a mode; something that is causally active; something that is more than an event. b. the essential part of a thing; essence. c. a thing considered as a continuing whole. 11. possessions, means, or wealth: *to squander one's substance.* 12. *Ling.* the preliminary or accoustic reality or the perceptual manifestation of a word or other construction (distinguished from *form*). 13. a standard of weights for paper. 14. in substance, a. concerning the essentials; substantially. b. actually; really: *That is in substance how it appeared to me.* [1250–1300; ME < L *substantia* substance, essence (lit., that which stands under, i.e., underlies), equiv. to *sub-* SUB- + -*stant-* (s. of *stāns,* prp. of *stāre* to STAND) + -*ia* -IA (See -ANCE)] —**sub´stance·less,** *adj.*

**sub´stance abuse´,** long-term, pathological use of alcohol or drugs, characterized by daily intoxication, inability to reduce consumption, and impairment in social or occupational functioning; broadly, alcohol or drug addiction.

**substance P,** a small peptide released upon stimulation in the nervous system and involved in regulation of the pain threshold. [earlier *standard preparation P* (1931); the initial is unexplained by the substance's discoverers]

**sub·stand·ard** (sub stan´dərd), *adj.* 1. below standard or less than adequate: *substandard housing conditions.* 2. noting or pertaining to a dialect or variety of a language or a feature of usage that is often considered by others to mark its user as uneducated; nonstandard. 3. *Insurance.* a. not measuring up to an insurer's regular standards in underwriting risks: *a substandard risk.* b. pertaining to insurance written to cover substandard risks. [1895–1900; SUB- + STANDARD]

**sub·stan·tial** (sub stan´shəl), *adj.* 1. of ample or considerable amount, quantity, size, etc.: *a substantial sum of money.* 2. of a corporeal or material nature; tangible; real. 3. of solid character or quality; firm, stout, or strong: *a substantial physique.* 4. basic or essential; fundamental: *two stories in substantial agreement.* 5. wealthy or influential: *one of the substantial men of the town.* 6. of real worth, value, or effect: *substantial reasons.* 7. pertaining to the substance, matter, or material of a thing. 8. of or pertaining to the essence of a thing; essential, material, or important. 9. being a substance; having independent existence. 10. *Philos.* pertaining to or of the nature of substance rather than to an accident or attribute. —n. 11. something substantial [1300–60; ...]

**ME substoncial** < LL *substantiōlis,* equiv. to L *substantia(a)* SUBSTANCE + -*ālis* -AL?] —**sub·stan´ti·al´i·ty, sub·stan´tial·ness,** *n.* —**sub·stan´tial·ly,** *adv.* —**Syn.** 3. stable, sound. 6. valid, important. —Ant. 2. immaterial, ethereal.

**sub·stan·ti·a·te** (sub stan´shē ā´), *v.t., -at·ed, -at·ing.* 1. to establish by proof or competent evidence: *to substantiate a charge.* 2. to give substantial existence to: *to substantiate an idea through action.* 3. to affirm as having substance; give body to; strengthen: *to substantiate a friendship.* [1650–60; < NL *substantiātus* (ptp. of *substantiāre*), equiv. to L *substantia(a)* SUBSTANCE + -*ātus* -ATE?] —**sub·stan´ti·a´tion,** *n.* —**sub·stan´ti·a´tive,** *adj.* —**sub·stan´ti·a´tor,** *n.* —**Syn.** 1. prove, confirm, verify, validate.

**sub·stan·ti·val** (sub´stan tī´vəl), *adj.* noting of, or pertaining to a substantive. [1825–35; SUBSTANTIVE + -AL?] —**sub´stan·ti´val·ly,** *adv.*

**sub·stan·tive** (sub´stən tiv), *n. Gram.* 1. a noun. 2. a pronoun or other word or phrase functioning or inflected like a noun. —*adj.* 3. *Gram.* a. pertaining to substantives. b. used in a sentence like a noun: *a substantive adjective.* c. expressing existence: "*to be*" is a substantive verb. 4. having independent existence; independent. 5. belonging to the real nature or essential part of a thing; essential. 6. real or actual. 7. of considerable amount or quantity. 8. possessing substance; having practical importance, value, or effect: *substantive issues under discussion.* 9. *Law.* pertaining to the rules of right which courts are called on to apply, as distinguished from rules of procedure (opposed to *adjective*). 10. (of dyes and dyeing) attaching directly to the material without the aid of a mordant (opposed to *adjective*). [1350–1400; ME < LL *substantīvus,* equiv. to L *substant(ia)* SUBSTANCE + -*īvus* -IVE] —**sub´stan·tive·ly,** *adv.* —**sub´stan·tive·ness,** *n.*

**sub´stantive right´,** a right, as life, liberty, or property, recognized for its own sake and not for the natural legal order of society. [1935–40]

**sub·stan·tiv·ize** (sub´stən ti vīz´), *v.t., -ized, -iz·ing.* to use (an adjective, verb, etc.) as a substantive; convert into a substantive: *a substantivized participle.* Also, esp. *Brit.,* **sub´stan·tiv·ise´.** [1865–70; SUBSTANTIVE + -IZE] —**sub´stan·tiv·i·za´tion,** *n.*

**sub·sta·tion** (sub´stā´shən), *n.* 1. a branch of a main post office. 2. an auxiliary power station where electrical current is converted, as from AC to DC, voltage is stepped up or down, etc. [1885–90; SUB- + STATION]

**sub·stit·u·ent** (sub stich´ōō ənt), *n.* 1. *Chem.* an atom or atomic group that takes the place of another atom or group present in the molecule of the original compound. —*adj.* 2. having been or capable of being substituted. [1890–95; < L *substituent-* (s. of *substituēns,* prp. of *substituere* to SUBSTITUTE, equiv. to *sub-* sub- + *-stitu-,* comb. form of *statuere* to set up, erect (see STATUE) + -*ent-* -ENT]

**sub·sti·tute** (sub´sti toot´, -tyoot´), *v., -tut·ed, -tut·ing, adj. —n.* 1. a person or thing acting or serving in place of another. 2. (formerly) a person who, for payment, served in an army or navy in the place of a conscript. 3. *Gram.* a word that functions as a replacement for any member of a class of words or constructions, as *do* in *He doesn't know but I do.* —*v.t.* 4. to put (a person or thing) in the place of another. 5. to take the place of; replace. 6. *Chem.* to replace (one or more elements or groups in a compound) by other elements or groups. —*v.i.* 7. to act as a substitute. —*adj.* 8. of or pertaining to a substitute or substitutes. 9. composed of substitutes. [1350–1400; ME < L *substitūtus* (ptp. of *substituere* to put in place of), equiv. to *sub-* sub- + -*stitū-,* comb. form of *stui-,* ptp. s. of *statuere* to set up (see STATUE)] —**sub´sti·tut´a·ble,** *adj.* —**sub´sti·tut´ing·ly,** *adv.* —**sub´sti·tu´tion·al, sub´sti·tu´tion·ar´y,** (sub´sti toö´shən ər´ē, -shə ner´-), *adj.* —**sub´sti·tu´tion·al·ly,** *adv.* —**Syn.** 1. alternative, replacement, equivalent.

**substi´tu´tion ci´pher,** *Cryptography.* a cipher that replaces letters of the plain text with another set of letters or symbols. Cf. transposition cipher. [1935–40]

**substitu´tion reac´tion,** *Chem.* the replacement of an atom or group of atoms in a compound by another atom or group.

**sub·stit·u·tive** (sub´sti too´tiv, -tyoo´-), *adj.* 1. serving as or capable of serving as a substitute. 2. pertaining to or involving substitution. [1590–1600; SUBSTITUTE + -IVE] —**sub´sti·tu´tive·ly,** *adv.*

**sub·strate** (sub´strāt), *n.* 1. a substratum. 2. *Biochem.* the substance acted upon by an enzyme. 3. *Electronics.* a supporting material on which a circuit is formed or fabricated. [1870–80; var. of SUBSTRATUM]

**sub·stra·to·sphere** (sub strat´ō sfēr´), *n.* (not used technically) the upper troposphere. [1915–20; SUB- + STRATOSPHERE] —**sub´stra·to·spher´ic** (sub´strat ə sfer´-), *adj.*

**sub·stra·tum** (sub strā´təm, -strat´əm, sub stra´təm, -strat´əm), *n., pl. -stra·ta* (-strā´tə, -strat´ə, -strä´tə, -strat´ə), *-stra·tums.* 1. something that is laid or spread under; a layer of matter lying under something else; a stratum or layer lying under another. 2. something that underlies or serves as a basis or foundation. 3. *Agric.* the subsoil. 4. *Biol.* the base or material on which a nonmotile organism lives or grows. 5. *Philos.* substance, considered as that which supports accidents or attributes. 6. *Phonet.* a layer of material placed directly on a film or plate as a foundation for the sensitive emulsion. 7. *Historical Ling.* a set of features of a language traceable to the influence of an earlier language that it has replaced, esp. among a subjugated population: *The French word Tar 80, quatrevingts ("four twenties"), may reflect a Celtic substratum.* Cf. superstratum. [1625–35; < NL; see SUB-, STRATUM] —**sub·stra´tive, sub·stra´tal,** *adj.*

**sub·struc·tion** (sub struk´shən), *n.* a foundation or substructure. [1615–25; < *substruction-* (s. of *substructiō*) foundation, equiv. to *substruct(us),* ptp. of *substruere* to lay a foundation (*sub-* sub- + *struere* to arrange, put in order + *-tus* prp. suffix) + -*iōn-* -ION] —**sub·struc´tion·al,** *adj.*

**sub·struc·ture** (sub struk´chər, sub´struk´-), *n.* 1. a structure forming the foundation of a building or other construction. 2. the foundations, piers, and abutments upon which the trusses or girders of the spans of a bridge rest. 3. any basic structure or organization. [1720–30; SUB- + STRUCTURE] —**sub·struc´tur·al,** *adj.*

**sub·sul·fate** (sub sul´fāt), *n. Chem.* a basic salt of sulfuric acid. Also, **sub·sul´phate.** [1795–1805; SUB- + SULFATE]

