**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **SFA SYSTEMS, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **CASE NO. 6:09-cv-340-LED** |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **1-800-Flowers.com, Inc., et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

| | | |
|---|---|---|
| **SFA SYSTEMS, LLC,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | **CASE NO. 6:11-cv-052-LED** |
| | § | |
| **v.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **Amazon.com, Inc., et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**

This Memorandum Opinion construes U.S. Patent No. 6,067,525 (the "'525 Patent") and U.S. Patent No. 7,941,341 (the "'341 Patent"). Also before the Court are Defendants' Motions for Summary Judgment of Invalidity for Indefiniteness (Case No. 6:11cv52, Docket No. 338 and Case No. 6:09cv340, Docket No. 433). For the reasons discussed below, the Court **DENIES** Defendants' motions.

**BACKGROUND**

The '525 Patent has a long history before the Court as Plaintiff SFA Systems, LLC ("SFA") has filed several separate suits against multiple defendants for infringement of the '525 Patent. The Court first construed the '525 Patent in a case against Infor Global Solutions, Inc.

and seven other defendants. *SFA Systems, LLC v. Infor Global Solutions (Michigan), Inc., et al.*, Case No. 6:07cv067, Docket No. 211 (hereinafter, "*Infor* opinion"). Since then, SFA has filed several more cases involving the same patent. *See SFA Systems, LLC v. BigMachines, Inc.,* Case No. 6:10cv300; *SFA Systems v. Rightnow Technologies, Inc.*, Case No. 6:11cv560; *SFA Systems v. Drugstore.com, Inc.*, Case No. 6:11cv635. The Court construed the '525 Patent a second time in *SFA Systems v. 1-800-Flowers.com, Inc.*, Case No. 6:09cv340, Docket No. 333 (hereinafter, "first *1-800-Flowers* opinion").[1] Many of the disputed terms have been previously construed by the Court. As the Court has already repeatedly described the technology at issue in the '525 Patent, it will not do so again. *See, e.g.*, Case No. 6:07cv067, Docket No. 211.

In addition to the '525 Patent, the '341 Patent is before the Court for the first time. The '341 Patent is a direct descendent of the '525 Patent, and is also directed to a sales-force automation system that integrates intelligent, automated salesperson support for multiple phases of the sales process. '341 Patent, Abstract. Generally, the claims of the '341 Patent are directed to systems that detect changes in information relating to events in a sales system, automatically initiate an operation based on the event, determine whether the event has occurred previously and update other events if the operation is automatically initiated. *See id.* at 3:55–4:3. Although the Court has not previously construed the '341 Patent, the Court has construed several of the terms currently in dispute in previous litigation arising from related patents.

## APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys.,*

---

[1] The Court adopted the opinion of Magistrate Judge Love with a minor modification regarding the claim phrase "inferring . . . a context." Case No. 6:09cv340, Docket No. 406.

*Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id*. Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim

3

or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*. Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court. *Id*. Generally, extrinsic

4

evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.

## ANALYSIS

**"sales process"**

This term appears in Claims 1, 2, 3, 13, 20, 21, 24, 25, 40, and 42 of the '525 Patent and Claims 1, 2, 13, 14, 16, 27, 29, 31, 32, and 33 of the '341 Patent. Plaintiff proposes "a process of selling goods or services, including two or more phases such as lead generation, time with customer, order management, and customer retention," as construed in the first *1-800-Flowers* opinion. Case No. 6:09cv340, Docket No. 333 at 8. The Defendants in the *Amazon.com, Inc.* case ("Amazon Defendants") propose "a real world process of selling goods or services including two or more phases such as lead generation, time with customer, order management and customer retention." Newegg, Inc. ("Newegg"), the sole defendant in the *1-800-flowers.com, Inc.* case, proposes "a real life process of a salesperson selling goods or services, including two or more phases such as lead generation, time with customer, order management, and customer retention." The parties' primary dispute is whether the definition of "sales process" should include Defendants' proposed real-world process and salesperson elements.

SFA argues the term is presumed to have the same meaning in both the '525 and '341 Patents because they share a common specification. Case No. 6:11cv52, Docket No. 335 at 8. Further, SFA contends Defendants' request to import "real-world process or salesperson" into the previous construction is unnecessary because the parties have already stipulated that "event occurring in the sales process" is a real-life action. *Id*. at 9.

To justify adding "real-world process" to the construction, the Amazon Defendants point to the Court's prior determination that an "event occurring in the sales process" is "a real-life

action or inaction that occurs in the sales process." Case No. 6:11cv52, Docket No. 339 at 5–6. These Defendants contend that SFA opposes defining the sales process as a real-world activity in order to pursue infringement theories against Defendants' websites that lack a real-world element. *Id*.

For its part, Newegg offers several theories to support including "salesperson" and "real life" as a clarification of the previously construed definition. Case No. 6:09cv340, Docket No. 340 at 5–12. First, Newegg contends that when the term "sales process" appears in the claims, it expressly relates to a process involving a salesperson. *Id*. at 5. Second, Newegg argues that the title of the '341 Patent is "Sales Force Automation System and Method" and *sales force* is defined as a group of employees whose job it is to sell their company's products or services. *Id*. at 6. Third, Newegg contends that the patent's prosecution history also supports inclusion of a salesperson, since the applicants repeatedly argued in amendments that the invention "improves the efficiency with which a salesperson completes sales transactions." *Id*. at 7. Fourth, Newegg maintains that the kiosk and website implementations in fact are only examples of tools that can form part of the sales process by collecting information for use by a salesperson. *Id*. at 8. Finally, Newegg points to SFA's arguments in prior litigation related to the '525 Patent. *Id*. at 10. In response to a motion for summary judgment of invalidity, SFA argued the '525 Patent's purpose was to help salespersons, thus distinguishing it from prior art that was *not* directed at helping salespersons. *Id*. In the first *1-800-Flowers* opinion, the Court concluded that SFA did not argue that the claims "*only* cover salesperson interaction," but Newegg believes that SFA did in fact distinguish prior art solely based on the presence of a salesperson. *Id*. at 11. Even if there are other distinguishable factors, Newegg contends that because SFA expressly relied on the presence of a salesperson to defeat an invalidity challenge to its patent, those arguments have a

disclaimer effect such that SFA should be estopped from arguing that a salesperson is not necessary. *Id*. at 11–12.

The Court has already construed this term, and "[t]he same terms in the same patent or related patents are presumed to carry the same meaning." *DataTreasury Corp. v. Magtek, Inc*., 2006 U.S. Dist. LEXIS 100662, at *10–11 (E.D. Tex. Sept. 29, 2006) (citing *Omega Eng'g, Inc. v. Raytek Corp*., 334 F.3d 1314, 1334 (Fed. Cir. 2003)). The Court will not add Defendants' proposed real-world or real-life requirements to the construction. While discussing the distinction between "events occurring in the system" and "events occurring in the sales process" in its prior opinion, the Court previously stated:

> The invention is intended to integrate *a real-life sales process* with events occurring in a computerized system. *See* '525 patent, Abstract ("A salesforce automation system which integrates computerized, intelligent automated salesperson support for multiple phases of the sales process."). Events occurring within the *system* are distinct from events occurring in the *sales process* because *the system is "computerized" and the "sales process" is real-world activity*. *Id*. at 30:36–41 ("a sales event may be an event in the sales process, typically occurring between the salesperson and the customer, while an application event may be an internal operation of the sales system (i.e., the operation of the software and hardware making up the sales system) which is used to electronically facilitate the sales event").