**sub·sume** (sub säm´), *v.t., -sumed, -sum·ing.* 1. to consider or include (an idea, term, proposition, etc.) as part of a more comprehensive one. 2. to bring (a case, instance, etc.) under a rule. 3. to take up into a more inclusive classification. [1525–35; < ML *subsūmere,* equiv. to L *sub-* sub- + *sūmere* to take; see CONSUME] —**sub·sum´a·ble,** *adj.*

**sub·sump·tion** (sub sump´shən), *n.* 1. an act of subsuming. 2. the state of being subsumed. 3. something that is subsumed. 4. a proposition subsumed under another. [1630–40; < ML subsumptiōn- (s. of subsumptiō) a subjoining, equiv. to subsūmp(tus) (ptp. of subsūmere to subsume) + L -*iōn-* -ION] —**sub·sump´tive,** *adj.*

**sub·sur·face** (sub´sûr´fis, sub´sûr´-), *adj.* below the surface, esp. of a body of water. [1770–80; SUB- + SURFACE]

**sub·sys·tem** (sub´sis´təm, sub sis´-), *n.* a secondary or subordinate system. [SUB- + SYSTEM]

**sub·tan·gent** (sub tan´jənt), *n. Geom.* the part of the x-axis cut off between the ordinate of a given point of a curve and the tangent at that point. [1745–55; SUB- + TANGENT]

**sub·teen** (sub´tēn´), *n.* 1. a young person approaching the teens or adolescence. 2. a range of even-numbered garment sizes, chiefly from 6 to 14, designed for girls under 13. —*adj.* 3. of, pertaining to, or designed for subteens: *subteen clothes.* [1950–55; SUB- + TEEN]

**sub·tem·per·ate** (sub tem´pər it), *adj.* of, pertaining to, or occurring in the colder parts of the Temperate Zone. [1850–55; SUB- + TEMPERATE]

**sub·ten·ant** (sub ten´ənt), *n.* a person who rents land, a house, or the like, from a tenant. [1400–50; late ME. See SUB-, TENANT] —**sub·ten´an·cy,** *n.*

---

CHINESE PRONUNCIATION KEY: *act, cape, dâre, part; set, equal; if, ice; or, over, order, oil, book, boot, out; up, use, urge; a = a in alone, e in system, i in easily, o in gallop, u in circus;* " *as in fire (fi°r), hour (ou°r);* b bat n net

---

sub·pave´ment, *n.*
sub·per´fo·rate´, *adj.*
sub·per·i·to·ne´al, *adj.*
sub·pec·to·ral, *adj.*
sub´po·dun´cle, *n.*
sub´po·dun´cled, *adj.*
sub´po·dun´cu·lar, *adj.*
sub´po·dun´cu·late, *adj.*
sub´po·dun´cu·lat´ed, *adj.*
sub´pol·lu·cid´, *adj.; -ly, adv.; -ness, n.*
sub·pel·lu·cid´i·ty, *n.*
sub´pol´tate, *adj.; -ly, adv.*
sub´pe·ten´go·nal, *adj.*
sub´per·i·car´di·ac´, *adj.*
sub´per·i·car´di·al, *adj.*
sub·per´i·to·no´al, *adj.*
sub·per´i·od, *n.*
sub·pe·tro´sal, *adj.; -ly, adv.*
sub´pet·i·o·late´, *adj.*
sub·pet´i·o·lat´ed, *adj.*
sub·pe·tro´sal, *adj.*

sub´pha·ryn´geal, *adj.*
sub´pha·ryn´go·an´al, *adj.; -ly, adv.*
sub´phase´, *n.*
sub·phos´phate, *n.*
sub·phra´try, *n., pl. -tries.*
sub´phren´ic, *adj.*
sub·pla´cal, *adj.*
sub´pl·ose, *adj.*
sub·pli·os´i·ty, *n.*
sub´plano·oc´cult, *n.*
sub´plac·en·tal, *n., pl. -ta, -tae.*
sub´pla·con´tal, *adj.*
sub·plant´, *n.*
sub´plant´i·grade´, *adj.*
sub´plex·al, *adj.*
sub´plow´, *n.*
sub·plow´, *n.*
sub·pop·lit´i·cal, *adj.; -ly, adv.*
sub·pop´u·lar, *adj.*
sub·pop´u·la´tion, *n.*

sub´por·phy·rit´ic, *adj.*
sub´port´, *n.*
sub·post´mas´ter, *n.*
sub·post´mas´ter·ship´, *n.*
sub·post´script´, *n.*
sub´pro·cep´tor, *n.*
sub´pro·cep´to·ral, *adj.*
sub´pro·cep´to·rate, *n.*
sub´pro·cep·to´ri·al, *adj.*
sub´pred´i·cate, *n.*
sub´pred·i·ca´tion, *n.*
sub·pred´i·ca´tive, *adj.*
sub·pre´fec·to´ri·al, *adj.*
sub´pre·fec·ture, *n.*
sub´pre·hen´sile, *adj.*
sub·pre·pu´tial, *adj.*
sub´pri´ma·ry, *adj.*
sub·pri´or, *n.*
sub·pri´or·ship´, *n.*
sub·prob´lem, *n.*
sub·pop·u·la´tion, *n.*

sub´proc·to´ri·al, *adj.*
sub´proc´tor·ship´, *n.*
sub·pro´duct, *n.*
sub´pro·fes´sor, *n.*
sub´pro·fes´sor·ate, *n.*
sub·pro·fes´sor·i·al, *adj.*
sub´pro·fes´sor·ship´, *n.*
sub·pro·fit´a·ble, *adj.; -ble·ness, n.; -bly, adv.*
sub´pro·jec´tion, *n.*
sub´pro·por´tion·al, *adj.; -ly, adv.*
sub·pro·stat´ic, *adj.*
sub´pro·tec´tor, *n.*
sub´pro·rec´tor·ship´, *n.*
sub´pro·vin´co, *n.*
sub´pu´bic, *adj.*
sub·pul´mo·nar´y, *adj.*
sub´pul´vi·nar, *adj.*
sub·pur´chas´er, *n.*
sub·pyr´a·mid´ic·al, *adj.*
sub·pyr·e·ne´an, *adj.*

sub·pyr´i·form´, *adj.*
sub´quad·ran´gu·lar, *adj.*
sub´quad´rate, *adj.*
sub·qual´i·ty, *n., pl. -ties.*
sub·ques´tion, *n.*
sub·quin´que·fid, *adj.*
sub·race´, *n.*
sub·ra´di·ance, *n.*
sub·ra´di·an·cy, *n.*
sub·ra´di·ate, *adj.*
sub·ra´di·cal, *adj.*
sub·rad´i·cal, *adj.; -ness, n.*
sub·ra´mose, *adj.*
sub·ra´mous, *adj.*
sub·range´, *n.*
sub´rat´tion, *n.*
sub·re´bel´lion, *n.*
sub·rec´tan´gu·lar, *adj.*
sub·rec´tor, *n.*
sub·rec´to·ry, *n., pl. -ries.*
sub·ref´er·ence, *n.*
sub·re´gion, *n.*

# EXHIBIT 3-E

IEEE Std 100-1992

# The New IEEE Standard Dictionary of Electrical and Electronics Terms
## [Including Abstracts of All Current IEEE Standards]

## Fifth Edition

**Gediminas P. Kurpis, Chair**

**Christopher J. Booth, Editor**



The Institute of Electrical and Electronics Engineers, Inc.
345 East 47th Street, New York, NY 10017-2394, USA

Copyright © 1993 by the
Institute of Electrical and Electronics Engineers, Inc.
All rights reserved. Published 1993
Printed in the United States of America

ISBN 1-55937-240-0

*No part of this publication may be reproduced in any form,
in an electronic retrieval system or otherwise,
without the prior written permission of the publisher.*

*January 15, 1993*

SH15594

ing the motor to operate at a constant average speed that is a submultiple of its apparent synchronous speed. *See:* **asynchronous machine.**                                                                                                                            [9]

**subsynchronous satellite (communication satellite).** A satellite, for which the sidereal period of rotation of the primary body about its own axis is an integral multiple of the mean sidereal period of revolution of the satellite about the primary body.                              [19]

**subsystem (1) (unique identification in power plants).** A portion of a system containing two or more integrated components which, while not completely performing the specific function of a system, may be isolated for design, test, or maintenance.                                    803-1983
**(2) (unique identification in power plants and related facilities).** A portion of a system containing two or more interrelated components which may be isolated for design, test, or maintenance.                          804-1983
**(3) (nuclear power generating station protective systems).** That part of the system which effects a particular protective function. These subsystems may include, but are not limited to those actuating: reactor shutdown; safety injection; containment isolation; emergency core cooling; containment pressure and temperature reduction; containment air cleaning.                                      380-1975w
**(4) (software).** A secondary or subordinate system with a larger system.         610.12-1990
**(5) (local and metropolitan area networks).** An element in a hierarchical division of an open system that interacts directly only with elements in the next higher division or the next lower division of that open system.
                                           802.6-1990

**subtrahend.** A number to be subtracted from another number (the minuend) to produce a result (the difference).                          610.1

**subtransient current (rotating machinery).** The initial alternating component of armature current following a sudden short circuit. *See:* **armature.**                                    [9]

**subtransient internal voltage (synchronous machine) (specified operating condition).** The fundamental-frequency component of the voltage of each armature phase that would appear at the terminals immediately following the sudden removal of the load. *Note:* The subtransient internal voltage, as shown in the phasor diagram, is related to the terminal-voltage and phase-current phasors by the equation:

$$E''_1 = E_a + RI_a + jX'' _d I_{ad} + jX'' _q I_{aq}$$

For a machine subject to saturation, the reactances should be determined for the degree of saturation applicable to the specified operating conditions.                              [9]