First *1-800-Flowers* opinion, at p. 7–8 (emphasis added). Thus, in order to appropriately distinguish "events . . . in the sales process" from "events . . . in the system," the Court has already stated that the sales process is real-world activity. First *1-800-Flowers* opinion, at 8. The Court did not, however, hold that the meaning of "the sales process" unequivocally excludes computer activity, as Defendants' proposals suggest. Such a finding is inconsistent with the teachings of the specification. For example, Figures 21 A through E list exemplary events, most of which either expressly or implicitly involve both real-world activity and the use of the computing system. *See* Figures 21 A and B ("a customer contacts an Internet Web-site to get product information"; "a customer uses a kiosk to gain information on a product or service and

7

request follow-up call from company representative"; "Salesperson configures a product and service solution for a customer"). Finally, the Amazon Defendants' complaint—that SFA's infringement contentions against e-commerce websites with no real-world element contradict the previous construction—does not warrant fresh claim construction. Instead, such complaints are appropriately addressed in motions for summary judgment.

Newegg's proposed "salesperson" requirement is not appropriate, either. Absent express claim language, the claims do not require use by a salesperson to the exclusion of other potential embodiments. First *1-800-Flowers* opinion, at 13. The Court has already determined that SFA did not argue previously that the claims only cover salesperson interaction. *Id.* at 14. In the prior litigation, SFA addressed the Filepp art by arguing that "[the system] could possibly be programmed for many purposes." Ex. F to Response, *Infor Litigation*, Pl.'s Resp. Mot. Summ. J. Inv. at 4. SFA went on to point out that Filepp does not "describe how to program the Prodigy online subscription service for direct sales from salespersons to end–user customers." *Id.* However, SFA stopped short of stating the asserted *claims* require a sales person, indicating that SFA's statements regarding the salesperson refer to the disclosure and not to the asserted claims. This conclusion seems obvious considering that SFA's argument distinguishing Filepp would have been much stronger had they simply argued that the claims require a salesperson. In sum, neither the claims themselves nor the intrinsic record support such a limitation. Therefore, SFA is not estopped from arguing that a salesperson is not a necessary part of the claimed sales process and there is no reason to import such limitation into the construction.

"Sales process" is construed—consistent with the Court's previous construction—as "a process of selling goods or services, including two or more phases such as lead generation, time with customer, order management, and customer retention."

**"facilitate/facilitating/facilitate a sales process"**

These terms appear in Claims 1 and 40 of the '525 Patent and Claim 27 of the '341 Patent. SFA contends no construction is necessary. The Amazon Defendants propose "assist" and "assisting" in place of "facilitate" and "facilitating."[2] Thus, the dispute is whether the construction should replace the common claim word, "facilitate," with another common word and arguable synonym, "assist."

The Amazon Defendants contend their construction is correct because the Court previously described the sales process as a "real-life . . . process," and the specification repeatedly uses the word "assist" to describe the manner in which the claimed sales system assists humans through the various states of that process. Case No. 6:11cv52, Docket No. 339 at 8. Therefore, "assist" distinguishes between the computerized process and the real-life process. *Id*.

SFA argues that Defendants' construction is simply a back-door attempt to imply that salesperson action is a requirement of these claims, and thus improperly imports a limitation from the specification. Case No. 6:11cv52, Docket No. 335 at 8.

These terms need no construction. First, the meaning of "facilitate" is clear in the context of the claim and it will be readily understandable to the jury. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co*., 521 F.3d 1351, 1362 (Fed. Cir. 2008) (recognizing that "district courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims"). The parties present no legally sound reason to replace the claim word, "facilitate," with the specification word, "assist."  There is no reason to import claim limitations that are not required by the claim language or the intrinsic record. Second, the Court has already clarified

---

[2] For example, "facilitate a sale," "facilitate a sales process," and "facilitate a new action." Case No. 6:11cv52, Docket No. 339 at 7–10.

that the sales process is a real-life activity but that it does not exclude computer involvement. *See supra* at 8 (citing first *1-800-Flowers* opinion, at 8). Thus, there is no need to further belabor the claim construction to highlight this distinction.

**"[facilitate a] new action"**

This term appears in Claims 1, 13, 31, 32 of the '341 Patent and Claims 1 and 20 of the '525 Patent. SFA contends no construction is necessary. The Amazon Defendants contend "facilitate a new action" should be construed as "to assist with a new action in the sales process," As "facilitate" has already been addressed, this dispute boils down to whether "new action" refers to an event *in the sales process*.

SFA argues that the term "new action" is used ordinarily in the context of the claims, and that Defendants' addition of "in the sales process" improperly imports a term from the specification to introduce a novel limitation wholly absent from the original term. Case No. 6:11cv52, Docket No. 335 at 10–11.

The Amazon Defendants argue that the term "new action" refers to an event in the real-life sales process because the claims consistently use "facilitate" for this type of real-life event. Case No. 6:11cv52, Docket No. 339 at 10. The Amazon Defendants further reason that the patents consistently use "act" or "action" to refer to that real-life sales process. *Id*. In other places, the claims describe certain events as occurring within the *computer* system, whereas this "new action" lacks such a description. *Id*. Therefore, the Amazon Defendants reason that this new action must occur outside the computer system, as part of the real-world sales process. *Id*.

It is not necessary to include "sales process" in the construction of "new action." It is clear from the claims that the new action is part of the sales process. *See Phillips*, 415 F.3d at 1314 ("[T]he claims themselves provide substantial guidance as to the meaning of particular

claim terms"). Each of the disputed claims follows the same pattern. It starts with a computer designed to facilitate sales-process actions. Then, later in the claim, a "new action" appears:

> a plurality of subsystems of a computer configured to electronically *facilitate one or more actions* performed during at least one phase of *the sales process*;
>
> . . .
>
> [an] event manager detecting one or more changes in information regarding an event occurring within the system and automatically initiating an operation in one or more particular subsystems of the computer to *facilitate a new action* based on the event

'341 Patent, 39:1–10 (emphasis added). *See also* 40:22, 33; 42:27, 42; 42:54, 65; '525 Patent, Claims 35:65–66, 36:8–9; 37:35–36, 44–45 (same). In each claim at issue, the term "new action" refers to the earlier "one or more actions . . . [in] the sales process." Logically, these "new actions" are just as much a part of the sales process as the predicate actions mentioned earlier in each claim. "New action" needs no further construction. However, the parties are cautioned to read this resolution of the dispute consistent with the previous holding that the sales process does not exclude computer activity, as explained above.

**"a computer implemented sales system"/"automated sales system"**

This term appears in the preambles of Claims 1, 27, 31, 33 of the '341 Patent and Claims 1 and 40 of the '525 Patent. The Court addressed this term in its first opinion in the *1-800-Flowers* case and determined it did not require construction. First *1-800-Flowers* opinion, at 11–13. SFA asserts that no construction is necessary for this term or that, if construed, it should be given its plain and ordinary meaning. Newegg proposes a "computer system used to guide a salesperson or guide content to a salesperson automatically during multiple phases of a sales process." As with the construction of "sales process," the dispute revolves around whether this term should be construed so as to incorporate a salesperson.

SFA contends that because the term is clear on its face, the construction should not incorporate a salesperson. Case No. 6:09cv340, Docket No. 425 at 5–6. SFA also argues that the Court previously rejected the proposal to incorporate a salesperson because the specification does not describe using the claimed systems and methods to assist a salesperson to the exclusion of other potential embodiments. *Id.*

Newegg argues that its proposed construction reflects the proper essence of the invention, which is designed to help a salesperson make sales. Case No. 6:09cv340, Docket No. 430 at 12–13. Newegg argues that the inventor used the salesperson to distinguish the invention from prior art during prosecution and in prior litigation. *Id.* Therefore, Newegg contends that an appropriate construction is one that makes clear that the system is intended to assist a salesperson. *Id.*

While the specification does describe using the claimed systems and methods to assist a salesperson, it does not do so to the exclusion of other potential embodiments. First *1-800-Flowers* opinion, at 12–13. Further, the Court will not import a salesman limitation where a salesperson is not literally required by the claims. "[A] computer implemented sales system"/"automated sales system" does not require construction.