**subtransient reactance (1) (power fault effects).** The reactance of a generator at the initiation of a fault. This reactance is used for the calculation of the initial symmetrical fault current. The current continuously decreases but it is assumed to be steady at this value as a first step, lasting approximately 0.05 s after a suddenly applied fault.                      367-1987
**(2) (electrical power systems in commercial buildings).** The apparent reactance of the stator winding at the instant the short circuit occurs.                                        241-1990

**subtrate (metal-nitride-oxide field-effect transistor).** This insulated-gate field-effect transistor (IGFET) region separates source from drain and is of opposite conductivity type. The potential on the substrate terminal can only be equally, or less attractive to the carriers in the channel than the source terminal.                                    581-1978w

**subtree.** A tree whose root node is part of a larger tree. *Note:* A subtree is made up of a node and all of its hierarchical descendants. *Syn:* **branch.**                           610.5-1990

**subtype.** A subset of a data type, obtained by constraining the set of possible values of the data type. *Note:* The operations applicable to the subtype are the same as those of the original data type. *See also:* **derived type.**
                                          610.12-1990

**subway transformer (power and distribution transformer).** A submersible-type distribution transformer suitable for installation in an underground vault.                      C57.12.80-1978

**sudden failure.** *See:* **failure, sudden.**

**sudden ionospheric disturbance (SID).** An ionospheric disturbance with a duration of a few minutes to a few hours, characterized by the sudden increase in the ionization of the D region in the daylight hemisphere as a result of a solar flare.                            211-1990

**sudden-pressure relay (power switchgear).** A relay that operates by the rate of rise in pressure of a liquid or gas.          C37.100-1981

**sudden short-circuit test (synchronous machine).** A test in which a short-circuit is suddenly applied to the armature winding of the machine under specified operating conditions.                                      [9]

**Suez Canal searchlight.** A searchlight constructed to the specifications of the Canal Administration that by regulation of the Administration, must be carried by every ship traversing the canal, so located as to illuminate the banks.                                   [119]

**suffix notation.** *See:* **postfix notation.**   610.1

**suicide control (adjustable-speed drive).** A control function that reduces and automatically maintains the generator voltage

# EXHIBIT 3-F

# McGraw-Hill

# Dictionary of

# Scientific and

# Technical

# Terms

## Fifth Edition



Please ask at Circulation
Desk for accompanying
software

**On the cover: Photomicrograph of crystals of vitamin B₁.**
(*Dennis Kunkel, University of Hawaii*)

Included in this Dictionary are definitions which have been published previously in the following works: P. B. Jordan, *Condensed Computer Encyclopedia*, Copyright © 1969 by McGraw-Hill, Inc. All rights reserved. J. Markus, *Electronics and Nucleonics Dictionary*, 4th ed., Copyright © 1960, 1966, 1978 by McGraw-Hill, Inc. All rights reserved. J. Quick, *Artists' and Illustrators' Encyclopedia*, Copyright © 1969 by McGraw-Hill, Inc. All rights reserved. *Blakiston's Gould Medical Dictionary*, 3d ed., Copyright © 1956, 1972 by McGraw-Hill, Inc. All rights reserved. T. Baumeister and L. S. Marks, eds., *Standard Handbook for Mechanical Engineers*, 7th ed., Copyright © 1958, 1967 by McGraw-Hill, Inc. All rights reserved.

In addition, material has been drawn from the following references: R. E. Huschke, *Glossary of Meteorology*, American Meteorological Society, 1959; *U.S. Air Force Glossary of Standardized Terms*, AF Manual 11-1, vol. 1, 1972; *Communications-Electronics Terminology*, AF Manual 11-1, vol. 3, 1970; W. H. Allen, ed., *Dictionary of Technical Terms for Aerospace Use*, 1st ed., National Aeronautics and Space Administration, 1965; J. M. Gilliland, *Solar-Terrestrial Physics: A Glossary of Terms and Abbreviations*, Royal Aircraft Establishment Technical Report 67158, 1967; *Glossary of Air Traffic Control Terms*, Federal Aviation Agency; *A Glossary of Range Terminology, White Sands Missile Range, New Mexico*, National Bureau of Standards, AD 467-424; *A DOD Glossary of Mapping, Charting and Geodetic Terms*, 1st ed., Department of Defense, 1967; P. W. Thrush, comp. and ed., *A Dictionary of Mining, Mineral, and Related Terms*, Bureau of Mines, 1968; *Nuclear Terms: A Glossary*, 2d ed., Atomic Energy Commission; F. Casey, ed., *Compilation of Terms in Information Sciences Technology*, Federal Council for Science and Technology, 1970; *Glossary of Stinfo Terminology*, Office of Aerospace Research, U.S. Air Force, 1963; *Naval Dictionary of Electronic, Technical, and Imperative Terms*, Bureau of Naval Personnel, 1962; *ADP Glossary*, Department of the Navy, NAVSO P-3097.

## McGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS, Fifth Edition

Copyright © 1994, 1989, 1984, 1978, 1976, 1974 by McGraw-Hill, Inc. All rights reserved. Printed in the United States of America. Except as permitted under the United States Copyright Act of 1976, no part of this publication may be reproduced or distributed in any form or by any means, or stored in a database or retrieval system, without the prior written permission of the publisher.

3 4 5 6 7 8 9 0     DOW/DOW     9 9 8 7 6 5

ISBN 0-07-042333-4

**Library of Congress Cataloging-in-Publication Data**

McGraw-Hill dictionary of scientific and technical terms /
    Sybil P. Parker, editor in chief.—5th ed.
        p.     cm.
    ISBN 0-07-042333-4
    1. Science—Dictionaries.    2. Technology—Dictionaries.
I. Parker, Sybil P.
Q123.M34   1993
503—dc20                                    93-34772
                                            CIP

**INTERNATIONAL EDITION**

Copyright © 1994. Exclusive rights by McGraw-Hill, Inc. for manufacture and export. This book cannot be re-exported from the country to which it is consigned by McGraw-Hill. The International Edition is not available in North America.

When ordering this title, use ISBN 0-07-113584-7.

by one that is more attainable or acceptable. { ,səb·stə'tü·shən }

**substitutional impurity** [SOLID STATE] An atom or ion which is not normally found in a solid, but which resides at the position where an atom or ion would ordinarily be located in the lattice structure, and replaces it. { ,səb·stə'tü·shən·əl im'pyür·əd·ē }

**substitution alphabet** [COMMUN] An alphabet used in a coded message in which each letter in the original message is replaced by another letter in the coded message, according to a set of rules. { ,səb·stə'tü·shən 'al·fə,bet }

**substitution cipher** [COMMUN] A cipher in which the characters of the original message are replaced by other characters according to a key. { ,səb·stə'tü·shən ,sī·fər }

**substitution method** [PHYS] Any method of measurement, such as substitution weighing, in which a quantity is determined by substituting for it a known quantity which produces the same effect. { ,səb·stə'tü·shən ,meth·əd }

**substitution reaction** [CHEM] Replacement of an atom or radical by another one in a chemical compound. { ,səb·stə'tü·shən rē,ak·shən }

**substitution solid solution** [MET] A solid alloy having the atoms of the solute located at some lattice of points of the solvent. { ,səb·stə'tü·shən 'säl·əd sə'lü·shən }

**substitution weighing** [MECH] A method of weighing to allow for differences in lengths of the balance arms, in which the object to be weighed is first balanced against a counterpoise, and the known weights needed to balance the same counterpoise are then determined. Also known as counterpoise method. { ,səb·stə'tü·shən ,wā·iŋ }

**substitutive nomenclature** [ORG CHEM] A system in which the name of a compound is derived by using the functional group (the substituent) as a prefix or suffix to the name of the parent compound to which it is attached; for example, in 2-chloropropane a chlorine atom has replaced a hydrogen atom on the central carbon of the propane chain. { 'səb·stə,tüd·iv 'nō·mən,klā·chər }

**substrain** [CYTOL] A strain derived by isolation of a single cell or group of cells having properties or markers not shared by the other cells of the cell strain. { 'səb,strān }

**substrate** [BIOCHEM] The substance with which an enzyme reacts. [ECOL] The foundation to which a sessile organism is attached. [ELECTR] The physical material on which a microcircuit is fabricated; used primarily for mechanical support and insulating purposes, as with ceramic, plastic, and glass substrates; however, semiconductor and ferrite substrates may also provide useful electrical functions. [ENG] Basic surface on which a material adheres, for example, paint or laminate. [ORG CHEM] A compound with which a reagent reacts. { 'səb,strāt }

**substratosphere** [METEOROL] A region of indefinite lower limit just below the stratosphere. { 'səb'strad·ə,sfir }

**substratum** [GEOL] Any layer underlying the true soil. { 'səb'strad·əm }

**substring** [COMPUT SCI] A sequence of successive characters within a string. { 'səb,striŋ }

**substructure** [CIV ENG] The part of a structure which is below ground. { 'səb,strək·chər }

**subsurface contour** See structure contour. { 'səb'sər·fəs 'kän,tür }

**subsurface current** [OCEANOGR] An underwater current which is not present at the surface or whose core (region of maximum velocity) is below the surface. { 'səb'sər·fəs 'kə·rənt }

**subsurface flow** [HYD] Interflow plus groundwater flow. { 'səb'sər·fəs 'flō }

**subsurface geology** [GEOL] The study of geologic features beneath the land and sea-floor surface. Also known as underground geology. { 'səb'sər·fəs jē'äl·ə·jē }

**subsurface tillage** [AGR] A method of stirring the soil with blades that leaves stubble on or just below the surface. { 'səb'sər·fəs 'til·ij }

**subsurface waste disposal** [ENG] A waste disposal method for manufacturing wastes in porous underground rock formations. { 'səb'sər·fəs 'wāst di,spōz·əl }

**subsurface wave** [ELECTROMAG] Electromagnetic wave propagated through water or land; operating frequencies for communications may be limited to approximately 35 kilohertz due to attenuation of high frequencies. { 'səb'sər·fəs 'wāv }