**"event manager"**

This term appears in Claims 1, 27, 28, 29, 30, 31, and 33 of the '341 Patent and Claims 1, 40, 41, 42, and 43 of the '525 Patent. The Court has twice previously reviewed this term as it appears in the '525 Patent, first in the *Infor* opinion and again in the first *1-800-Flowers* opinion. Case No. 6:07cv067, Docket No. 211 at 8–9; Case No. 6:09cv340, Docket No. 333 at 22. The original construction was "hardware and/or software." *Infor* at 9. Later, in response to a dispute as to whether the event manager is structural, the Court amended the construction to "hardware and or software that is within a computer implemented sales system." First *1-800-Flowers*

opinion, at 22. SFA proposes the construction adopted in the first *1-800-Flowers* opinion. Defendant Newegg proposes "an inference engine that is functionally separate from the subsystems." The disputes are whether: (1) the absence of the '525 Patent's "inference" claim limitations from the '341 Patent necessitates a more detailed definition to include an "inference engine;" and (2) the event manager must be functionally separate.

### 1) Inference Requirement

Newegg argues that "event manager" must be clarified because Claims 1 and 40 of the '525 Patent recite "an event manager . . . inferring occurrence of the event . . . , " while Claims 1 and 27 of the '341 Patent do not recite any inference capability. Case No. 6:09cv340, Docket No. 430 at 19. Newegg suggests that the Court referred to this inference capability in its previous determination that additional claim limitations on the event manager in the '525 Patent prevent it from reading on "anything under the sun." *Id*. at 20. According to Newegg, the prosecution history also suggests that the inference capability is central to the '525 Patent. *Id*. Thus, Newegg argues that the previous construction, absent an inference limitation, would allow the event manager to read on "anything under the sun." *Id*.

SFA asks for adoption of the previous construction to be consistent. Case No. 6:09cv340, Docket No. 425 at 9. SFA maintains that there is no further need for clarification and it is improper to import a specific embodiment into this claim term. *Id*.

The construction in the first *1-800-Flowers* opinion is appropriate. The term's construction was based on the '525 Patent's specification, which remains unchanged, and is substantively identical to the '341 Patent's specification. The inference engine discussed by the patents is described as an option for "an alternative embodiment" employing an expert system. *See* '341 Patent, Col. 36–37. The effect of Newegg's request is to limit the subject claims to this

alternative embodiment. Furthermore, each independent claim at issue provides multiple functional limitations to the "event manager," thus preventing an overly broad reading of the term. Therefore, the event manager cannot read anything under the sun.

### 2) Functionally Separate Requirement

Newegg further proposes "an inference engine that is *functionally separate* from the subsystems" because the event manager is always described and shown as being functionally separated from the subsystems. *Id*. at 22–23. Newegg argues that since the event manager is the brain of the claimed system, it must be separate from the various subsystems in order to interface with them. *Id*.

SFA contends Newegg's proposed "functionally separate" language does not correspond to any part of the term being construed. Case No. 6:09cv340, Docket No. 425 at 9. Therefore, SFA argues that adding this language to the construction would improperly create new limitations. *Id*.

Adding "functionally separate from the subsystems" to the construction would muddy the term instead of clarifying it. The claims recite an event manager "coupled to the subsystems and configured to" realize various operations within them. '341 Patent, Col. 50–65. While in one sense the event manager has a distinct function from that of each subsystem, at the same time the event manager works in conjunction with each system to realize any given function. For example, Figure 5 of the '525 Patent shows the event manager working with the order management component. '525 Patent, 3:3–4. The claims set out the functionality of the event manager with sufficient specificity such that adding additional limitations to the construction is unnecessary.

In sum, the parties have not proposed any meritorious clarification for "event manager"

and there is no reason to read additional limitations into this term. Consistent with its prior construction, "event manager" is construed as "hardware and/or software that is within a computer implemented sales system."

**"detecting one or more changes in information regarding an event"**

This term appears in Claims 1 (event in the system), 13 (event in the sales process), 27 (event in the system), and 32 (event in the sales process) of the '341 Patent. SFA suggests that no construction is needed. Newegg proposes "detecting one or more changes in information concerning an event *that exists in the system*." The dispute centers around whether the detected changes in events are limited to *pre-existing* events.

SFA offers several reasons for leaving this term unconstrued. First, SFA submits that commonly understood words like "detect" and "information" need not be defined, and there is no indication of a special meaning in the context of the claims. Case No. 6:09cv340, Docket No. 425 at 9. SFA also contends that to the extent "event" has a special meaning, it has already been construed in the '525 patent in the context of "event occurring in the system" and "event occurring in the sales process."[3] *Id*. at 10. Further, since the claims alternatively use the term "event" to refer to events occurring in the system (e.g., Claims 1 & 27) and events occurring in the sales process (e.g., Claims 13 and 32), limiting all claimed events to system events would contradict the express claim language. *Id*.

Newegg argues that the specification illustrates that when changes in information regarding an event occurs in the system, that information already existed in the system. Case No. 6:09cv340, Docket No. 430 at 26. For example, Newegg points to portions of the specification

---

[3] The previous construction of "event occurring in the system" was "an operation of the software or hardware making up the sales system." First *1-800-Flowers* opinion, at 7. The previous construction of "event occurring in the sales process" was "a real-life action or inaction that occurs in the sale process." *Id*. at 10.

that recite an automatic checking of changes made to information in the system, and reasons that such information necessarily already existed in the system. *Id.* at 26.

The plain language of the claims includes information regarding new events and pre-existing events. The claims recite "changes in information regarding *an* event." The specification, which discusses the occurrence of events and the subsequent action of the system, does not contradict the claim language. Contrary to the plain claim language and the specification's teachings, Newegg's proposal would limit the claim so that new events could not satisfy this limitation. In addition, Newegg's proposal requires that all events "exist[] *in the system.*" As noted above, each of the subject claims expressly requires either events occurring in the system or events occurring in the sales process. Thus, Newegg's proposal would be either duplicative of Claims 1 and 27 or contradictory to the express claim language of Claims 13 and 32. This term needs no construction.

**"event occurring within/in the system"**

This term appears in Claims 1 and 27 of the '341 Patent. SFA proposes adoption of the Court's prior construction, "an operation of the software or hardware making up the sales system." First *1-800-Flowers* opinion, at 7. Defendant Newegg proposes "an internal software or hardware activity that corresponds to an event in the sales process." The disputes include whether the system events: (1) must be internal; and (2) necessarily correspond to events in the sales process.

SFA argues the Court's previous construction is proper, whereas Newegg's proposed construction would introduce an additional limitation not contemplated by the claims. Case No. 6:09cv340, Docket No. 425 at 13. Despite the fact that the Court previously distinguished an "event occurring within/in the system" from an "event occurring in the sales process," Newegg's

16

proposed construction makes "event occurring within the sales process" a requirement of an "event occurring within the system." *Id.*

Newegg points to the specification to support its arguments that the software or hardware activity must be internal. Case No. 6:09cv340, Docket No. 430 at 27–28 ("a sales event may be an event in the sales process, . . . while an application event may be an internal operation of the sales system . . . ."). Newegg also contends that, according to the specification, application events "generally represent a sales event occurring in the sales process." *Id.*

The Court has already construed an "event occurring within the system" as "an operation of the software or hardware making up the sales system." Although the specification does mention the word "internal," the Court's construction contemplates that word by referring to "hardware or software making up the sales system." Newegg's proposal confuses rather than aids the Court's construction by raising the question of what is "internal" hardware or software. Further, it is not necessary to define the system event as one "that corresponds to an event in the sales process" because any correspondence between events in the sales process and events in the system is already expressly required by the claims. For example, Claim 1 recites a subsystem that "determines if the event has occurred previously in the sales process and updates another event or task in at least another subsystem. . . ." '341 Patent, 39:11–14. While consistent with many embodiments, Newegg's proposal would require both types of events in every claim, thereby improperly importing limitations. Therefore, consistent with the Court's previous construction, "event occurring within/in the system" is construed as "an operation of the software or hardware making up the sales system."