**subsynchronous** [ELEC] Operating at a frequency or speed



**SUBTENSE BAR**

The subtense bar used in the subtense technique of distance measurement. *(Lockwood, Kessler, and Bartlett Inc.)*

that is related to a submultiple of the source frequency. { 'səb'siŋ·krə·nəs }

**subsynchronous resonance** [ELEC] An electrical resonant frequency on an alternating-current transmission line that is less than the line frequency, and results from the insertion of series capacitors to cancel out part of the line and system reactance. { 'səb'siŋ·krə·nəs 'rez·ən·əns }

**subsystem** [ENG] A major part of a system which itself has the characteristics of a system, usually consisting of several components. { 'səb,sis·təm }

**subtangent** [MATH] For a given point on a plane curve, the projection on the *x* axis of a rectangular coordinate system of the segment of the tangent between the point of tangency and the intersection of the tangent with the *x* axis. { 'səb'tan,jənt }

**subtend** [BOT] To lie adjacent to and below another structure, often enclosing it. [MATH] A line segment or an arc of a circle subtends an angle with vertex at a specified point if the end points of the line segment or arc lie on the sides of the angle. { səb'tend }

**subtense bar** [ENG] The horizontal bar of fixed length in the subtense technique of distance measurement method. { 'səb'tens 'bär }

**subtense technique** [CIV ENG] A distance measuring technique in which the transit angle subtended by the subtense bar enables the computation of the transit-to-bar distance. { 'səb'tens tek'nēk }

**subterranean ice** See ground ice. { 'səb·tə'rān·ē·ən 'īs }

**subterranean stream** [HYD] A subsurface stream that flows through a cave or a group of communicating caves. { 'səb·tə'rān·ē·ən 'strēm }

**subtilin** [MICROBIO] An antibiotic substance obtained from *Bacillus subtilis*, active against gram-positive bacteria. { 'səb·tə·lən }

**subtracted time** [IND ENG] In a continuous timing technique, the difference between two successive readings of a stopwatch. { 'səb'trak·təd 'tīm }

**subtracter** [COMPUT SCI] A computer device that can form the difference of two numbers or quantities. { 'səb'trak·tər }

**subtraction sign** [MATH] The symbol −, used to indicate subtraction. Also known as minus sign. { 'səb'trak·shən ,sīn }

**subtractor** [ELECTR] A circuit whose output is determined by the differences in analog or digital input signals. { 'səb'trak·tər }

**subtraction** [MATH] The addition of one quantity with the negative of another; in a system with an additive operation this is formally the sum of one element with the additive inverse of another. { 'səb'trak·shən }

**subtractive primaries** [OPTICS] The three colors, usually yellow, magenta, and cyan (greenish-blue), which are mixed together in a subtractive process. { 'səb'trak·tiv 'prī,merēz }

**subtractive process** [OPTICS] The process of producing colors by mixing absorbing media or filters of subtractive primary colors. { 'səb'trak·tiv 'präs·əs }

**subtrahend** [MATH] A quantity which is to be subtracted from another given quantity. { 'səb'trə,hend }

**subtree** [MATH] A subgraph of a tree which is itself a tree. { 'səb,trē }

**Subtriquetridae** [INV ZOO] A family of arthropods in the suborder Porocephaloidea. { ,səb·trə'ketrə,dē }

**subtropic** [METEOROL] An indefinite belt in each hemisphere between the tropic and temperate regions; the polar boundaries are considered to be roughly 35-40° northern and southern latitudes, but vary greatly according to continental influence, being farther poleward on the western coasts of continents and farther equatorward on the eastern coasts. { 'səb'träp·ik }

**subtropical anticyclone** See subtropical high. { 'səb 'träp·ə· kəl ,anti'sī,klōn }

**Subtropical Convergence** [OCEANOGR] The zone of converging currents, generally located in midlatitudes. { 'səb'träp· ə·kəl kən'vər·jəns }

**subtropical cyclone** [METEOROL] The low-level (surface chart) manifestation of a cutoff low. { 'səb'träp·ə·kəl 'sī,klōn }

**subtropical easterlies** See tropical easterlies. { 'səb'träp·ə· 'ēs·tər,lēz }

**subtropical easterlies index** [METEOROL] A measure of the strength of the easterly wind between the latitudes of 20° and 35°N; the index is computed from the average sea-level pressure difference between these latitudes and is expressed as the east to west component of the corresponding geostrophic wind.

meters an[...]
tər,lēz ,in[...]
**subtropica**[...]
'träost }
**subtropica**[...]
highs of th[...]
as centers [...]
over ocean[...]
known as a[...]
cyclone. {[...]
**subtropica**[...]
belts of high[...]
near 30°N[...]
subtropical[...]
**subtropical**[...]
tər,lēz }
**subulate** [E[...]
'səb·yə·lət[...]
**Subulitacea**[...]
mollusks in[...]
fold but lack[...]
**Subuluridae**[...]
'səb·yə'lür[...]
**subuluroidea**[...]
nodes in the o[...]
lips with sen[...]
three teeth. {[...]
**subumbrella**[...]
body of a jelly[...]
**subunit** See p[...]
**subvoice-grad**[...]
width is small[...]
is usually a c[...]
grād ,chan·əl[...]
**subway** [CIV E[...]
the constructio[...]
**subway-type t[...]
**succession** [E[...]
change in the n[...]
munity and by [...]
which may grad[...]
a group of roc[...]
chronological or[...]
**accession of c[...]
season by either [...]
of the crop that[...]
wave crops in a [...]
succession. { sa[...]
**successive app[...]
analog-to-digital [...]
dering each bit [...]
equal to 0 or [...]
ak·ses·iv ə,prä[...]
**successive appr[...]
a problem in [...]
ed, this solutio[...]
roximation, and [...]
uired. { sək·se[...]
**successive fractu[...]
and fracturing op[...]
ture a new part [...]
**accessor** [MATH[...]
x *b* for which t[...]
{ sək·ses·ə[...]
**accessor job** [c[...]
ther job (predece[...]
ther job has be[...]
**cinamide** [BIOC[...]
nic acid. { səl[...]
**cinate** [ORG CH[...]
ple, sodium suc[...]
of succinic acid[...]
**nic acid** [ORG [...]
colorless crysta[...]
chemical interme[...]
{ sək'sin·ik [...]
**nic acid dehydr[...]
res the dehydro[...]

# EXHIBIT 3-G

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

TYLER DIVISION

Case Number 6:07-CV-067-LED


SFA Systems, LLC,

Plaintiff,

vs.

Infor Global Solutions, Inc.,

Defendant.


* * * * * * * * * * * * * * * * * * * * * * * *

            VIDEOTAPED DEPOSITION OF

            MICHAEL P. KREBSBACH

* * * * * * * * * * * * * * * * * * * * * * * *


DATE TAKEN:  09/22/08      BY:  CINDY M. TRATTLES


MAGNA LEGAL SERVICES

CONFIDENTIAL - ATTORNEY'S EYES ONLY

SFA020216
f59abcb6-0621-4a6e-bd4f-64d94bbeacec

Page 82

1   A   I understand.
2   Q   What a subsystem is.  And is it your understanding
3       that you don't know if it's a subsystem or not?
4       That's a fair answer.  I just want to know what
5       your answer is.
6           MR. EDMONDS:  Objection, form.
7   Q   (By Mr. Zaher) Either it is or it isn't or you
8       don't know?
9           MR. EDMONDS:  Objection, form.
10  A   The problem is that's a very technical question
11      when you see one word on a page of a block diagram
12      that I haven't seen in many many years.
13  Q   (By Mr. Zaher) Take your time.
14  A   Data by itself implies storage.
15  Q   Okay.
16  A   And so without reading this entire patent I don't
17      know if what you're pointing to on one of the last
18      pages and referring to this Figure 2 if data was a
19      subsystem.  I see API on top of the word Data,
20      which to me implies it was a sub -- meant to be a
21      subsystem rather than a storage container.
22  Q   Okay.  And that would be the same thing as an event
23      manager or the Communications block?
24          MR. EDMONDS:  Objection, form.
25  A   It's my understanding that an event manager and the

Page 83

1       communications would be subsystems.
2   Q   (By Mr. Zaher) Okay.  Okay.  What is order
3       management?
4           MR. EDMONDS:  Objection, form.
5   A   Order management is the management of an order.
6   Q   (By Mr. Zaher) And sales management, what is sales
7       management?
8           MR. EDMONDS:  Objection, form.
9   A   I don't recall what we meant by sales management in
10      this figure.
11  Q   (By Mr. Zaher) Well, this system as far as you
12      invented it and understood it to work, would this
13      system be capable of generating an offer or a sales
14      quote?
15          MR. EDMONDS:  Objection, form.
16  Q   (By Mr. Zaher) For pricing?
17          MR. EDMONDS:  Objection, form.
18  A   I believe so.
19  Q   (By Mr. Zaher) Is that one of its purposes?
20          MR. EDMONDS:  Objection, form.
21  Q   (By Mr. Zaher) Or were those one of its purposes,
22      some of its purposes?
23          MR. EDMONDS:  Same objection.
24  A   Yes.
25  Q   (By Mr. Zaher) Okay.

Page 84

1           MR. ZAHER:  John, you've made this
2       objection.  I'd like to meet your objection.  What
3       is the problem and I'll try to see if I can correct
4       it?
5           MR. EDMONDS:  Well, I can't tell whether
6       you're asking him about terms in the abstract or
7       whether you're talking about terms in the patent.
8       To the extent you're talking about terms in the
9       patent, the construction of those terms is a matter
10      of law for the Court.
11          MR. ZAHER:  Okay.
12          MR. EDMONDS:  And the witness has
13      testified that he's spent 10 minutes reviewing this
14      thing in the last 13 years.  So, you know, to the
15      extent you're asking him questions about something
16      in the context of the patent you're really just
17      asking him to speculate at this point.
18          MR. ZAHER:  Okay.  Well, the question
19      really is as to Figure 2 and those are the words
20      that are on Figure 2.
21  Q   (By Mr. Zaher) You understand we're talking about
22      Figure 2 and the words that are on Figure 2?
23  A   Yes.
24  Q   Okay.  Do you understand those words?
25  A   I understand the words, but I don't know what the

Page 85

1       reference to Figure 2 is.
2   Q   What reference?
3   A   Somewhere in this document it talks about Figure 2
4       and all these numbers.  I see a basic block
5       diagram.
6   Q   Uh-hum.  Is it fair to say that this is a block
7       diagram about your invention?
8   A   Yes.
9   Q   Okay.  Drawing your attention back to Claim 1.  Do
10      you see the next paragraph following the plurality
11      of the substances is the detecting one or more
12      changes in state characteristic.  Do you see that?
13  A   Yes.
14  Q   What is meant by detecting one or more changes in
15      state characteristic of an event occurring within
16      the system?  Can you explain that?
17          MR. EDMONDS:  Objection, form.
18  A   I just read it to mean what the words actually
19      state.  I mean I would consider it to be standard
20      definitions of the words involved.
21  Q   (By Mr. Zaher) Give me an example of
22      detecting one or more changes in state
23      characteristic of an event occurring within the
24      system.
25          MR. EDMONDS:  Objection to form.