**"the event has occurred previously in the sales process"**

This term appears in Claims 1, 13, 27, 31, 32, and 33 of the '341 Patent. SFA contends that the term does not require additional construction beyond the previous constructions of "event" and "sales process." The Amazon Defendants propose "the event has occurred previously in the same sales process in which an item or service is sold." Newegg proposes "determines if the event is at least the second occurrence of the event in the same sales process that pertains to the customer associated with the event." The dispute is whether construction is necessary to define *which* event and sales process are referenced by "the event" and "the sales process."

SFA contends that no construction is necessary because "event" and "sales process" have already been construed, and "occurred previously" does not acquire any special meaning here that would require construction. Case No. 6:09cv340, Docket No. 425 at 11. Furthermore, mentions of *the* event and *the* sales event clearly refer back to the event or sales process mentioned earlier in the claim. *Id.* at 12. SFA states that any confusion about this antecedent basis can be resolved by jury instructions rather than through a claim construction that creates new limitations. *Id.* at 12.

The Amazon Defendants contend that the event and sales process in this term refer to the *same* event and sales process, respectively, mentioned earlier in each claim. Case No. 6:11cv52, Docket No. 339 at 15. By example, Claim 13 recites "detecting one or more changes in information regarding *an* event occurring in *the sales process*" and later "determin[ing] if *the* event has occurred previously in *the sales process*." *Id.* Therefore, the latter phrase refers back to the same event mentioned earlier and refers to the same sales process. *Id.*

Similarly, Newegg argues that without construction, the term "occurred previously" could apply to any previous event in any sales process ever completed, without any meaningful boundaries. Case No. 6:09cv340, Docket No. 430 at 23. Therefore, Newegg seeks to construe the term to clarify that "the event" refers to a prior event that occurred in the present sales process. *Id*. at 24. Moreover, a given sales process necessarily relates to a specific customer, with steps such as scheduling "follow up activities," "receiving[ing] and shar[ing] all information related to that customer's contact with the company," and "identify[ing] customer as a potential customer for accessories." *Id*. at 24. Finally, Newegg contends that if an event has "occurred previously," this occurrence logically must be *at least the second occurrence* of the same event. *Id*. at 25.

With respect to this dispute, there is no legally sound reason to confine the claims beyond the literal syntax of the express words and the prior construed terms. Grammatically, the general rule is that the first mention of a noun is preceded by *a* or *an* and subsequent references to the same noun are preceded by *the* or *said*. As an example, the second mention of "sales process" ("the sales process") refers back to the first mention ("a sales process") and both relate to the same "process of selling goods or services, including two or more phases such as lead generation, time with customer, order management, and customer retention" (the construction for "sales process."). The same analysis applies for the events. Therefore, the claim syntax, combined with the prior constructions of "event" and "sales process," is sufficient to resolve the parties' dispute, and this term does not require separate construction.

**"context"/"infer[ring] . . . a context"**

"Context" appears in Claims 1–4, 15, 16, 18–21, 24, 27, 28, 30, 32, and 40 of the '525 Patent. In the *Infor* case, the Court adopted the parties' agreed construction: "information already existing within the system that becomes relevant upon the occurrence of an event." *Infor* opinion,

19

at 7. The Court adopted the same definition in the *1-800-Flowers* case. First *1-800-Flowers* opinion, at 15. SFA proposes the Court's prior construction. The Amazon Defendants propose "the circumstances in which an event occurs, a setting."

"[I]nfer[ring] . . . a context" appears in Claims 1, 20, and 40 of the '525 Patent. The Court previously construed this term as "logical process by which the fact that information already existing within the system becomes relevant upon the occurrence of an event is derived by application of logical rules." First *1-800-Flowers* opinion, at 17–18. While originally the parties advocated for different constructions, at the *Markman* hearing the parties reached an agreed construction that adds "to known or assumed facts" to the end of the Court's prior construction.[4] Thus, "infer[ring] a context" is construed as a "logical process by which a context is derived by application of logical rules to known or assumed facts." Further, "context"—consistent with the Court's prior construction—is construed as "information already existing within the system that becomes relevant upon the occurrence of an event."

**"infer[ring] . . . occurrence of the event [occurring within/in the system]"**

This term appears in Claims 1, 20 and 40 of the '525 Patent. SFA argues no construction is needed or, if construed, the prior constructions of "infer[ring]" and "event occurring within/in the system" should be combined to read: "logical process by which an occurrence of the event is derived by application of logical rules." The Amazon Defendants propose "a logical process by which the fact that a hardware or software operation internal to the system has occurred is derived from known facts by the application of logical rules." The central dispute is whether the inferred event is necessarily the antecedent "event within the system."

---

[4] "The Court: It would read, 'logical process by which a context is derived by . . . application of logical rules to known or assumed facts.' . . . [D]o we have an agreement then that will be the definition by agreement? Is that agreeable to Defendants?. . . . Mr. Fowler: Your Honor, we prefer our construction, but this would be acceptable as an alternative. The Court: So do I take that as an agreement? Mr. Fowler: Yes, Your Honor. The Court: Plaintiffs agree? Mr. Fenster: Yes, sir." Case No. 6:09cv340, Docket No. 444 at 47–49.

SFA contends that, because the Court has previously construed both "infer[ring]" and "event occurring within/in the system," this new permutation that combines the two terms need not be separately construed. Case No. 6:11cv52, Docket No. 335 at 34. While SFA agrees that there is an antecedent basis for the term "the event," SFA believes that crafting the effects of that antecedent basis for the claim construction is improper. Case No. 6:11cv52, Docket No. 349 at 5. SFA contends that the normal rules regarding antecedent basis adequately define the scope of the claims such that no additional construction is necessary. *Id*.

The Amazon Defendants argue that their proposed construction clarifies that the event refers to the antecedent system event ("event occurring within the system"). Case No. 6:11cv52, Docket No. 339 at 11. Since that antecedent term has already been construed as "an operation of the software or hardware making up the sales system," Defendants argue that their construction correctly clarifies that "the event" refers back to that same internal event. *Id*.

Defendants' proposal amounts to a request to clarify claim syntax by adding an overlapping claim construction. However, applying ordinary principles of claim syntax is sufficient to resolve the parties' dispute. For example, Claim 1 of the '525 Patent recites "detecting one or more changes in state characteristic of *an event occurring within the system*, inferring occurrence of *the* event and a context in which *the* event occurred" (emphasis added). It is clear that the second two mentions of "the" event refer to the antecedent "event occurring within the system." No further construction is necessary.

**"lead"**

This term appears in Claims 5–10, 12, 33–37, 39, and 42 of the '525 Patent and Claims 5–10, 12, 20–24, and 26 of the '341 Patent. SFA argues that no construction is necessary. Newegg proposes "an individual determined to be a potential customer based on previously

obtained information relating to the individual's identity, prior purchases, and product interests." The dispute is whether "lead" must be a potential customer.