22  (Pages 82 to 85)

MAGNA LEGAL SERVICES

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 86

1   A   A change in state would be if you picked one engine
2      and then decided to choose another engine, the
3      state of the engine selected would have changed.
4   Q   (By Mr. Zaher) And that would be --. How would
5      that be understood in the system? Would that be a
6      variable that might change? Is that what that
7      could be?
8          MR. EDMONDS: Objection, form.
9   A   A variable --. The word variable is a broad
10      meaning term in programming. Everything is based
11      on variables. If it can change, by definition it's
12      a variable. So it would be a variable changing.
13  Q   (By Mr. Zaher) Okay. Would that be say a change in
14      some information in the database? Could that be
15      the same kind of change in state?
16          MR. EDMONDS: Objection, form.
17  A   To the extent that when you refer to database
18      you're talking about data that can be changed while
19      the system is being used as opposed to data that's
20      put into the system to help it operate.
21  Q   (By Mr. Zaher) Which one of those would it be
22      closest to?
23          MR. EDMONDS: Objection, form.
24  A   Oh, "detecting one or more changes in state
25      characteristic of an event occurring within the

Page 87

1      system". If I go back to that, that means it's
2      detecting one or more changes in state
3      characteristic of an event occurring within the
4      system. That's state characteristic, if it
5      changes.
6   Q   (By Mr. Zaher) Could that be an example of a change
7      of information in a database?
8          MR. EDMONDS: Objection, form.
9   A   If it's variable, it can change. If it's static,
10      it cannot change. So it would not change.
11  Q   (By Mr. Zaher) I see. So your point is that if
12      it's a spot in the database that is static and
13      never intended to be changed, it wouldn't refer to
14      that. But if it was a place in the database or
15      data system where it's intended to be changed, it
16      could refer to that; is that what you're saying?
17          MR. EDMONDS: Objection to form.
18  A   Yes.
19  Q   (By Mr. Zaher) Okay. How does the system detect
20      changes in state? What is that process?
21          MR. EDMONDS: Objection, form.
22  A   That's the very process of coding a system.
23  Q   (By Mr. Zaher) I don't understand your answer.
24      Could you explain that in more detail?
25          MR. EDMONDS: Same objection.

Page 88

1   A   A system is made up of a set of instructions that
2      operate inside a computer.
3   Q   (By Mr. Zaher) Okay.
4   A   And the inherent operation of a computer is to
5      continually check the state of any variable as
6      defined by the programmer.
7   Q   And do all computer programs do that?
8          MR. EDMONDS: Object to form.
9   A   Since I don't know all computer systems, if you're
10      talking in laymen's terminology as opposed to in
11      general how computer systems operate, yes, that's
12      how they operate. They continually cycle through
13      and look for changes.
14  Q   (By Mr. Zaher) Okay. And how about your specific
15      programs that you were working on and designing and
16      coding, did your systems do this?
17          MR. EDMONDS: Objection, form.
18  A   Yes.
19  Q   (By Mr. Zaher) Okay. The next element is
20      "inferring occurrence of the event and a context in
21      which the event occurred based at least in part on
22      the detected changes in state". Do you understand
23      that?
24          MR. EDMONDS: Objection, form.
25  A   I understand it as it's written.

Page 89

1   Q   (By Mr. Zaher) Okay. Can you give me an example of
2      that like you did detecting?
3          MR. EDMONDS: Objection to form.
4   A   I can't recall.
5   Q   (By Mr. Zaher) You can't give me an example of what
6      that would be as you did for detecting? You can't
7      do it for occurrence?
8          MR. EDMONDS: Objection, form.
9   A   In terms of detecting, that's much more common than
10      inferring and I cannot remember from that long ago
11      at that point in time an example of inferring
12      occurrence.
13  Q   (By Mr. Zaher) You understand what it means though;
14      right?
15  A   Uh-hum.
16  Q   Okay. But you can't give me an example in the
17      abstract of how that would work?
18          MR. EDMONDS: Objection, form.
19  A   I want to be accurate and so I cannot recall what
20      it would be.
21  Q   (By Mr. Zaher) You can't recall what it would be.
22      Okay. Why don't you explain what it is then.
23          MR. EDMONDS: Objection, form.
24  A   Inferring occurrence of the event is
25      self-explanatory. Inferring that something has

23  (Pages 86 to 89)

MAGNA LEGAL SERVICES

CONFIDENTIAL - ATTORNEY'S EYES ONLY

SFA020238
f59abcb6-0621-4a6e-bd4f-64d94bbeacec

Page 90

1   happened. Inferring an occurrence. "Inferring
2   occurrence of the event and a context in which the
3   event occurred based at least in part on the
4   detected changes in state."
5          It's simply what it states there, that
6   there is an occurrence of an event that is in some
7   sort of context, such as speccing a truck. That's
8   a context of a configuration. And the event
9   occurred based on detected changes in state. So if
10  someone selects an option that was previously not
11  selected, it would have changed state.
12         And the event that occurred would have
13  been that an action occurred, such as pointing to
14  something and causing it to change state. And the
15  system inferred the occurrence of the event because
16  there are rules in the configurator that instruct
17  it to look at another section of the configuration
18  that may have changed states based on rules.
19  Q   (By Mr. Zaher) I see. Okay. That was very
20  helpful. Thank you.
21         Now, the next step is, "Automatically
22  initiating an operation in one or more particular
23  subsystems of the compute to facilitate a new
24  action based on the inferred context." If you
25  could please do the same thing you just did for

Page 91

1   inferring just to relate that.
2   A   The second part of my answer --
3          MR. EDMONDS: Objection, form. Go ahead.
4   A   The second part of my answer is that the
5   automatically initiating an operation means because
6   one thing --. One of the meanings as I recall
7   would be that a new component is selected based on
8   selecting a component in a completely different
9   area, that the system automatically initiates an
10  operation to change the state of a component in a
11  different area.
12  Q   (By Mr. Zaher) So if you were to upgrade to a tire
13  that was a bigger size, it would automatically
14  update the axle that would accommodate that, for
15  example?
16  A   That could be an example.
17  Q   Is that a fair example? Or if there's a better
18  one, give me one. I'd like to hear it from you.
19  Does that one work?
20  A   From a technical standpoint tires don't affect
21  axles.
22  Q   Why don't you give me one that would be more
23  accurate then.
24  A   That if you changed engines, you might have to have
25  a different radiator because of physical fit.

Page 92

1   Q   I see. So if you upgraded to a more powerful
2   engine, the automatic initiation aspect of that
3   would be to accommodate the engine whatever other
4   related components would be, like the alternator or
5   the battery size or the radiator would be
6   automatically changed?
7   A   Uh-hum.
8   Q   Is that what that means? Okay. I see. And so is
9   that --. For example, we were talking about the
10  TCO, the truck change order. Would that be a
11  process that could be initiated through this
12  automatic initiating phase here?
13         MR. EDMONDS: Objection, form.
14  A   The question I don't think --. It's an apples and
15  oranges thing.
16  Q   (By Mr. Zaher) Okay. Well, for example, if you had
17  an existing order and somebody, a customer made a
18  change, I wanted a more powerful truck. I'm doing
19  a heavier load, so I'd like to change my order. So
20  they initiate a change order. That's what you told
21  me were some of the things the software would do.
22  A   Uh-hum.
23  Q   So they would do that. Would there be sort of an
24  automated process to then --. To change the
25  engine, as you had said, they've got to put maybe a

Page 93

1   different radiator, a different battery. Would
2   that be --
3   A   As far as the system is concerned, it's just like
4   doing a new order. You just had a starting point.
5   Q   Okay.
6   A   You made a change. The system behaved the way it
7   normally changed.
8   Q   Okay.
9   A   And then you would submit that not as a new order,
10  but --
11  Q   I meant as a change.
12  A   A change.
13  Q   Truck change order, the TCO.
14  A   Okay. So the truck change order. And the word
15  change tells the factory they have an order.
16  Q   Yes.
17  A   Now you have a new one.
18  Q   Okay.
19  A   But from the system standpoint it's just a
20  continuation of the speccing process.
21  Q   I see. And so since it was a change in order,
22  there was a context in which there was a prior
23  order because you had one to begin with; is that
24  right?
25         MR. EDMONDS: Objection to form.

24 (Pages 90 to 93)

MAGNA LEGAL SERVICES

CONFIDENTIAL - ATTORNEY'S EYES ONLY

SFA020239
f59abcb6-0621-4a6e-bd4f-64d94bbeacec

# EXHIBIT 3-H

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

Case No. 6:07-cv-607

SFA SYSTEMS, LLC,

Plaintiff,

v.

INFOR GLOBAL SOLUTIONS,

Defendant.

_____

VIDEOTAPE DEPOSITION OF:  DAVID ROBERT LUNDBERG
                          September 25, 2008
                          (ATTORNEY'S EYES ONLY)

_____

        PURSUANT TO NOTICE AND SUBPOENA, the
videotape deposition of DAVID ROBERT LUNDBERG was
taken on behalf of the Defendant at 1200 17th Street,
Suite 1900, Denver, Colorado 80202, on September 25,
2008, at 9:12 a.m., before Sharon L. Szotak, Registered
Professional Reporter, Certified Realtime Reporter, and
Notary Public within Colorado.