SFA argues that "lead" should be given its plain and ordinary meaning. Case No. 6:09cv340, Docket No. 425 at 15. SFA contends that Newegg's definition of a lead as "an individual determined to be a potential customer" conflicts with the specification. *Id.* at 16. For example, the specification differentiates between a lead and a potential customer where it states that "[c]onventional lead management systems . . . assist sales personnel in developing customer leads into potential customers." '341 patent, 1:46–48. *Id.* at 16. According to SFA, Defendant's construction of "lead" would render this statement redundant. *Id.*

Newegg argues that both the claims and specification use "lead" to refer to a "potential customer." Case No. 6:09cv340, Docket No. 430 at 16–17. For example, the specification explains that one subsystem's goal is "committing a customer to a specific purchase, i.e., converting the 'lead' into a purchasing customer." *Id.* at 17 (citing '341 Patent, 8:51–54). The specification also recites an event manager that can suggest "that the particular customer may be a prospective lead." *Id.* (citing '341 Patent, 15:4–11). Newegg concludes that these equivalencies mean "lead" is an "individual determined to be a potential customer" based on several pieces of information: the individual's identity, prior purchases, and product interests. Newegg contends that the specification supports a construction that includes this information because it recites that "information such as names, addresses, and product interests of potential customers is gathered. . . . Sales information . . . such as information previously gathered, purchased databases, or previous customers, may also be used in conjunction with the lead generation component to identify potential customers." '341 Patent, 8:21–31.

Newegg's argument must be rejected because it seeks to replace the ordinary meaning of a common word—lead—with strict limitations gleaned from merely anecdotal comments in the specification. Newegg's proposal to limit a "lead" to a "potential customer" would require a special definition or disavowal, neither of which is present here. The specification plainly uses the word "lead" in contexts where it does not refer to an individual determined to be a potential customer: "[c]onventional lead management systems have been developed, for example, to assist sales personnel in *developing customer leads* into *potential customers*." '341 patent, 1:46-48 (emphases added). Here, a lead only has the possibility, if developed, of *becoming* a "potential customer." The specification also mentions "lead" as just one of various types of data. For example: "Each of the above-described components are driven in some respect by data and information, such as prices, specifications, competition, features and benefits, leads, names, financing, sales programs, etc." '341 Patent, at 11:2-6. It would make no sense to replace "lead" with "individual determined to be a potential customer" in such cases. Since a jury will understand the term lead as it applies in each context of the claim better than any definition that attempts to narrow or broaden the common understanding of the term, no construction is necessary.

**"first memory storing a plurality of rules"**

This term appears in the Claims 4, 19, and 32 of the '341 Patent. Claim 4 is representative of the patent's usage of the term:

> The system of Claim 1, further comprising: a first memory storing a plurality of rules, each rule indicating at least one subsequent action to be taken by a subsystem of the sales system upon occurrence of a corresponding event occurring in a particular context; and a decision subsystem to identify a rule stored in the first memory corresponding to the event and for initiating operation of the particular subsystem based on the identified rule.

'341 Patent, 39:23–32. SFA argues that no construction is necessary. Newegg proposes "a database of stored rules functionally separate from the event manager; a rule is a statement which prescribes that on the occurrence of a particular event, another event or action is initiated." The disputes are: (1) whether the claimed memory must be implemented in a *database*; and (2) whether this term refers to something *functionally separate* from the event manager.

### 1) Database Requirement

Newegg argues that a database is required because a rule-storage database is included not just in one preferred embodiment, but in every embodiment of the '341 Patent. Case No. 6:09cv340, Docket No. 430 at 29. Newegg contends that every mention of the term "memory" appears in reference to storage of various databases. *Id*. at 29–30. Newegg reasons that since the patent offers no alternative arrangements, this embodiment is not a "mere recommendation," it is a requirement.  *Id*. at 29, quoting *Snow v. Lake Shore & M.S. Ry. Co*., 121 U.S. 617, 630 (1887).

SFA asserts that there is no indication that these common words—"memory," storage," and "rules"—have a special meaning in the context of these claims. Case No. 6:09cv340, Docket No. 425 at 14. Further, SFA believes Newegg's proposed construction improperly seeks to limit the term to a preferred embodiment by requiring a database. *Id*. SFA argues that neither the claims nor the specification require a database. Case No. 6:09cv340, Docket No. 436 at 10

Newegg's specification-based proposal improperly limits the "first memory storing a plurality of rules" to a database. Although claims "must be read in view of the specification, of which they are a part," "[t]he written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims." *Markman*, 52 F.3d at 979–80. Further, even if the specification recites only one preferred embodiment as Defendants suggest, the Federal Circuit has "expressly rejected the contention that if a patent describes only a single

24

embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips*, 415 F.3d at 1312 (citing *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1366 (Fed. Cir. 2004)). The concept of "memory," and its various alternatives, was well understood at the time the patent was filed, and there is no reason to limit this common technical term to a single embodiment.

### 2) Functionally Separate Requirement

Newegg contends that every figure of the '341 patent supports a construction that clarifies that the first memory is functionally separate from the event manager. Case No. 6:09cv340, Docket No. 430 at 30.

SFA responds that Newegg's proposed introduction of "functionally separate" would add limitations that do not relate to any part of the term. Case No. 6:09cv340, Docket No. 436 at 10. SFA argues that the figures to which Newegg points as evidence that the memory is functionally separate are actually conceptual diagrams showing blocks separated to represent different concepts, not necessarily a functional separation. *Id*. Therefore, SFA contends that the Court should reject Newegg's definition and conclude that this term does not need construction. *Id*.

There is no legal basis to add a functional-separation limitation to the claims. Newegg's argument regarding the drawings' separate representation of memory and the event manager effectively suggests that "functional separation" should be imported to every patent claim with similar underlying illustrations. Therefore, "first memory storing a plurality of rules" does not need construction.

### "time with customer subsystem"

This term appears in Claims 5, 6, 8, 9 and 10 of the '525 Patent. SFA contends no construction is necessary. The Amazon Defendants propose "the subsystem used by a salesman

that includes a product information module, a customer requirements module, a quote preparation module, a finance module, a proposal generation module, a presentation module, a life cycle module, a performance evaluation module, and a competitive comparison module." Newegg proposes "a subsystem that assists a salesperson in converting a lead into a buying customer, and that stores information about the amount of time a salesperson spends with a customer." The parties dispute whether this term requires a specific, salesperson-focused definition.

SFA argues that no further construction is necessary because the Court previously construed both "subsystem" and "plurality of subsystems" for the '525 Patent in the *Infor* opinion. 6:11cv52, Docket No. 335 at 21–22. Further, SFA believes "time with customer" needs no construction, as it simply refers to a subsystem that "relate[s] to the details occurring during the time a customer spends with the system." *Id.* at 22. SFA contends that Defendants' proposed constructions improperly seek to import limitations from a specific embodiment, such as "salesman," "product-information module," "customer-requirements module," and "quote-preparation module." *Id.*

The Amazon Defendants argue that this term has no plain and ordinary meaning and must therefore be construed according to the '525 Patent's specification. Case No. 6:11cv52, Docket No. 339 at 17. The Amazon Defendants contend that the specification only recites a "time with customer subsystem" used by a salesperson:

> the time with customer component is used ***by salespeople*** when they are with a customer or preparing a proposal or presentation for a customer in order to generate a sale of the product or service. The integrated subcomponent modules facilitate interaction between ***the salesperson*** and the customer through the sales process to develop specific solutions that meet the customer's needs, thereby enabling ***the salesperson*** to close the sale as described above.

*Id.*, quoting '525 Patent at 12:12–20 (emphases added).

Further, the Amazon Defendants argue that the construction should include the specific components provided in the specification:

> The subcomponent modules [of the time with customer subcomponent] include a product information module 402, a customer requirements module 404, a configuration module 406, a quote preparation module 408, a finance module 410, a proposal generation module 412, a presentation module 414, a life cycle module 416, a performance evaluation module 418, a competitive comparison module 420, among other modules.

'525 Patent at 11:64–12:7.