CONFIDENTIAL - ATTORNEY'S EYES ONLY                              SFA020763
                                                     f2eb50d7-91c9-4e06-a3d3-a1eaead1aaba

SFA Systems, LLC v. Infor Global Solutions   DAVID ROBERT LUNDBERG                9/25/2008

Page 62

10:41:38  1   you know, this idea of -- of, you know, always looking
10:41:43  2   for ways to make things more effective and more
10:41:47  3   beneficial for the salespeople or the sales process.
10:41:51  4   And starting with the concept, you know, what would
10:41:53  5   make that better, what automation or what -- how can we
10:41:57  6   apply, you know, what's going on in the sales process
10:42:02  7   and how can we, you know, make that better.
10:42:06  8       Q.   So what's your understanding of what's --
10:42:08  9   what's in here, then?  What this patent -- the
10:42:10 10   invention is that's disclosed in this patent?
10:42:12 11           MR. EDMONDS:  Objection to form.
10:42:16 12       A.   You know, again, I haven't read it, so
10:42:19 13   I -- you know, for a long time.  But the -- the aspect
10:42:22 14   of it was to be able to, you know, look at different
10:42:29 15   things going on in the sales process, you know, the --
10:42:33 16   what might be going on with, you know -- you know,
10:42:38 17   looking at a customer's requirements to what that
10:42:44 18   customer -- what that customer's, you know, annual
10:42:48 19   sales are.  So if their annual sales are going down,
10:42:51 20   you might sell to them one way.  If their annual sales
10:42:55 21   are going up, you might sell to them a different way.
10:42:58 22           And looking at -- being able to capture
10:43:01 23   the context of what's going on in that customer's
10:43:03 24   buying process, so to speak, or in that relationship
10:43:06 25   between the seller and the buyer and saying, you know,

Page 63

10:43:08  1   what -- what -- what would change if we -- if the -- if
10:43:13  2   the salesperson knew this, what would change over here,
10:43:17  3   and being able to put, you know, a system in place that
10:43:20  4   would recognize what's going on across those different
10:43:23  5   areas.
10:43:32  6       Q.   Was that something that you thought that
10:43:34  7   salespeople were doing on their own, you know, without
10:43:39  8   the assistance of software?
10:43:41  9           MR. EDMONDS:  Objection to form.
10:43:44 10       A.   I don't -- I don't know that we looked at
10:43:48 11   it that way.  You know, we were looking for what's --
10:43:51 12   what would uniquely add value into that process to, you
10:43:55 13   know, help the customer buy the right thing and help
10:43:58 14   the sales -- the seller be selling the right thing, and
10:44:03 15   having, you know -- you know, something that was doing
10:44:07 16   things that either the customer or the salesperson
10:44:09 17   wouldn't recognize or be able to do on their own.
10:44:19 18       Q.   What kind of things did you have in mind?
10:44:22 19           MR. EDMONDS:  Objection to form.
10:44:24 20       A.   You mean as far as -- as -- give me a
10:44:30 21   little more.  I'm trying to figure out what you're
10:44:32 22   looking for.
10:44:32 23       Q.   When you were talking about the, you
10:44:44 24   know -- when you talked about recognizing things that
10:44:47 25   the -- you know, the salesperson or the customer might

Page 64

10:44:51  1   not recognize --
10:44:52  2       A.   Uh-huh.
10:44:53  3       Q.   -- what kind of things did you have in
10:44:54  4   mind?
10:44:55  5           MR. EDMONDS:  Objection, form.
10:44:55  6       A.   You know, I -- you know, the example I
10:44:57  7   just gave is, you know -- that's one example.  You
10:45:05  8   know, other examples might be -- it's been a long time
10:45:13  9   since I've looked at it.
10:45:15 10           The -- you know, the idea of -- of, you
10:45:19 11   know, looking at a customer's credit score, for
10:45:22 12   example, corporate credit score, and being able to, you
10:45:26 13   know, understand or have that change what was being
10:45:30 14   offered or suggested to the customer that they buy
10:45:35 15   based on other information or other triggers that
10:45:37 16   would -- would influence, you know, probability of the
10:45:41 17   customer buying the right thing.
10:45:43 18       Q.   Did these -- I guess the series of ideas
10:45:46 19   that ultimately led to this invention, did they -- did
10:45:49 20   they start from the products that CWC was selling at
10:45:54 21   that time?
10:45:55 22           MR. EDMONDS:  Objection to form.
10:45:57 23       A.   Well, again, the products that CWC was
10:45:59 24   selling at that time didn't have this concept in it.  I
10:46:02 25   mean, that's -- you know, that's what we were -- we got

Page 65

10:46:08  1   excited about and, you know, why we put it into -- into
10:46:12  2   a patent is -- is, you know -- prior to that, things
10:46:16  3   were done within the solutions for the customers kind
10:46:20  4   of within isolation.  You know, it would -- the rules
10:46:22  5   would come from the customer, and, you know, it was
10:46:26  6   simply, you know, read the rules and do something on
10:46:28  7   the screen.
10:46:30  8           This was going beyond that and saying, you
10:46:32  9   know, what should happen if -- if the salesperson would
10:46:38 10   know this other thing or these other three things going
10:46:40 11   on, what would be different, you know, and being able
10:46:44 12   to -- to have that -- you called it automated or -- or
10:46:48 13   a system in place that would look for those differences
10:46:50 14   and make changes based on -- on what -- what -- you
10:46:55 15   know, what other things were going on at the same time.
10:46:58 16       Q.   So the system would rely on a broader set
10:47:00 17   of data?
10:47:02 18           MR. EDMONDS:  Objection to form.
10:47:05 19       A.   You know, from a technical solution, you
10:47:08 20   know, a broader set of data, broader side of knowledge
10:47:13 21   or events or the context of what's going on around that
10:47:17 22   sales opportunity.
10:47:19 23       Q.   I guess, relative to the -- you know, the
10:47:22 24   software that CWC was selling, you know, before this --
10:47:26 25   this patent --

ATTORNEY'S EYES ONLY

depo@huntergeist.com          HUNTER + GEIST, INC.   303.832.5966/800.525.8490

CONFIDENTIAL - ATTORNEY'S EYES ONLY

SFA020779

f2eb50d7-91c9-4e06-a3d3-a1eaead1aaba

SFA Systems, LLC v. Infor Global Solutions    DAVID ROBERT LUNDBERG                    9/25/2008

Page 66

10:47:27 1    A. Uh-huh.
10:47:28 2    Q. -- that, you know, looked at certain data
10:47:29 3  and applied certain rules and produced a certain
10:47:32 4  outcome, right?
10:47:33 5        MR. EDMONDS: Objection to form.
10:47:34 6    A. Yes. I mean, to -- to -- you know, the
10:47:38 7  customer supplied rules, basically, statements that
10:47:43 8  says, you know, if the customer selects this option,
10:47:46 9  then this option is not available, or if this one --
10:47:49 10 you know, but it's -- it was the isolated concept. It
10:47:52 11 was -- it was good stuff, but it was still isolated in
10:47:55 12 context.
10:47:56 13   Q. But it took -- it took the data that was
10:47:58 14 available to the system and then applied the rules that
10:48:00 15 were supplied to the system, and then gave a certain
10:48:03 16 output, right?
10:48:05 17   A. For that particular -- you know, like, for
10:48:07 18 the purpose of -- of speccing out a truck, you know,
10:48:11 19 or -- or making sure that the right options were added
10:48:14 20 onto a truck. That -- maybe I'm not explaining it
10:48:18 21 well, but that was -- that was the the -- the scope or the
10:48:21 22 limit. It -- it looked at just that -- that process,
10:48:25 23 the process of scoping out a truck and adding options
10:48:29 24 to a truck, for example.
10:48:30 25        And so it only took the rules that applied

Page 67

10:48:33 1  to what option could go on and could not go off -- or
10:48:37 2  could not -- could go on and could not go on based on
10:48:40 3  the rules that came from the company, from the
10:48:43 4  customer's company.
10:48:44 5    Q. And then the new system, that used rules,
10:48:47 6  also? Or did that use rules, also, I guess?
10:48:50 7    A. Well, we didn't get into, you know,
10:48:54 8  whether it was rules or -- or whatever. It was -- the
10:48:58 9  concept is, you know, being able to look beyond just
10:49:01 10 that narrow thing and take multiple things and the
10:49:04 11 context in which it's happening to make -- cause
10:49:06 12 something else to happen.
10:49:16 13   Q. When you're talking about looking beyond
10:49:18 14 the context, so in the old system we talked about, it
10:49:22 15 would look at what options were available and apply the
10:49:24 16 rules of, you know, what options could -- could or
10:49:28 17 could not go with each other, right?
10:49:30 18   A. Yeah. Based -- based on the -- you know,
10:49:33 19 it was basically from the engineering database of the
10:49:35 20 company saying -- what's an example? -- this -- this
10:49:43 21 fuel tank cannot go on this truck. You know, it
10:49:46 22 just -- it doesn't fit, or whatever reason they had.
10:49:49 23 It doesn't fit, so that one's not available. Here are
10:49:51 24 the three that are available, that based on the
10:49:54 25 engineering rules from that company that said if this,

Page 68

10:49:57 1  then you can't have that. And so that's -- it was the
10:50:00 2  narrow -- it was the context of just understanding what
10:50:03 3  could and couldn't fit. That was good stuff, but
10:50:06 4  that's not -- that's not what we were trying to get
10:50:08 5  after.
10:50:08 6    Q. Then in this new system, it would also
10:50:10 7  look to say the customer's -- like, to use your
10:50:13 8  example, their credit score, and it might say if their
10:50:16 9  credit score is above a certain number, you know,
10:50:18 10 recommend this, and if it's below that number,
10:50:21 11 recommend a different option. Is that something that
10:50:22 12 the system might do?
10:50:24 13       MR. EDMONDS: Objection to form.
10:50:26 14   A. Yeah. I mean, just -- it boils back to
10:50:29 15 being able to look across more than just that isolated
10:50:33 16 event and being able to take, you know, the aspect of
10:50:37 17 the context of -- of other pieces of information, so to
10:50:40 18 speak.
10:50:49 19   Q. But then the system would take that
10:50:51 20 context and how -- how would it get to a result? Would
10:50:55 21 it apply rules to reach a result, or was it some other
10:50:59 22 process?
10:50:59 23       MR. EDMONDS: Objection to form.
10:51:00 24   A. I don't recall -- I don't recall that we
10:51:02 25 defined how, you know -- what technology or -- or, you