Newegg proposes a construction with two components: (1) that the system assists a *salesperson* in converting a lead into a buying customer; and (2) that it stores information about the *amount of time* a salesperson spends with a customer. Case No. 6:09cv340, Docket No. 430 at 14. According to Newegg, this comports with the '341 patent's specification, which indicates that the time with customer subsystem "is used by the salesperson during the phase of the sales process which occurs from the time a qualified lead is identified to the time a sale is completed and an order is created." *Id.* at 15 (quoting '341 Patent at 8:45–48). Further, Newegg argues that the claims recite a system that "receives necessary information . . . and stores information obtained during the time spent with the customer . . . ." *Id.* (quoting '341 Patent at 9:14–20). Newegg argues that the prosecution history of a predecessor to the '341 Patent confirms that "time with customer" involves a salesperson because the inventors distinguished prior art based on the fact that the "time with customer subsystem" stores information about the amount of time a salesperson spends with a customer.  *Id.* at 15–16.

The term clearly and unambiguously defines itself—a subsystem related to the "time with a customer." This simple conclusion is clear when reading the description found in the '525 Patent: "[T]he time with customer component 104 is used by salespeople when they are with a customer . . . in order to generate a sale of the product or service." '525 Patent, 12:13–16.

Defendants' proposed constructions improperly incorporate only select embodiments. Defendants' common request to incorporate a salesperson is also improper. The Court has already determined that, in absence of an express claim limitation, the intrinsic record does not support limitations requiring use by a salesperson to the exclusion of other potential embodiments. First *1-800-Flowers* opinion, at 13. The patent certainly teaches the use of websites or kiosks as proxies for sales persons. '341 Patent at 15:11–30. Further, the teachings imply that a website can replace a salesperson. '341 Patent at 15:20–24.

Newegg's proposal that the system stores information about the amount of a time a salesperson spends with a customer is directly contradicted by one of the specification sections that Newegg cites. Docket No. 430 at 15 (citing '341 Patent at 9:14–20). The specification recites a system that stores information, not about the *amount of time* spent with a customer but rather about "information *obtained during time* spent with the customer." '341 Patent, 9:14–20 (emphasis added).

Defendants' proposed constructions improperly incorporate only select embodiments. Thus, no construction of this term is necessary.

## MOTIONS FOR SUMMARY JUDGMENT OF INDEFINITENESS

Defendants move for summary judgment of invalidity for indefiniteness on three grounds: (1) apparatus claims reciting method steps; (2) insoluble ambiguity of the preamble term "intelligently integrating;" and (3) insoluble ambiguity of the wherein clause. For the reasons set forth below, the Court **DENIES** these motions for summary judgment.

## APPLICABLE LAW

"Summary judgment is appropriate in a patent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law." *Nike Inc. v. Wolverine World Wide, Inc*., 43 F.3d 644, 646 (Fed. Cir. 1994); FED. R. CIV. P. 56(c). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). If the moving party meets this burden, the nonmoving party must then set forth "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see also T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

A party seeking to invalidate a patent must overcome a presumption that the patent is valid. *See* 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. Partn'p*, 564 U.S. __, 131 S. Ct. 2238, 2243 (2011); *United States Gypsum Co. v. National Gypsum Co.*, 74 F.3d 1209, 1212 (Fed. Cir. 1996). This presumption places the burden on the challenging party to prove the patent's invalidity by clear and convincing evidence. *Microsoft*, 131 S.Ct. at 2243; *United States Gypsum Co.*, 74 F.3d at 1212. Close questions of indefiniteness "are properly resolved in favor of the patentee." *Datamize, LLC v. Plumtree Software, Inc*., 417 F.3d 1342, 1348 (Fed. Cir. 2005); *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1380 (Fed. Cir. 2001).

Claims must particularly point out and distinctly claim the invention. "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112 ¶ 2. The primary purpose of the requirement of definiteness is to provide notice to those skilled in the art of what will constitute infringement. *See United Carbon Co. v. Binney Co.*, 317 U.S. 228, 236 (1942). The definiteness standard is one of reasonableness under the circumstances, requiring that, in light of the teachings of the prior art and the invention at issue, the claims apprise those skilled in the art of the scope of the invention with a reasonable degree of precision and particularity. *See*

*Shatterproof Glass Corp. v. LibbeyOwens Corp.*, 758 F.2d 613, 624 (Fed. Cir. 1985). To rule "on a claim of patent indefiniteness, a court must determine whether one skilled in the art would understand what is claimed when the claim is read in light of the specification." *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1372 (Fed. Cir. 2004). "A determination of indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims, [and] therefore, like claim construction, is a question of law." *Amtel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1378 (Fed. Cir. 1999).

## ANALYSIS

1. **Motion for Summary Judgment of Indefiniteness for Impermissible Mixing of Method and Apparatus Claims**

Claim 1 of the '525 Patent and Claim 27 of the '341 Patent recite a "computer implemented sales system," and Claim 1 of the '341 Patent recites an "automated sales system." Newegg contends that these claims improperly mix method steps into a systems claim and move for summary judgment of indefiniteness on these claims. Case No. 6:09cv340, Docket No. 433.

The following claim is representative of the disputed language:

> ***A computer implemented sales system*** used to facilitate a sales process, the system comprising: a plurality of subsystems configured to facilitate one or more actions performed during at least one phase of the sales process; and an event manager, coupled to the subsystems, the event manager ***detecting one or more changes*** in state characteristic of an event occurring within the system, ***inferring occurrence of the event and a context*** in which the event occurred based at least in part on the detected changes in state, and ***automatically initiating an operation*** in one or more particular subsystems of the computer to facilitate a new action based on the inferred context.

'525 Patent, 35:63–36:10 (emphasis added).

A single claim that recites two separate statutory classes of invention, e.g., "an apparatus and a method of using that apparatus," renders the claim indefinite under 35 U.S.C. § 112 ¶ 2. *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005). The problem

with mixing apparatus and method steps is that such mixed claims fail to clarify "whether infringement would occur when one creates a system that allows the user to [perform the step] . . . or . . . when the user actually [performs the step]." *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1277 (Fed. Cir. 2012). "[S]uch a claim 'is not sufficiently precise to provide competitors with an accurate determination of the "metes and bounds" of protection involved' and is 'ambiguous and properly rejected.'" *Id.* (quoting *Ex parte Lyell*, 17 U.S.P.Q.2d 1548 (1990)). However, apparatus claims that are limited by functional language are not necessarily indefinite. *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) (citing *Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008)). If the functional language of the claim merely describes "the structure and capabilities of the claimed apparatus," then the claim is sufficiently definite under 35 U.S.C. § 112 ¶ 2. *SynQor, Inc. v. Artesyn Techs., Inc.*, 2010 U.S. Dist. LEXIS 74808, at *97 (E.D. Tex. July 26, 2010), *aff'd SynQor v. Artesyn Techs. Inc.*, No. 2011-1192 (Fed. Cir. March 13, 2013) (citing *Microprocessor*, 520 F.3d at 1375).

Newegg argues that the claims at issue impermissibly mix apparatus claims with method steps because they recite a system and use verbs such as detecting, initiating, inferring, determining, and updating to recite method steps. Case No. 6:09cv340, Docket No. 433 at 4. Newegg contends that this mixture is impermissible because the public does not receive fair notice of whether infringement occurs when a system with the claimed capabilities is created, or when the system is used to perform the claimed steps. *Id.* at 9. Although Newegg acknowledges that an apparatus claim can use similar verbs as functional language to recite system capabilities, Newegg contends the present limitations are not functional language because they describe an action that must be performed to use the apparatus and lack the phrase "configured to" or similar

language to introduce it as a description of the system's capabilities. *Id*. at 6. As a result, Newegg argues that the Court should invalidate the claims that use these terms rather than engage in "claim saving" to fix the patentee's invalid choice of claim language. 6:09cv340, Docket No. 437 at 5.