Page 69

10:51:06 1  know, was it rules or -- you know, I don't recall
10:51:09 2  what -- you know, what we defined as how it would work.
10:51:13 3  You know, how the technology would be applied or what
10:51:16 4  technology would be used to -- to enable it.
10:51:20 5    Q. So at the time that you developed it, you
10:51:22 6  didn't necessarily have an understanding of how it
10:51:25 7  would function in the real world? It was just at a
10:51:28 8  conceptual level?
10:51:30 9        MR. EDMONDS: Objection to form.
10:51:30 10   A. Well I think, as I recall -- again, it's
10:51:33 11 been a long time. But, you know, we certainly, you
10:51:37 12 know, had -- had an aspect and understanding that it
10:51:41 13 could, in fact, be deployed. I mean, it wasn't -- I
10:51:44 14 mean, we wanted to be able to sell it and market it, so
10:51:46 15 it had to be buildable. And we had the concept --
10:51:51 16 again, I'm not the right one to explain from a
10:51:53 17 technology and code how it was going to be done, but we
10:51:56 18 had the concept and understanding, and, in fact, it
10:51:59 19 was -- it was absolutely doable.
10:52:01 20   Q. What was your role in developing this
10:52:03 21 invention?
10:52:05 22   A. You know, the -- in bouncing ideas across
10:52:09 23 each other, you know, understanding what -- what the
10:52:13 24 marketplace was looking for, and if we could do a
10:52:17 25 certain thing, what the value of that would be to a

18 (Pages 66 to 69)

ATTORNEY'S EYES ONLY

depo@huntergeist.com          HUNTER + GEIST, INC.   303.832.5966/800.525.8490

CONFIDENTIAL - ATTORNEY'S EYES ONLY

SFA020780

f2eb50d7-91c9-4e06-a3d3-a1eaead1aaba

SFA Systems, LLC v. Infor Global Solutions   DAVID ROBERT LUNDBERG          9/25/2008

## Page 70

10:52:20 1    customer and how they could exploit the value of that.
10:52:27 2    You know, coming up with, you know, maybe scenarios, if
10:52:30 3    we could do that, and that would be the ideas bouncing
10:52:33 4    amongst us, you know.  If we could do that, then we
10:52:36 5    could also do this.  And that's how the ideas kind of
10:52:39 6    grew, so --
10:53:06 7          Q.  So do you recall with any more specificity
10:53:11 8    than that, you know, what it was that -- any particular
10:53:13 9    parts of this concept that -- that, you know, you
10:53:17 10   recall were your own or --
10:53:22 11         A.  You know, I don't.  You know, it was --
10:53:25 12   you know, maybe I'm not doing a good enough job of
10:53:30 13   explaining, but it was -- it was the genesis of ideas
10:53:33 14   by talking and thinking together and -- and -- I mean,
10:53:38 15   that's kind of -- I guess that's how ideas always grow,
10:53:42 16   to me, you know.
10:53:43 17         Q.  I guess, how was it that you and
10:53:45 18   Mr. Johnson and Mr. Krebsbach came to be working
10:53:49 19   together on this particular concept?
10:53:57 20         A.  You know, we just did.  I mean, that was
10:54:02 21   part of my responsibilities from a product management
10:54:05 22   and oversseeing those type of things.  Mike worked with
10:54:11 23   customers and had a good understanding of the market,
10:54:13 24   you know.  Jerry was Jerry.  He was very insightful
10:54:18 25   and -- and, you know, helped, you know, in the

## Page 71

10:54:21 1    collaboration of those ideas and was a good one at
10:54:24 2    throwing out challenges and then talking about
10:54:26 3    solutions for those.
10:54:30 4          Q.  Do you know -- did Clear With Computers
10:54:33 5    ever sell a product that did what's described in this
10:54:37 6    patent?
10:54:38 7              MR. EDMONDS:  Objection to form.
10:54:39 8          A.  I don't recall.
10:54:45 9          Q.  Do you recall if they ever started working
10:54:47 10   on developing a product?  I think you said that you
10:54:50 11   felt like this idea was really, you know, revolutionary
10:54:53 12   and would really find a lot of acceptance in the
10:54:56 13   marketplace and would be what customers would want.  So
10:54:58 14   in conjunction with developing the patent, did you
10:55:00 15   start working on a product?
10:55:03 16         A.  Not that I recall directly related to it,
10:55:06 17   no.
10:55:27 18         Q.  Could I have you take a look at the back
10:55:29 19   of the patent, or what's called the claims.  Are you
10:55:33 20   familiar with the claims?
10:55:35 21         A.  Okay.
10:55:36 22         Q.  And so if you could start with column 35.
10:55:42 23   Column numbers are written at the top of the --
10:55:44 24         A.  Okay.
10:55:45 25         Q.  And toward the very bottom of that column

## Page 72

10:55:47 1    you'll see, "What is claimed is."  And then it says
10:55:49 2    number 1.  Do you see that?
10:55:51 3          A.  Yes.
10:55:52 4          Q.  If you could read to yourself, read
10:55:54 5    through claim 1.  I'm just curious if maybe that will
10:55:57 6    refresh your recollection at all about any of the
10:55:59 7    development of this -- this invention or how it related
10:56:02 8    to any products that CWC might have been working on.
10:58:19 9          A.  (The deponent perused the exhibit.)
10:58:20 10         Q.  Did you have a chance to look over that?
10:58:22 11         A.  Yes.
10:58:23 12         Q.  I imagine that's not necessarily the
10:58:25 13   language you might choose to use to -- to describe your
10:58:29 14   invention, but does that, you know, help you remember
10:58:31 15   at all what it was that the three of you --
10:58:34 16         A.  Uh-huh.
10:58:35 17         Q.  -- you know, were talking about?
10:58:37 18         A.  Uh-huh.
10:58:37 19         Q.  Does that shed any light on maybe the
10:58:39 20   process through which this invention came about?
10:58:42 21         A.  No.
10:58:45 22         Q.  Would it allow you to kind of describe
10:58:47 23   with any more particularity, you know, the idea that it
10:58:50 24   is that you had?
10:58:52 25         A.  No.  I think, you know, after reading

## Page 73

10:58:54 1    this, the example, you know, kind of seems to -- this
10:58:59 2    know, that's what I recall, so --
10:59:02 3          Q.  When you say, "the example," which example
10:59:03 4    are you talking about?
10:59:05 5          A.  The one that you read back to me with, you
10:59:07 6    know, credit scores and, you know, just -- and they
10:59:10 7    used the word "systems," you know.  One area of the
10:59:13 8    sales process were the sales system being influenced
10:59:18 9    and recognizing the context of that into another part,
10:59:22 10   you know, of the sales process or another part of the
10:59:24 11   sales system.
10:59:25 12         Q.  So in that example, the one part of a
10:59:27 13   sales system might be the information about the
10:59:29 14   customer's credit score?
10:59:32 15         A.  That's an example.  You know --
10:59:34 16         Q.  And then, I guess, what would be the other
10:59:36 17   part?  The other part would be something that generated
10:59:39 18   offers or -- or what would be the other part of the system
10:59:41 19   be?
10:59:42 20         A.  It could be a part -- you know, the
10:59:44 21   configuration part.  It could be the pricing part.  It
10:59:47 22   could be discounts.  I don't know.  There -- you know,
10:59:52 23   that was different -- different parts of it.
10:59:56 24         Q.  So if we were to look at the claim, the
10:59:59 25   first part, where it says, a plurality of subsystems,

19 (Pages 70 to 73)

ATTORNEY'S EYES ONLY

depo@huntergeist.com      HUNTER + GEIST, INC.   303.832.5966/800.525.8490

CONFIDENTIAL - ATTORNEY'S EYES ONLY

SFA020781

f2eb50d7-91c9-4e06-a3d3-a1eaead1aaba

SFA Systems, LLC v. Infor Global Solutions   DAVID ROBERT LUNDBERG                          9/25/2008

Page 74

11:00:05 1    the plurality of subsystems could be all those things
11:00:08 2    that you just described?  Is that right?
11:00:10 3            MR. EDMONDS:  Objection, form.
11:00:14 4        A.  I guess.  You know, I -- when you say
11:00:17 5    plurality of subsystems, that's -- you know, there's
11:00:20 6    multiple subsystems.
11:00:21 7        Q.  So in your understanding, would the
11:00:24 8    configuration be one of the subsystems?
11:00:27 9            MR. EDMONDS:  Objection to form.
11:00:29 10       A.  Again, it's been a long time since we were
11:00:31 11   having the discussions around the patent, but, you
11:00:33 12   know, it seems logical.
11:00:36 13       Q.  And pricing?  Would that be another
11:00:39 14   subsystem?
11:00:40 15           MR. EDMONDS:  Objection to form.
11:00:41 16       A.  Could be.
11:00:43 17       Q.  It could be different in any
11:00:44 18   implementation, but those are possibilities?  Is
11:00:47 19   that --
11:00:48 20           MR. EDMONDS:  Same objection.
11:00:49 21       A.  Correct.
11:00:49 22       Q.  Do you have any understanding, at the top
11:00:51 23   of column 36, the event manager, what that component of
11:00:55 24   the system would be?
11:00:56 25           MR. EDMONDS:  Objection, form.