SFA counters that the claims do not impermissibly mix apparatus and method limitations. Instead, SFA argues that the claims merely use functional language to describe the system by means of what it does. Case No. 6:09cv340, Docket No. 435 at 3. Further, SFA disagrees with Newegg's suggestion that "configured to" or similar language is required to mark functional language that describes system capabilities. *Id*. at 7–8. SFA contends that it is common for computer-implemented systems that include software to be claimed with functional language describing the software's capabilities. *Id*. at 4. In Claim 1 of the '525 Patent, for example, the system "detect[s]," "infer[s]," and "initiat[es]." *Id*. at 7–8. As a result, infringement would occur upon constructing a system with those capabilities.

Defendants cite to *IPXL Holdings, L.L.C. v. Amazon.com, Inc*., 430 F.3d 1377, 1384 (Fed. Cir. 2005), *Katz Interactive Call Processing Patent Litigation v. Am. Airlines, Inc*., 639 F.3d 1303, 1318 (Fed. Cir. 2011), and their progeny, and argue the claims at issue similarly mix method and apparatus claims. However, the claims in those cases suffered from a true ambiguity as to whether the claims require building a product or performing a method. In particular, those cases involved apparatus claims incorporating steps where a user acts *upon the system*. Here, the claims involve capabilities *of the system*, as limitations on the "event manager" and "subsystem" structural elements. The functional language merely describes the functional capability of the claimed structures. Therefore, there is no uncertainty about when infringement would occur—it plainly occurs when a system is created that can perform the claimed functions.

Further, the language present in the claims is functional despite the lack of "configured to" or similar wording. Claim 1 of the '525 Patent and Claims 1 and 27 of the '341 Patent claims recite components of the sales system: a plurality of subsystems and an event manager. Verbs such as "detect[ing]," "infer[ring]," and "initiat[ing]" serve to recite the system's capabilities. One of ordinary skill in the art would understand that Claim 1 of the '525 Patent and Claims 1 and 27 of the '341 Patent are limited to an apparatus, and that any infringement occurs upon creation of the claimed system. *See Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1319 (Fed. Cir. 2003) (finding that the party seeking to invalidate a claim as indefinite must show by clear and convincing evidence that one skilled in the art would not understand the scope of the claim when read in light of the specification).

Defendants have failed to show by clear and convincing evidence that these claims are insoluble due to an impermissible mix of apparatus limitations and method steps. Accordingly, Defendants' motions for summary judgment of indefiniteness of Claim 1 of the '525 Patent and Claims 1 and 27 of the '341 Patent are **DENIED**.

## 2. **Motion for Summary Judgment of Indefiniteness due to Insoluble Ambiguity of "Intelligently Integrating"**

The preambles of Claims 1 and 31 of the '341 Patent recite an "automated sales system for intelligently integrating into a single system tools used by a salesperson in the sales process." '341 Patent, 38:64–66, 42:22–24. Both the Amazon Defendants and Newegg contend that the "intelligently integrating" phrase is insolubly ambiguous, and move for summary judgment of indefiniteness on these claims. Case No. 6:09cv340, Docket No. 433; Case No. 6:11cv52, Docket No. 338.

A preamble is limiting "if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808, 62 USPQ2d 1781, 1784 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305, 51 USPQ2d 1161, 1165 (Fed. Cir. 1999)). "[A] claim preamble has the import that the claim as a whole suggests for it. In other words, when the claim drafter chooses to use both the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects." *Bell Commc'ns. Research, Inc. v. Vitalink Commc'ns. Corp.*, 55 F.3d 615, 620, 34 USPQ2d 1816, 1820 (Fed. Cir. 1995). When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention. *See, e.g., Electro Sci. Indus. v. Dynamic Details, Inc.*, 307 F.3d 1343, 1348, 64 USPQ2d 1781, 1783 (Fed. Cir. 2002); *Rapoport v. Dement*, 254 F.3d 1053, 1059, 59 USPQ2d 1215, 1219 (Fed. Cir. 2001); *Pitney Bowes*, 182 F.3d at 1306, 51 USPQ2d at 1166. On the other hand, "if the body of the claim sets out the complete invention," then the language of the preamble may be superfluous. *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1310, 64 USPQ2d 1832, 1837 (Fed. Cir. 2002); *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1373–74, 58 USPQ2d 1508, 1512 (Fed. Cir. 2001).

SFA argues that "intelligently integrating" does not render Claims 1 and 31 of the '341 Patent indefinite because it is not a limitation. Case No. 6:11cv52, Docket No. 350 at 2–3. SFA contends that although the Court previously held that the preamble of Claim 1 of the '525 is a limitation, that holding does not extend to the related claims in the '341 preamble, which contain additional language including "intelligently integrating." *Id*. Finally, SFA argues that

"intelligently integrating" is not necessary to understand the claim, since the body of the claims in the '341 Patent sets out a complete invention. *Id.* at 3.

The Court previously found the preambles of Claim 1 and Claim 40 of the '525 Patent to be limiting. First *1-800-Flowers* opinion, at 12. The preambles of Claims 1 and 31 of the '341 Patent are similar, but not identical. For comparison, the preamble of Claim 1 of the '525 Patent recites:

> A computer implemented sales system used to facilitate a sales process, the system comprising: . . .

35:63–64. The preamble of Claim 1 of the '341 Patent recites:

> An automated sales system for facilitating a sale of an item or service by intelligently integrating into a single system tools used by a salesperson in a sales process, the automated sales system comprising: . . .

38:64–66; 42:22–24. Although the '341 Patent is a continuation of the '525 Patent, no preamble phrase is transferred intact to the newer patent—all are rephrased or expanded. '341 Patent at 1:6–20. Therefore, it is not a given that the Court's previous finding extends to the preambles of Claims 1 and 31 of the '341 Patent.

For a preamble to be limiting it must be "'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l*, at 808. Defendants simply assume that the preambles of Claim 1 and 31 of the '341 Patent are limiting, and focus their argument on whether the preamble term "intelligently integrating" is so insolubly ambiguous that it renders the claim indefinite. Defendants contend that "intelligently integrating" is insolubly ambiguous because intelligence is a subjective word of degree, and the patent provides no standard for determining whether a sales system has been intelligently integrated rather than merely integrated. Case No. 6:09cv340, Docket No. 433 at 9; Case No. 6:11cv52, Docket No. 338 at 5–6. By Defendants' own

arguments, then, "intelligently integrating" cannot be necessary to give meaning to the claim. Accordingly, the law does not elevate this preamble phrase to a substantive claim limitation.

Furthermore, even if "intelligently integrating" were a limitation, it is not insolubly ambiguous. "Intelligently" refers to the computer-science form of intelligence, which is a mere reference to "processing capability." *See* THE COMPUTER GLOSSARY: THE COMPLETE ILLUSTRATED DICTIONARY, Alan Freedman, 9th Ed. (2001). The subject claims do not employ the word "intelligently" as a word of degree. Rather, the word helps describe the affirmative claim limitations as relating to integration by computer processing.

In sum, Defendants do not provide a meritorious basis for either finding the preamble language a limitation or finding such language insolubly ambiguous. Accordingly, Defendants' motions for summary judgment of indefiniteness of Claims 1 and 31 of the '341 Patent are **DENIED**.

3. **Motion for Summary Judgment of Indefiniteness due to Insolubly Ambiguous Wherein Clause**

Independent Claims 1, 13, 27, 31, 32 and 33 of the '341 Patent recite the following wherein clause:

> wherein at least one subsystem of the plurality of subsystems determines if the event has occurred previously in the sales process and updates another event or task in at least another subsystem of the plurality of subsystems if the operation is automatically initiated

'341 Patent, 39:11–16; 40:36–40; 41:61–65; 44:17–21; 42:44–51; 43:9–13. The Amazon Defendants contend that this wherein clause is insolubly ambiguous and move for summary judgment to invalidate these claims as well as their dependent claims. Case No. 6:11cv52, Docket No. 338 at 8, 14.