Page 75

11:00:58 1        A.  Well, as I recall, the event manager was
11:01:03 2    kind of just exactly what it describes.  It -- it --
11:01:07 3    you know -- you know, looks for, you know, changes
11:01:12 4    or -- or changes of events or context and does
11:01:17 5    something about it.
11:01:21 6        Q.  So what would be the kinds of changes of
11:01:23 7    events that it would be looking for?
11:01:26 8            MR. EDMONDS:  Objection to form.
11:01:30 9        A.  Again, you know, the example that -- that
11:01:32 10   I gave would -- is the most common example I could
11:01:37 11   think of in that respect.  If -- if a new piece of
11:01:40 12   information or the change of a particular piece of
11:01:43 13   information should influence something else going on,
11:01:49 14   that's the idea, so --
11:01:51 15       Q.  All right.  I guess, what -- what would be
11:01:52 16   the event in that -- in that example?  I mean, if it's
11:01:57 17   helpful, I'm happy to talk through it with reference to
11:02:00 18   your particular example.
11:02:01 19       A.  Okay.  So what was the question again?
11:02:05 20           MR. EDMONDS:  Objection.
11:02:05 21       Q.  What would be the event?
11:02:07 22           MR. EDMONDS:  Objection, form.
11:02:09 23       A.  The event in that case would be, you know,
11:02:14 24   credit score had changed, right?  Recognizing that an
11:02:17 25   event -- that a credit score changed or -- or was

Page 76

11:02:22 1    available, you know.  Whereas, when the sales process
11:02:25 2    started, the credit score wasn't available, now the
11:02:28 3    credit score is available.  And so that's -- that's an
11:02:32 4    event.
11:02:34 5        Q.  So -- so when the patent claim talks about
11:02:37 6    detecting one or more changes in a state characteristic
11:02:41 7    of an event occuring within the system, your
11:02:44 8    understanding of that relative to our example is that
11:02:45 9    if a credit score became available, the system would
11:02:48 10   recognize that that credit score hadn't been available
11:02:51 11   but now is, and that would be the functionality
11:02:53 12   described in that sentence; is that correct?
11:02:57 13           MR. EDMONDS:  Objection to form.
11:02:58 14       A.  You asked me for an example, and that's
11:02:59 15   what I gave you, so --
11:03:01 16       Q.  Okay.  The event is that the credit score
11:03:06 17   became available in that example?
11:03:07 18       A.  In that example.
11:03:08 19       Q.  And then the system would detect that --
11:03:11 20   that change?
11:03:12 21           MR. EDMONDS:  Objection to form.
11:03:13 22       A.  Would recognize that a change had happened
11:03:15 23   or a new piece of information was available, correct.
11:03:18 24       Q.  What would -- what would the system -- how
11:03:20 25   would the system infer occurrence of the event in the

Page 77

11:03:23 1    context in which the event occurred?
11:03:25 2            MR. EDMONDS:  Objection, form.
11:03:27 3        A.  Where are you at?
11:03:28 4        Q.  So it's the fifth line down in column 36.
11:03:32 5    It says, "Inferring occurrence of the event and a
11:03:36 6    context in which the event occurred."
11:03:42 7            MR. EDMONDS:  Same objection.
11:03:43 8        A.  I don't know.  You know, to me, it's --
11:03:46 9    that's what's -- that's what's written.  I don't know
11:03:48 10   how else to explain it differently.  You know, I
11:03:50 11   mean -- you know, infer is infer, right?  And so --
11:04:02 12       Q.  And I guess that's what I'm trying to
11:04:03 13   understand.  When we're talking about the last portion
11:04:06 14   of the claim and you said, well, a credit score became
11:04:10 15   available, the system would recognize that that credit
11:04:12 16   score became available, and presumably it would have
11:04:15 17   that -- now that piece of data.  You know, the credit
11:04:18 18   score is X, whatever the number might be.
11:04:20 19       A.  Uh-huh.
11:04:20 20       Q.  So what did the system, then, infer?
11:04:24 21           MR. EDMONDS:  Objection.
11:04:25 22       A.  I don't recall.  I don't -- I don't know
11:04:27 23   how to explain that differently or how to -- how to go
11:04:30 24   into more detail on that, I guess.  I just don't.
11:04:33 25       Q.  Okay.  And then the -- what would be the

20  (Pages 74 to 77)

SFA Systems, LLC v. Infor Global Solutions    DAVID ROBERT LUNDBERG                          9/25/2008

---

## Page 78

11:04:37 1    automatically initiating an operation in one or more
11:04:40 2    particular subsystems of the computer?  That last
11:04:44 3    sentence, in the example you provided, what would be
11:04:47 4    the example of that process?
11:04:48 5         MR. EDMONDS:  Objection to form.
11:04:49 6         A.  The example, you know -- the -- in that
11:04:54 7    case would be changing what options are available to
11:04:59 8    the customer in the configuration piece of things,
11:05:02 9    right?  Maybe making less things available or higher
11:05:06 10   end things available.  Something like that.
11:05:23 11        Q.  The portion of the claim that talks about
11:05:26 12   inferring occurrence of the event, do you have an
11:05:28 13   understanding of what that refers to?
11:05:31 14        MR. EDMONDS:  Objection.
11:05:32 15        A.  I don't recollect, you know, what -- what
11:05:34 16   the purpose of that was.  Other than reading the words
11:05:37 17   now, I don't recall, you know, what conversation we had
11:05:40 18   around that or -- or what we -- what we were going
11:05:45 19   after.
11:05:45 20        Q.  And you also mentioned, I think when you
11:05:47 21   were talking more generally about the invention, kind
11:05:49 22   of using the context.  And that appears here in the
11:05:51 23   claim, too.  And in context, what are you talking about
11:05:54 24   when you say context?
11:05:56 25        MR. EDMONDS:  Objection to form.

## Page 79

11:06:01 1         A.  The context in, you know -- so again the
11:06:24 2    context would just be, you know, the context of taking
11:06:29 3    that particular piece of information in context with --
11:06:32 4    with other pieces of information.  You know, that's --
11:06:36 5    you know, again, it's -- to give you a specific
11:06:39 6    example, I can read the words again, but I don't
11:06:42 7    recall, you know, having a particular conversation
11:06:44 8    around that or, you know -- but other than saying it
11:06:48 9    takes into account the context in which the change
11:06:50 10   happened.
11:06:55 11        Q.  So would the context be just the other
11:06:58 12   information that the system knows about that customer
11:07:00 13   or that transaction?  Or is it broader than that?
11:07:04 14        MR. EDMONDS:  Objection to form.
11:07:04 15        A.  I don't know.  I mean, I'm -- I don't -- I
11:07:07 16   don't recall the conversations that we had specific to
11:07:11 17   that, or -- I've described how I -- you know, the
11:07:16 18   examples and so forth.  But I don't know how better to
11:07:19 19   explain what that particular word means.
11:07:24 20        Q.  Okay.  And again, now that you've kind of
11:07:51 21   looked at the claim, at the time you were working on
11:07:55 22   putting together this patent, do you recall, was -- was
11:07:58 23   there any other, you know, development going on on an
11:08:01 24   actual product, or were these claims -- or this
11:08:06 25   invention at all related to CWC's attempts to develop a

## Page 80

11:08:10 1    particular product that embodied these concepts?
11:08:15 2         MR. EDMONDS:  Objection to form.
11:08:16 3         A.  You know, I don't recall specific -- you
11:08:19 4    know, a specific project being launched to code -- you
11:08:22 5    know, to write code or anything like that.  I don't
11:08:25 6    recall that.  So, you know, I just -- I don't recollect
11:08:29 7    that anything did or didn't start as a result of this.
11:08:34 8         I mean, this was a long, drawn-out process
11:08:37 9    from the patent, you know, compared to doing specific
11:08:40 10   projects.
11:08:41 11        Q.  Were any of the features that are
11:08:43 12   discussed in -- in this patent ever ultimately offered
11:08:48 13   to CWC's customers in any form?
11:08:51 14        MR. EDMONDS:  Objection to form.
11:08:52 15        A.  I don't know.  Like I say, it's been a
11:08:54 16   long time since I looked through that, and it's been a
11:08:58 17   long time since I've known -- since I was there, so --
11:09:02 18        Q.  Do you recall, in the development of
11:09:04 19   Signature Plus, did you ever talk about trying to
11:09:07 20   incorporate some of this, you know, new -- new concept
11:09:09 21   into Signature Plus?
11:09:11 22        A.  Well, at the time we started Signature
11:09:13 23   Plus, we had already had these discussions and these
11:09:15 24   concepts, so, you know -- I don't remember that, you
11:09:20 25   know -- any particular conversation around, go read

## Page 81

11:09:22 1    this patent, we're going to build this.
11:09:25 2         But, you know, these were evolutionary
11:09:29 3    ideas, and once we captured these concepts, we would,
11:09:31 4    you know, try to add some of those things in, but
11:09:35 5    again, I don't recall an exact conversation or anything
11:09:37 6    that said, you know, here's the patent, go do this.
11:09:41 7         Q.  Okay.  I appreciate that.  But I guess did
11:09:43 8    Signature Plus do any of these things?  Did it use
11:09:45 9    context at all in any of the functionality that it
11:09:47 10   provided?
11:09:47 11        A.  You know, I don't -- you know, that was
11:09:50 12   completed about the time I was leaving, and so, you
11:09:55 13   know, I don't recall exactly if anything actually got
11:09:57 14   in there or not.
11:09:59 15        Q.  What about any of CWC's custom off
11:10:05 16   solutions?  Were there any of those that you're aware
11:10:08 17   of that incorporated any of this idea so that the use
11:10:10 18   of contexts to help, you know, drive the sales process?
11:10:14 19        A.  I'm not aware of any.
11:10:22 20        Q.  What about systems that relied on
11:10:28 21   customers' transaction history or purchase history to
11:10:30 22   help guide the sales process?  Did CWC, to your
11:10:33 23   knowledge, have any systems that used that type of
11:10:36 24   functionality?
11:10:37 25        MR. EDMONDS:  Objection to form.

21 (Pages 78 to 81)

CONFIDENTIAL - ATTORNEY'S EYES ONLY

SFA020783
f2eb50d7-91c9-4e06-a3d3-a1eaead1aaba