The Amazon Defendants contend that the wherein clause is insolubly ambiguous due to three ambiguous terms: "determines if the event has occurred previously;" "if the operation is automatically initiated;" and "updates another event or task." *Id*. at 8–12. First, Defendants contend that the claim does not define what effect the determination mentioned in "determines if the event has occurred previously" has on "updat[ing] another event or task." *Id*. at 8. If the later event or task is updated, there is no indication if that happens only if the event has occurred previously, only if it hasn't occurred previously, or either way. *Id*. at 8–9. The Amazon Defendants contend that neither the specification nor the prosecution history shed light on this issue. *Id*. at 9.

Second, the Amazon Defendants contend that the wherein clause recites the condition "if the operation is automatically initiated," but does not indicate which of the first two steps is conditioned by the automatic initiation. *Id*. The Amazon Defendants argue that this ambiguity, combined with the ambiguity arising from "determines if the event has occurred previously," can result in six different but equally plausible interpretations, thus making it impossible for one of ordinary skill in the art to determine if a product infringes. *Id*.

Third, the Amazon Defendants contend that the step requiring the system to "update[] another event or task" is insolubly ambiguous because the patent does not disclose how to update an event or task. *Id*. at 11–12. As the patent generally refers to an "event" simply as something that has happened, the Amazon Defendants argue it is unclear how an event can be updated. *Id*. at 12. The Amazon Defendants submit that the specification provides no guidance because it refers to updating information or modules but never to updating events. *Id*. at 12–13. Therefore, the Amazon Defendants claim that the updating step is indefinite and, in combination with the

previously mentioned ambiguities, the '341 Patent's independent claims and their dependent claims should be invalidated. *Id*. at 13.

SFA argues that the wherein clause is not indefinite because there is no dependent relationship between the phrases as Defendants contend. Docket 350 at 7. According to SFA, the clause simply requires a subsystem that can perform two functions: (1) determine if the event occurred previously; and (2) update another event or task in another subsystem if the operation is automatically initiated. *Id*. As to the conditional phrase "if the operation is automatically initiated," SFA argues that it unambiguously modifies only the updating phrase. *Id*. at 7–8. As support, SFA points to the rule of the last antecedent, which holds that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Id*. at 8. Finally, SFA argues that the term "update an event or task" is not ambiguous because the specification does disclose the ability to update both tasks and events. *Id*. at 10. For example, the specification discloses that the event manager may "recognize operations carried in the customer satisfaction module . . . and may direct the self management component 102 to automatically insert tasks . . . ." *Id*. at  10 (quoting '341 Patent, 22:40–50). The time management module also recites the ability to update tasks by "drag[ging] and drop[ping]" them. *Id*. at 10 (quoting '341 Patent, 24:8–25). Likewise, SFA contends that the specification recites ways to update events: pairing or grouping (34:38–55), and linking (36:12–23). *Id*. at 11.

A claim may escape a finding of indefiniteness "[i]f the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable people will disagree . . . ." *Exxon Research and Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). In the wherein clause at issue, the claim language does not indicate any dependent relationship, nor is such a relationship necessary to understand the clause as

written. A simple conjunction—"and"—joins the two functions of the claimed subsystem. Therefore, one of ordinary skill can determine that the claims require a subsystem that can perform both the determining step and the updating step recited in the wherein clause. As to the phrase "if the operation is automatically initiated," the most plausible conclusion is the one suggested by SFA under the grammar rules—that this phrase conditions only the nearest antecedent. Although Defendants may disagree about this meaning, the language does not reach a level of indefiniteness such that no meaning is discernible. *Id*.

The Amazon Defendants argue that the limitation "updates another event or task" is insolubly ambiguous because neither the specification nor the prosecution history of the '341 Patent discloses how to update an event. Case No. 6:11cv52, Docket No. 338 at 11. While Defendants' position facially refers to specification support, at the core of this argument is Defendants' allegation that the concept of "updating" is hopelessly unclear because "events" are something that happen, an occurrence. *Id*. at 11–2. It is evident both from the specification (e.g. Figure 21) and the Court's prior constructions that "events" are generally something that happens. In that respect, the Court has already defined "event occurring within the system" as "an operation of the software or hardware making up the sales system." The Court has also defined "event occurring in the sales process," as "a real life action or inaction that occurs in the sales process." Even though "events" are generally occurrences, the specification is clear that events are recorded. This disclosure is implicit throughout the specification, for example in discussing events that are tied together. '341 Patent, 34:38-55. In addition, the specification discloses specific embodiments where "events" are preserved as records in a database:

> The rules may prescribe that on the occurrence of a particular event, ***an event record is examined in the event manager database*** to determine if other related events have occurred, and if the other events have occurred, the rules may indicate that another sales event should be initiated.

'341 at 35:48–53 (emphasis added).

> Typical operation of the event manager 201 will now be described. In the disclosed embodiment, upon the occurrence of an application event using the business object 1908, the business object 1908 exposes 1914, ***the event and associated event handlers to the event managing unit 1904, and the information contained in the exposed event is used by the event managing unit 1902 to create or update a database in the event manager database 1904***.

'341 at 35:23–40 (emphasis added). Given the breadth of the disclosure, including the embodiment that discloses the recording of events in a database, one skilled in the art would understand how to create or update such a record. And more importantly, the skilled artisan would understand the claim language relating to updating an event. In view of the specification, the skilled artisan would recognize that claim language regarding updating an event refers to updating the record of an event, however that record is maintained. Finally, Defendants' argument and much of the briefing relies mostly upon the extent of disclosed embodiments and very little upon an alleged ambiguity in the claim words. Though claims must be read in view of the specification, the issue of indefiniteness is whether the claim words are discernable. Here, the disputed words are discernable in view of the specification and thus, the claim is not indefinite. Therefore, the Court **DENIES** Defendants' motion for summary judgment of indefiniteness of the '341 Patent's independent claims 1, 13, 27, 31, 32 and 33 and their dependent claims.

## CONCLUSION

For the foregoing reasons, the Court interprets the claim language in this case in the manner set forth above. For ease of reference, the Court's claim interpretations are set forth in a table as Appendix A. Further, the Court hereby **DENIES** Defendant Newegg's Motion for Partial Summary Judgment of Indefiniteness (Docket No. 433) and Defendants Amazon, Inc., et al.'s Motion for Partial Summary Judgment of Indefiniteness (Docket No. 338).

**So ORDERED and SIGNED this 11th day of April, 2013.**



**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

**APPENDIX A**

| Claim Term | Court's Construction |
|---|---|
| 1.  sales process | a process of selling goods or services, including two or more phases such as lead generation, time with customer, order management, and customer retention |
| 2.  facilitate/facilitating | No construction |
| 3.  [facilitate a] new action | No construction |
| 4.  computer implemented sales system/automated sales system | No construction |
| 5.  event manager | hardware and/or software that is within a computer implemented sales system |
| 6.  detecting/detect one or more changes in information regarding an event | No construction |
| 7.  event occurring within the system/event occurring in the system | an operation of the software or hardware making up the sales system |
| 8.  the event has occurred previously in the sales process | No construction |
| 9.  context | information already existing within the system that becomes relevant upon the occurrence of an event |
|     infer[ring] . . . a context | logical process by which a context is derived by application of logical rules to known or assumed facts |
| 10. Infer[ring]. . . occurrence of the event [occurring within/in the system] | No construction |
| 11. lead | No construction |
| 12. first memory storing a plurality of rules | No construction |
| 13. time with customer subsystem | No construction |